IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

FCI USA INC., and
FCI AMERICAS TECHNOLOGY INC.,

      Plaintiffs,

   v.

MOLEX INCORPORATED

      Defendant.

Case No. 1:07-cv-00049 (JJF)

**COMPENDIUM OF UNREPORTED CASES CITED IN
DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS, STAY OR TRANSFER**

Josy W. Ingersoll  (#1088)
Adam W. Poff  (#3990)
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899-0391
(302) 571-6600
jingersoll@ycst.com

*Attorneys for Defendant Molex Incorporated*

OF COUNSEL:

John W. Kozak
Dennis R. Schlemmer
Caryn C. Borg-Breen
Leydig, Voit & Mayer Ltd.
Two Prudential Plaza, Suite 4900
Chicago, IL  60601-6780
(312) 616-5600

## INDEX

**Tab**

*Arrow Communication Labs., Inc. v. John Mezzalingua Assocs., Inc.*,
   No. Civ. 05-201-SLR, 2005 WL 2786691 (D. Del. Oct. 26, 2005)................................ 1

*Charles Schwab & Co. v. Duffy*
   No. C 98-03612-MMC, 1998 WL 879659 (N.D. Cal. Dec. 8, 1998)............................ 2

*Genfoot, Inc. v. Payless Shoesource, Inc.*,
   No. 03-398-SLR, 2003 WL 22953183 (D. Del. Dec. 3, 2003)....................................... 3

*Matsushita Battery Industrial Co. v. Energy Conversion Devices, Inc.*,
   No. Civ. A. 96-101-SLR, 1996 WL 328594 (D. Del. Apr. 23, 1996) ........................... 4

*Miteq, Inc. v. Comtech Telecomm. Corp.*,
   No. Civ. A. 02-1336-SLR, 2003 WL 179991 (D. Del. Jan. 23, 2003) ........................... 5

*National Foam, Inc. v. Williams Fire & Hazard Control, Inc.*,
   No. Civ. A. 97-3105, 1997 WL 700496 (E.D. Pa. Oct. 29, 1997)................................. 6

*Sandisk Corp. v. STMicroelectronics, Inc.*,
   No. 05-1300, 2007 WL 881008 (Fed. Cir. Mar. 26, 2007)............................................ 7

*Thales Airborne Sys. S.A. v. Univ. Avionics Sys. Corp.*,
   No. 05-583-SLR, 2006 WL 1749399 (D. Del. June 21, 2006)....................................... 8

*Whelan v. United Pacific Industries, Inc.*,
   No. Civ. A. 02-2519, 2002 WL 31513432 (E.D. Pa. Nov. 1, 2002).............................. 9

## CERTIFICATE OF SERVICE

I, Adam Poff, Esquire, hereby certify that on April 16, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Thomas C. Grimm, Esquire
> MORRIS, NICHOLS, ARSHT & TUNNELL
> 1201 N. Market Street
> Wilmington, DE 19801
> tgrimm@mnat.com

I further certify that I caused a copy of the foregoing document to be served by hand delivery and e-mail on the above-listed counsel of record and on the following counsel in the manner indicated below:

> ### *By E-Mail*
>
> Albert J. Breneisen, Esquire
> KENYON & KENYON LLP
> One Broadway
> New York, NY 10004
> abreneisen@kenyon.com

John W. Bateman, Esquire
Michael M. Shen, Esquire
Yariv Waks, Esquire
KENYON & KENYON LLP
Washington, DC  20005
*jbateman@kenyon.com*
*mshen@kenyon.com*
*ywaks@kenyon.com*


YOUNG CONAWAY STARGATT & TAYLOR, LLP

/S/ ADAM W. POFF (NO. 3990)
_____

Josy W. Ingersoll (No. 1088) *[jingersoll@ycst.com]*
Adam W. Poff (No. 3990) *[apoff@ycst.com]*
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
*Attorneys for Defendant*

049489.1002

# TAB 1

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Arrow Communication Laboratories, Inc. v. John
Mezzalingua Associates, Inc.
D.Del.,2005.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ARROW COMMUNICATION LABORATORIES,
INC., Plaintiff,
v.
JOHN MEZZALINGUA ASSOCIATES, INC.,
Defendant.
JOHN MEZZALINGUA ASSOCIATES, INC.,
Counterclaim Plaintiff,
v.
ARROW COMMUNICATION LABORATORIES,
INC., and Tresness Irrevocable Patent Trust,
Counterclaim Defendants.
**No. Civ. 05-357-SLR.**

Oct. 26, 2005.

Richard D. Kirk, of the Bayard Firm, Wilmington,
Delaware. for Arrow Communication Laboratories,
Inc., and Tresness Irrevocable Patent Trust. R.
Terrance Rader, Charles W. Bradley, Glenn E.
Forbis, Linda D. Kennedy, and Shelly L. Hokenstad
, of Rader, Fishman & Grauer PLLC, Bloomfield
Hills, Michigan, and Lawrence P. Trapani, of
Manlius, New York, of Counsel.
Jeffrey B. Bove, and Kevin M. Baird, of Connolly
Bove Lodge & Hutz LLP, Wilmington, Delaware.
for John Mezzalingua Associates, Inc. James R.
Muldoon, and John A. Wasleff, of Wall, Marjama
& Bilinski, LLP, Syracuse, New York. of Counsel.

MEMORANDUM OPINION
ROBINSON, Chief J.

I. INTRODUCTION

*1 On June 3, 2005, plaintiff Arrow
Communication Laboratories, Inc. ("plaintiff")
filed a complaint in the United States District Court

for the District of Delaware alleging patent
infringement by defendant John Mezzalingua
Associates, Inc. ("defendant"). (D.I.1) Plaintiff
claims to be the lawful owner of all right, title and
interest in U.S. Patent No. 5,745,838 ("the '838
patent"). (*Id.*) Plaintiff alleges that defendant is
infringing the '838 patent by manufacturing, selling
and offering for sale in the United States, and by
importing into the United States, electronic filters
covered by one or more of the claims of the '838
patent. (*Id.*) Plaintiff further alleges that defendant
is actively inducing others to infringe the '838 patent
. (*Id.*)

On June 6, 2005, defendant filed an action for
declaratory judgment of patent non-infringement
and invalidity in the United States District Court for
the Northern District of New York. (D.I.9, ex. A)
On August 11, 2005, plaintiff's infringement suit
was referred to the Magistrate Judge of the District
of Delaware for the purpose of exploring alternative
dispute resolution. (D.I.29) Trial is scheduled for
November 2006. (*Id.*)

II. BACKGROUND

Plaintiff is a corporation organized under the laws
of the State of New York with its principal place of
business in Syracuse, New York. Defendant is a
corporation organized under the laws of the State of
Delaware with its principal place of business in East
Syracuse, New York.

III. STANDARD OF REVIEW

Defendant moves the court to transfer this matter,
pursuant to 28 U.S.C. § 1404(a), to the United
States District Court for the Northern District of
New York. (D.I.6) Section 1404(a) provides: "For
the convenience of the parties and witnesses, in the
interests of justice, a district court may transfer any
civil action to any other district or division where it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2

Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

might have been brought." 28 U.S.C. § 1404(a) (2003). A plaintiff's choice of forum is to be accorded substantial weight and courts should only transfer venue if the defendant is truly regional in character. *See Bergman v. Brainin*, 512 F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir.1970)). A defendant has the burden of establishing that "the balance of convenience of the parties and witnesses strongly favors" transfer. *Id.* Accordingly, "defendants brought into suit in Delaware must prove that litigating in Delaware would pose a 'unique or unusual burden' on their operations" for a Delaware court to transfer venue. *See Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215 (D.Del.1993). A motion to transfer venue may also be granted if there is a related case which has been first filed or otherwise is the more appropriate venue in which to litigate the issues between the parties. *See American Bio Medica Corp. v. Peninsula Drug Analysis Co., Inc.*, 1999 WL 615175, *5 (D.Del.1999).

**\*2** In reviewing a motion to transfer venue, courts have not limited their consideration to the three factors enumerated in § 1404(a) (i.e., convenience of parties, convenience of witnesses, and interests of justice). The Third Circuit, in fact, has indicated that the analysis for transfer is very broad and has urged consideration of "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir.1995) (internal quotations and citation omitted). These factors entail six private and five public interests. Private interests include: (1) the plaintiff's forum preference as manifested by the plaintiff's original forum choice; (2) the defendant's forum preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of the books and records to the extent that the files could not be produced in the alternative forum. *Id.* Public interests include: (1) the enforceability of the judgment; (2) practical

considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; and (5) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

In considering the private interest factors under *Jumara*, the court, consistent with Third Circuit precedent, adheres to the notion that transfer is not to be liberally granted and plaintiff's choice of forum is a paramount consideration. The deference afforded plaintiff's choice of forum will apply as long as a plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp.*, 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.*, 2001 WL 1617186 (D.Del. Nov. 28, 2001); *Cont'l Cas. Co. v. Am. Home Assurance Co.*, 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually regarded as less inconvenient to a plaintiff if the plaintiff has not chosen its "home turf" or a forum where the alleged wrongful activity or injury occurred, the "plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re ML-Lee Acquisition Fund II, L.P.*, 816 F.Supp. 973, 976 (D.Del.1993).

## IV. DISCUSSION

As an initial matter, the court notes that venue is proper in Delaware as defendant is incorporated under the laws of the State of Delaware. Nevertheless, the District of Delaware is not plaintiff's "home turf," since it maintains its principal place of business in New York. In this sense, it appears to be more convenient to both the plaintiff and defendant to try the instant litigation in the Northern District of New York. Indeed, this court previously recognized that,
**\*3** [w]hen the plaintiff has chosen to bring suit in a district that is not plaintiff's "home turf" and that has no connection to any acts giving rise to the lawsuit, convenience to the plaintiff is not as great

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

as it would be were plaintiff litigating at or near plaintiff's principal place of business or at the site of activities at issue in the lawsuit.

*Burstein v. Applied Extrusion Techs. Inc.,* 829 F.Supp. 106, 110 (D.Del.1992) (citing *Sports Eye, Inc. v. Daily Racing Form, Inc.,* 565 F.Supp. 634, 637 (D.Del.1983) (internal citations omitted)). Moreover, the locus of the alleged infringement occurred in Syracuse, New York. If defendant has infringed the '838 patent, such infringement was done primarily in Syracuse, where the accused products were developed, manufactured and sold. Based on the evidence offered, the majority of the witnesses with discoverable information also are located in and around Syracuse, New York. In addition, most of defendant's documents relating to the production, promotion, marketing and sales of the accused product are maintained in central New York. On this basis, the court concludes that the private factors under *Jumara* weigh in favor of transferring the case at bar to the United States District Court for the Northern District of New York.

One of the public interest factors under *Jumara* involves the administrative considerations of the courts. More than fifty years ago, the Third Circuit Court of Appeals adopted the "first-filed rule" where "in all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. M'Iver,* 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently, the second-filed action is usually stayed or transferred to the court where the first-filed action is pending. *Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171 (E.D.Pa.1991); *Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.,* 2001 U.S. Dist. LEXIS 18547, Civil Action No. 01-532-GMS, 2001 WL 1414868 (D.Del.2001). The rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." *E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is within the discretion of the trial court. *Id.* at 972, 977. Invocation of the rule will usually be the norm, not the exception. Courts

presented with exceptional circumstances may exercise their discretion to depart from the first-filed rule. *Id.* at 979. In this case, it is undisputed that the present patent infringement suit in the District of Delaware was first filed and involves the same patent and the same issues as the declaratory judgment action filed thereafter by defendant in the Northern District of New York. Therefore, the burden is on defendant to present some exceptional circumstances why the court should depart from the first-filed rule.

*4 In support of its argument supporting transfer, defendant states that all of its relevant witnesses reside in New York, all the documents and records related to the accused product are in New York, and the subject matter of the lawsuit has significant local interest in New York. (D.I. 7 at 1-3) In contrast, evidence suggests that the District of Delaware has no connection to the subject matter of plaintiff's lawsuit, except that defendant is incorporated there. Defendant contends that pursuing the lawsuit in the District of Delaware will generate "significant expenses and other burdens" to the parties. (*Id.* at 3-4) Given this evidence and noting the regional character of the parties, with the primary business operations of each party located in the Northern District of New York, there are exceptional circumstances present which require the court to depart from the first-filed rule.

In considering the other public interest factors under *Jumara,* the court notes that the parties have taken significant steps to advance the instant litigation in the District of Delaware. The parties have exchanged initial disclosures, are set to explore settlement with the magistrate judge, and have arranged a schedule for litigation, with trial set to occur in about one year. These factors weigh in favor of maintaining the litigation in the District of Delaware. However, factors are also present which weigh in favor of transferring the case to the Northern District of New York. First, defendant's declaratory judgment action, which involves the same subject matter as this case, is currently pending in the United States District Court for the Northern District of New York.[FN1] In addition, both parties are regional in character and operate their businesses out of central New York,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 4

Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

suggesting that the Northern District of New York is the most appropriate venue for the parties to litigate. Although a suit in this matter was first filed in Delaware, the public interest factors weighing in favor of keeping the litigation in the District of Delaware are not compelling. The court, therefore, concludes that the public interest factors under *Jumara* favor transferring venue to the Northern District of New York.

> FN1. By stipulation of the parties, that case has been stayed pending this court's decision on defendant's motion to transfer venue. (N.D. N.Y., Case No. 05-CV-703 (NAM/DEP), D.I. 6) The court has no reason to believe that, once the stay is lifted, the declaratory judgment action in the Northern District of New York will move forward with any less swiftness than that with which the instant case has progressed in the District of Delaware. The familiarity with the parties and subject matter possessed by the Northern District of New York will certainly promote expeditiousness in handling the case.

### V. CONCLUSION

On balance, the court finds that the public interest factors and private interest factors weigh strongly in favor of transferring venue in this case. The court, as a result, concludes that defendant has sufficiently proven that litigating in the District of Delaware would pose a unique burden which merits transfer of venue. For the reasons stated, defendant's motion to transfer is granted. An order consistent with this memorandum opinion shall issue.

### ORDER

At Wilmington this 26th day of October, 2005, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant's motion to transfer (D.I.6) is granted.

2. The above-captioned action shall be transferred to the United States District Court for the Northern District of New York.

D.Del.,2005.
Arrow Communication Laboratories, Inc. v. John Mezzalingua Associates, Inc.
Not Reported in F.Supp.2d, 2005 WL 2786691 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in F.Supp.2d                                                                                        Page 1

Not Reported in F.Supp.2d, 1998 WL 879659 (N.D.Cal.), 49 U.S.P.Q.2d 1862
**(Cite as: Not Reported in F.Supp.2d)**

▷
Charles Schwab & Co., Inc. v. Duffy
N.D.Cal.,1998.

United States District Court, N.D. California.
CHARLES SCHWAB & CO., INC, Plaintiff,
v.
Howard R. DUFFY, III, et al., Defendants.
**No. C98-03612 MMC.**

Dec. 8, 1998.

ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS FOR LACK OF PERSONAL
JURISDICTION AND, ALTERNATIVELY,
GRANTING DEFENDANTS' MOTION TO
DISMISS UNDER 28 U.S.C. § 2201(a)

CHESNEY, J.

**\*1** This matter came on regularly for hearing on December 4, 1998. The moving parties in this matter, defendants Howard R. Duffy III and James P. Duffy ("Duffy"), argue (1) that Schwab's complaint for declaratory relief should be dismissed because this Court lacks personal jurisdiction and (2) that the complaint should be dismissed or transferred because a direct infringement action subsequently filed by Duffy in New Jersey should have priority.

Having considered the papers submitted in support of and in opposition to the motion, as well as the arguments of counsel at the hearing, the Court rules as follows.

(1) The act of sending several "threatening" letters to California is insufficient to create personal jurisdiction in this case. *See Cascade Corp. v. Hiab-Foco AB,* 619 F.2d 36, 37-38 (9th Cir.1980); *see also Douglas Furniture Co. of California, Inc., v. Wood Dimensions, Inc.,* 963 F.Supp. 899, 901-03 (C.D.Cal.1997); *Stairmaster Sports/Medical Products, Inc., v. Pacific Fitness Corp. .,* 916 F.Supp. 1049, 1053-54 (W.D.Wash.1994). While

Schwab has noted that several district courts appear to have taken a contrary view, the Ninth Circuit's decision in *Cascade* is controlling, as the district court determined in *Stairmaster.*[FN1]

> FN1. The Court is unconvinced that *Cascade,* which is directly on-point with respect to the issue presented, is no longer controlling law in light of the Supreme Court's decision in *Burger King v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Plaintiff offers no argument regarding how or why *Burger King* undermines the Ninth Circuit's holding in *Cascade.*

In addition, Duffy's unsuccessful attempts to promote a business relationship with Schwab are insufficient to create jurisdiction in this case under either a contracts analysis or a torts analysis. *See Douglas,* 963 F.Supp. at 902 (noting that, in the Ninth Circuit, a party may assert jurisdiction based upon either contract or tort analysis). Duffy's attempts to cultivate a business relationship did not result in the formation of a contract, let alone a contract that envisioned ongoing activity in California. As a result, these attempts do not constitute purposeful availment under a contracts analysis of personal jurisdiction. *See Burger King v. Rudzewicz,* 471 U.S. 462, 473-76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (noting that merely contracting with a party from the forum state does not, in itself, create jurisdiction). Nor did these attempts involve any tortious conduct on the part of Duffy. *See, e.g., California Software, Inc., v. Reliability Research, Inc.,* 631 F.Supp. 1356, 1363-64 (C.D.Cal.1986) (holding that, under the "effects" test of the Ninth Circuit in claims asserting personal jurisdiction based on a torts analysis, communications may create jurisdiction when they are calculated to cause injury in California). The motion to dismiss is therefore GRANTED on the grounds that this Court may not, consistent with due

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 879659 (N.D.Cal.), 49 U.S.P.Q.2d 1862
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

process, exercise personal jurisdiction over Duffy in this case.

(2) Even if the Court had jurisdiction over Duffy, the circumstances in this case justify the Court exercising its discretion not to hear a case filed under the Declaratory Judgments Act. *See* 28 U.S.C. § 2201(a) (1998); *see also Brillhart v. Excess Ins. Co. Of America,* 316 U.S. 491, 494-95, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942) (holding that a district court has discretion whether to hear a case filed under the Declaratory Judgments Act). In this case, it is appropriate to depart from the first-to-file rule and dismiss the action because the instant action appears to be an anticipatory suit, *see Capitol Records, Inc., v. Optical Recording Corp.,* 810 F.Supp. 1350, 1353-54 (S.D.N.Y.1992). Applying the first-to-file rule would thwart settlement negotiations, as intellectual property holders would feel compelled to file suit rather than communicate with an alleged infringer. *Id.* Moreover, permitting this case to continue would reward a race to the courthouse that appears to have been "won" by Schwab, at least in part, due to a letter sent to Duffy's attorney that may have misled Duffy as to Schwab's settlement intentions. *See Mission Ins. Co. V. Puritz Fashions Corp.,* 706 F.2d 599, 601-03 (5th Cir.1983) (dismissing action filed under 28 U.S.C. § 2201(a) where court found that plaintiff caused defendant to delay filing suit by representing that plaintiff was considering the merits of the claim). Accordingly, even if personal jurisdiction could properly be exercised over Duffy in this case, the Court would exercise its discretion to dismiss the action under the Declaratory Judgments Act. *See id.* at 602 (upholding district court's dismissal of first-filed action in anticipatory suit case).

**\*2** For the reasons stated, the motion to dismiss is hereby GRANTED.

The clerk shall close the file.

IT IS SO ORDERED.

N.D.Cal.,1998.
Charles Schwab & Co., Inc. v. Duffy
Not Reported in F.Supp.2d, 1998 WL 879659 (N.D.Cal.), 49 U.S.P.Q.2d 1862

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 22953183 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Genfoot, Inc. v. Payless Shoesource, Inc.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
GENFOOT, INC., Plaintiff,
v.
PAYLESS SHOESOURCE, INC. Defendant.
**No. Civ. 03-398-SLR.**

Dec. 3, 2003.

Warren Thomas Pratt, Drinker, Biddle & Reath,
LLP, Wilmington, DE, for Plaintiff.
Tanya E. Pino, Prickett, Jones & Elliott,
Wilmington, DE, for Defendant.

MEMORANDUM ORDER
ROBINSON, J.

### I. INTRODUCTION

*1 Plaintiff filed suit against defendant on April 17,
2003 alleging infringement of U.S. Patent No.
6,237,252 ("the '252 patent") pursuant to 35 U.S.C.
§§ 271, 281, 283, 284 and 285. (D.I.1) On July 9,
2003, defendant moved, pursuant to 28 U.S.C. §
1404(a),[FN1] to transfer venue to the District of
Kansas, and to consolidate the case with *Payless
Shoesource, Inc. v. Genfoot,* Civil Action No.
02-4160-SAR. (D.I.6) The matter is fully briefed.
(D.I.7, 8) For the reasons that follow the motion to
transfer will be granted.

> FN1. Title 28, Section § 1404(a) provides:
> For the convenience of parties and
> witnesses, in the interest of justice, a
> district court may transfer any civil action
> to any other district or division where it
> might have been brought.

### II. BACKGROUND

Plaintiff is Canadian corporation with its principal
place of business in Montreal, Quebec, Canada.
(D.I.1) Plaintiff is the owner of the '252 patent
which, essentially, protects technology related to a
draw cord closure on the upper part of a shoe boot.
Plaintiff alleges defendant has sold and continues to
sell a boot that includes technology protected by the
'252 patent. In the complaint, plaintiff describes
defendant as the operator of retail stores selling
footwear in all fifty states. In the motion to transfer,
however, defendant explains that there are two
distinct entities denominated "Payless ShoeSource,
Inc." (D.I.7, Ex. B) Defendant, a Delaware
corporation, "functions solely as a holding company
" and "conducts no activities relating to creating,
manufacturing, buying of selling footwear or other
merchandise of any type." (D.I.7, Ex. B) The
second entity, Payless ShoeSource, Inc., is a
Missouri corporation and "an indirect,
wholly-owned subsidiary of the Delaware holding
company whose sole function is to conduct retail
sales of Payless merchandise in the United States,
the Virgin Islands and Puerto Rico." (*Id.*) A third
entity, Payless ShoeSource Worldwide, is a Kansas
corporation and is an "indirect, wholly-owned
subsidiary of Delaware Holding Company." (*Id.*)

On October 18, 2002, the second entity, Payless
ShoeSource, Inc., filed a complaint for declaratory
judgment against Genfoot, Inc. in the United States
District Court for the District of Kansas. (D.I.7, Ex.
A) Payless seeks judgment of patent invalidity,
unenforceability and noninfringement on the '252
patent. (*Id.*) On April 16, 2003, Genfoot moved to
dismiss based on lack of personal jurisdiction.
(D.I.8) Genfoot's motion remains pending.

### III. DISCUSSION

More than fifty years ago, the Third Circuit Court
of Appeals adopted the "first-filed rule" where "[i]n
all cases of federal concurrent jurisdiction the court
which first had possession of the subject must

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 2

Not Reported in F.Supp.2d, 2003 WL 22953183 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

decide it." *Crosley Corp. v. Hazeltine Corp.,* 122          END OF DOCUMENT
F.2d 925, 929 (3d Cir.1941) (quoting *Smith v.
McIver,* 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)
). Consequently, the second filed action should be
stayed or transferred to the court where the first
filed action is pending. *Peregrine Corp. v.
Peregrine Indus., Inc.,* 769 F.Supp. 169, 171
(E.D.Pa.1991); *Dippold-Harmon Enterprises, Inc.
v. Lowe's Companies, Inc.,* Civil Action No.
01-532-GMS, 2001 WL 1414868 (D.Del.2001).
The rule "encourages sound judicial administration
and promotes comity among federal courts of equal
rank." *E.E.O.C. v. University of Pennsylvania,* 850
F.2d 969, 971 (3d Cir.1988). The decision to
transfer or stay the second action is within the
discretion of the trial court. *Id.,* at 972, 977.
However,
**\*2** invocation of the rule will usually be the norm,
not the exception. Courts must be presented with
exceptional circumstances before exercising their
discretion to depart from the first-filed rule.

*Id.* at 979.

The court finds this case involves the same parties,
the same patent and same legal theories as the first
filed action in the District of Kansas. A transfer of
the subsequently filed Delaware action will promote
judicial administration and consistency of results.


IV. CONCLUSION

For the reasons stated, at Wilmington, this 2d day of
December, 2003,

IT IS ORDERED that:

1. The motion to transfer is granted. (D.I.6)

2. The above-captioned action shall be transferred
to the United States District Court for the District of
Kansas.

D.Del.,2003.
Genfoot, Inc. v. Payless Shoesource, Inc.
Not Reported in F.Supp.2d, 2003 WL 22953183
(D.Del.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Matsushita Battery Industrial Co., Ltd. v. Energy
Conversion Devices, Inc.
D.Del.,1996.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
MATSUSHITA BATTERY INDUSTRIAL CO.,
LTD., Toyota Motor Corporation, and Toyota
Motor Sales, U.S.A., Inc., Plaintiffs,
v.
ENERGY CONVERSION DEVICES, INC. and
Ovonic Battery Company, Inc. Defendants.
**No. CIV. A. 96-101-SLR.**

April 23, 1996.

Kent A. Jordan, of Morris, James, Hitchens &
Williams, Wilmington, Delaware, for plaintiff. Of
Counsel for plaintiff Matsushita Battery Industrial
Co.: Morton Amster, Michael J. Berger, and
Abraham Kasdan, of Amster, Rothstein &
Ebenstein, New York, New York; Of Counsel for
plaintiffs Toyota Motor Corporation and Toyota
Motor Sales, U.S.A., Inc.: Edward W. Greason, and
Arthur D. Gray, of Kenyon & Kenyon, New York,
New York.
Bruce M. Stargatt, Josy W. Ingersoll, and John W.
Shaw, of Young, Conaway, Stargatt & Taylor,
Wilmington, Delaware, for defendants. Of Counsel:
Chester T. Kamin, David J. Bradford, and Jeffrey
A. Koppy, of Jenner & Block, Chicago, Illinois;
Lawrence G. Norris, of Rothwell, Figg, Ernst &
Kurz, Washington, D.C.; and Marvin S. Siskind,
Vice President/Patent Counsel, Energy Conversion
Devices, Inc., Troy, Michigan.

MEMORANDUM OPINION
SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 Plaintiff Matsushita Battery Industrial Co. Ltd. ("
MBI") filed this declaratory judgment action on

February 28, 1996.[FN1] Plaintiffs seek a declaration
of invalidity and non-infringement of Ovonic's
United States Patent Number 5,348,822 ("'822
patent"). On February 29, 1996, defendants Energy
Conversion Devices, Inc. ("ECD") and Ovonic
Battery Company Inc. ("Ovonic") filed suit against
plaintiffs in the United States District Court for the
Eastern District of Michigan, claiming infringement
of the same patent. Currently before the court are
defendants' motion to stay or dismiss the
declaratory judgment action or, in the alternative, to
transfer the case to the Eastern District of Michigan
(D.I. 6) and plaintiffs' motion to enjoin defendants'
infringement suit in the Eastern District of
Michigan. (D.I. 19) The motions have been fully
briefed, and the court heard oral arguments on April
10, 1996. For the reasons set forth below,
defendants' motion will be denied and plaintiffs'
motion to enjoin will be granted.

II. BACKGROUND

Defendant ECD and its subsidiary Ovonic are
Delaware corporations whose principal place of
business is Troy, Michigan. (D.I. 8 at Ex. B) Over
the past fifteen years, Ovonic has developed new
technology in the field of rechargeable nickel metal
hydride ("NiMH") batteries, and holds numerous
patents in this area. (D.I. 8 at Ex. B) Batteries made
with this new technology have the advantages of
long life, no memory effect, and no environmentally
hazardous materials. Ovonic has found particular
success in marketing its technology for use in "
consumer batteries" (e.g., batteries for camcorders,
laptop computers, and cellular telephones) and in
the development of a commercially viable electric
vehicle ("EV") battery. (D.I. 8 at Ex. B) In June
1994, Ovonic formed a joint venture with General
Motors Corporation ("GM") to produce and market
batteries for EVs on a worldwide basis. (D.I. 8 at
Ex. B) Ovonic has also been awarded several
contracts by the United States Advanced Battery
Consortium ("USABC"), which is composed of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Ford Motor Company, GM, and Chrysler Corporation, to further develop EV battery technology. (D.I. 8 at Ex. B)

Plaintiff MBI, a Japanese corporation with its headquarters in Osaka, operates worldwide as one of the largest producers of batteries. (D.I. 11 at ¶ 3) MBI has also conducted extensive research and development in the area of NiMH batteries. Toyota, a Japanese corporation, and Toyota Sales, which is incorporated and based in California, have joined MBI in testing programs for MBI's EV batteries. (D.I. 11 at ¶¶ 4, 5, 16, 17)

In 1992, defendants and MBI negotiated a series of licensing agreements concerning NiMH technology for use in consumer batteries. During those negotiations, the parties apparently discussed licensing EV battery technology as well, but were unable to reach agreement. They did, however, execute a side letter in which they agreed "if necessary and appropriate, to explore the possibility of arriving at mutually acceptable terms for the grant to MBI of patent licenses under ECD/OBC's Hydride Battery Patents for large hydride battery applications such as electric vehicle propulsion." (D.I. 8 at Ex. 1)

**\*2** Between 1992 and 1995, ECD/Ovonic and MBI continued to communicate while working independently to develop NiMH batteries for EV application. The record indicates that fairly frequent correspondence, meetings between engineers from both companies, and an exchange of sample batteries took place during this period. (D.I. 8 at Ex. I-K)

In May 1995, Stanford Ovshinsky, President and CEO of ECD, contacted Steve Kawauchi, Executive Vice President of MBI, and requested a meeting to discuss ECD's proposal for the licensing of EV battery technology. (D.I. 21 at B109) Two months later, MBI broke off negotiations, indicating through its attorney that it had "no interest in pursuing the ECD/OBC Proposal given to Mr. Kawauchi by Mr. Ovshinsky and also does not have any counterproposal to make to ECD/OBC." (D.I. 21 at B111) In response to this communication, ECD notified MBI that it was prepared to take legal

action, ostensibly for patent infringement. (D.I. 8 at Ex. B-2) After a conciliatory reply from MBI and a letter from GM to MBI's parent company urging that negotiations resume, ECD decided not to file suit, and negotiations of some sort apparently continued. (D.I. 8 at Ex. B-4, B-5, B-6, B-7; D.I. 21 at B113-B129)

The final breakdown in negotiations, which led to this suit, occurred after ECD learned that Toyota planned a program for testing EVs in the United States using NiMH batteries manufactured by MBI. On February 5, 1996 ECD sent letters protesting this action to Toyota Sales, Southern California Edison Company (which was involved in the planned project), and MBI. (D.I. 21 at B89-92; D.I. 8 at Ex. B-8) In its letter to MBI, ECD stated, " ECD would urge Matsushita to accelerate its discussions about the possibilities for the GM Ovonic J[oint] V [[[enture]. If a definite plan is developed for MBI participation and investment in GM Ovonic, ECD is prepared to resume discussions with MBI to resolve our outstanding issues in a satisfactory manner." (D.I. 8 at Ex. B-8) In response to this communication, ECD received a letter dated February 15 which stated, in its entirety, "Your letter to Steve Kawauchi was received while he is on a business trip out of the country. He will respond to you on his return." (D.I. 8 at Ex. B-9) On February 26, 1996 Ovonic, through its attorney, notified MBI of its belief that MBI was infringing Ovonic's '822 patent by supplying Toyota with EV batteries for testing in the United States. Ovonic demanded that MBI cease and desist or Ovonic would take legal action. (D.I. 8 at Ex. B-10) Two days later, without responding further to either of ECD/Ovonic's letters, MBI filed the instant declaratory judgment action.

### III. DISCUSSION

A. Dismissal under the Declaratory Judgment Act

Plaintiffs filed this suit pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. The Act gives the court before which a declaratory judgment action is brought discretion to hear, or refuse to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 3

Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

hear, the suit. *Wilton v. Seven Falls Co.,* 115 S. Ct. 2137 (1995); *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 936 (Fed. Cir. 1993), *cert. denied,* 114 S. Ct. 1126 (1994); *Samuel Goldwyn, Inc. v. United Artists Corp.,* 113 F.2d 703, 709 (3d Cir. 1940). In general, a court may not dismiss a suit for a declaration of noninfringement on the ground that an infringement suit was subsequently filed. *Genentech,* 998 F.2d at 937; *see generally Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir. 1941), *cert. denied,* 315 U.S. 813 (1942) ("In all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it."). This "first filed rule" gives the district court hearing the first filed case the power to enjoin later filed cases involving the same parties and the same issues. *EEOC v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir. 1988), *aff'd,* 493 U.S. 182 (1990).

**\*3** There are, however, certain recognized exceptions to the first filed rule, and other exceptions may be made "when justice or expediency requires, as in any issue of choice of forum." *Genentech,* 998 F.2d at 937, *citing Kahn v. General Motors Corp.,* 889 F.2d 1078, 1081-83 (Fed. Cir. 1989). Defendants urge the court to find an exception to the first filed rule in this case because plaintiffs engaged in an improper "race to the courthouse" in order to avoid litigating in the Eastern District of Michigan. Defendants maintain that plaintiffs filed this action in bad faith, knowing that defendants were awaiting a response to their request for further negotiations. To allow this action to proceed, they argue, would penalize good faith efforts to negotiate and reward precipitous litigation. In addition, defendants argue that the comparative convenience of each forum to the parties and nonparty witnesses weighs in favor of dismissing this action in favor of the later filed suit.

Whether a party has filed a declaratory judgment action anticipatorily or in bad faith is a proper factor for the court to consider in deciding whether to dismiss a first filed action. *Serco Services Co., L.P. v. Kelley Co., Inc.,* 51 F.3d 1037, 1039-40 (Fed. Cir. 1995); *Davox Corp. v. Digital Systems Int'l, Inc.,* 846 F. Supp. 144, 148 (D. Mass. 1993); *Bausch & Lomb Inc. v. Alcide Corp.,* 684 F. Supp.

1155, 1158-60 (W.D.N.Y. 1987). In *Serco Services,* the Federal Circuit held that "we cannot say that it was an abuse of discretion to consider that [plaintiff] intended to preempt [defendant's] infringement suit, as the district court found, as one factor in the decision whether to dismiss the declaratory suit in favor of [the] subsequent infringement action." *Serco Services,* 51 F.3d at 1040 (emphasis added).

In the case at bar, the parties have offered conflicting versions of the tenor of their negotiations. Defendants maintain that they had a long and fruitful history of negotiations with plaintiffs, that they were patiently and in good faith awaiting a reply from Mr. Kawauchi, and that they were shocked to discover that plaintiffs had filed suit without having responded to defendants' offer to negotiate. Plaintiffs, on the other hand, characterize their decision to file suit as a reasonable response to defendants' repeated demands that MBI enter into a joint venture, despite MBI's emphatic rejection of previous such demands. Having received a letter from defendants explicitly threatening imminent legal action, plaintiffs argue that they reasonably and in good faith made the decision to file for declaratory judgment.

After reviewing the numerous affidavits and items of correspondence submitted by the parties, the court finds that the record is unclear as to the precise tone of the negotiations between the parties. Although MBI may have acted hastily in filing suit without responding to ECD/Ovonic's February 1996 letters, despite its indications that Mr. Kawauchi would respond, the court cannot conclude from the record before it that an improper race to the courthouse took place. Furthermore, even if plaintiffs' actions could be considered anticipatory, absent any other factors weighing toward dismissal or transfer, the court declines to grant defendants' motion on this ground alone. *See Id.*[FN2]

B. Transfer of Venue

**\*4** Title 28, Section 1404(a) provides:
For the convenience of parties and witnesses, in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                          Page 4

Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
(Cite as: Not Reported in F.Supp.)

interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Congress intended through Section 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988). "The standard under which transfer applications are considered requires district courts to consider the convenience of parties and witnesses, the interest of justice, and whether the action could have been brought in the transferee court." *SportsMEDIA Technology Corp. v. Upchurch,* 839 F. Supp. 8, 9 (D. Del. 1993). The parties do not dispute that the Eastern District of Michigan is a proper venue for this action.

A plaintiff's choice of forum should not be lightly disturbed. As a general rule, "[b]ecause plaintiffs' choice of forum is accorded substantial weight, the burden is on the defendants to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin,* 512 F. Supp. 972, 973 (D. Del. 1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22,25 (3d Cir. 1970) , *cert denied,* 401 U.S. 910 (1971) (emphasis added). Plaintiffs' choice of forum is "paramount." *E.g., Wesley-Jessen Corp. v. Pilkington Visioncare,* 157 F.R.D. 215, 216 (D. Del 1993).

### 1. Convenience of Parties and Witnesses

Defendants contend that "the Eastern District of Michigan is an unusually appropriate and convenient forum for all concerned." They assert that defendants and all of their likely fact witnesses reside in Michigan, that plaintiffs regularly conduct business there, and that third party witnesses, "all relevant files and corporate records," and Ovonic's testing facilities are located in Michigan.

Even if the Eastern District of Michigan were the more convenient trial forum for both the parties and the non-party witnesses, this factor would not be sufficient to compel a transfer. This case is analogous to *Wesley-Jessen Corp. v. Pilkington*

*Visioncare, Inc.,* 157 F.R.D. 215 (D. Del. 1993). In that case, a defendant made a similar showing regarding the locations of parties, documents, and nonparty witnesses. The court concluded that transfer was inappropriate for three reasons. First, the court noted that, for a company engaged in business throughout the United States, the claim that litigation away from the most convenient forum is burdensome is somewhat suspect. *Wesley-Jessen,* 157 F.R.D. at 218. Defendants in this case have argued that they do not operate nationally, and that their small size would result in a disproportionate burden on them if they were forced to litigate in Delaware. The record indicates, however, that defendants have attended meetings and negotiations throughout the world. The second factor noted by the court in *Wesley-Jessen* is the incorporation of defendant in Delaware. Here again, the court outlined the heightened burden on such a business. " Absent some showing of a unique or unexpected burden, these corporations should not be successful in arguing that litigation in their state of incorporation is inconvenient." *Id.* Finally, the court noted the somewhat archaic nature of the " convenience of the parties" factor in determining a motion to transfer:

*\*5* A third reason for denying the motion to transfer is that technological advances have substantially reduced the burden of having to litigate in a distant forum .... These technologies have shortened the time it takes to transfer information, reduced the bulk or size of documents or things on which information is recorded and can be transferred and have lowered the cost of moving that information from one place to another.

*Id.* The court also notes that discovery in this case will take place throughout the United States and in Japan. The overall burden of litigating this case, therefore, will likely be the same regardless of where the trial itself is to be held. In light of these factors, the court finds that defendants have not demonstrated that litigation in Delaware imposes on them a unique or unexpected burden.

### 2. Interests of Justice

Defendants argue that a transfer is warranted in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

interests of justice. In analyzing this claim, the court must consider judicial resources, cost to the parties, access to proof, and the availability of compulsory process. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 821 F. Supp. 962, 966 (D. Del. 1993). No party contends that a transfer would have any impact on judicial resources or cost to the parties. Addressing compulsory process, defendants maintain that several important witnesses, who according to defendants are likely to be reluctant to testify, reside outside the reach of the court's subpoena power. The court addressed an analogous contention in *Critikon,* 821 F. Supp. at 967. In that case, defendant

ha[d] not represented to the [c]ourt that [the third party witness] would be unwilling to testify at trial voluntarily. Because [the witness] is a former employee of [defendant], ... the [c]ourt must assume that he would be willing to testify absent a subpoena.

In this case, defendants have offered the affidavit of David J. Bradford, who represented defendants in another patent infringement case in this district. Based on his experience in that case, Mr. Bradford asserts that GM, GM-Ovonic, Ford Motor Company, and USABC "will not voluntarily testify or produce documents in this case." (D.I. 29 at Ex. 3) Defendants have not specifically identified any witnesses who have refused to testify; despite Mr. Bradford's opinion, the court does not find defendants' showing of the necessity of compulsory process sufficient to warrant transfer.

With respect to the availability of records, this court held in *Critikon*:

The location of documents, in the context of access to proof, in a document-intensive case such as this can be misleading. No matter where the trial is held, [defendant's] ... counsel and [plaintiff's] ... counsel will be required to travel to [various places] to select and produce the requested discovery. Regardless of where trial is held, the documents will be copied and mailed to the offices of counsel and subsequently transported to trial.

**\*6** 821 F. Supp. at 966-67. In light of the wide geographical scope of discovery in this case, the possibility that the nonparties mentioned in Mr. Bradford's affidavit will have relevant evidence and

will request protective orders in the Eastern District of Michigan is likewise unpersuasive. For these reasons, the court finds that defendants have not established that this factor compels the transfer of this action.

Based on the record as it presently stands, defendants have failed to demonstrate that the interests of justice dictate transferring this action.

### IV. CONCLUSION

For the forgoing reasons, defendants' motion to stay or dismiss the declaratory judgment action or, in the alternative, to transfer the case to the Eastern District of Michigan will be denied. Plaintiffs' motion to enjoin defendants' infringement suit in the Eastern District of Michigan will be granted. An order consistent with this opinion shall issue.

> FN1. Toyota Motor Corporation ("Toyota" ) and Toyota Motor Sales, U.S.A., Inc. (" Toyota Sales") were added as plaintiffs in an amended complaint dated March 7, 1996. (D.I. 11)

> FN2. Defendants also argue that Michigan is a more convenient forum for the parties and nonparty witnesses. As discussed fully in the following section, the court finds this argument unpersuasive. Thus, the court will not consider convenience a factor in deciding whether to make an exception to the first filed rule.

D.Del.,1996.
Matsushita Battery Industrial Co., Ltd. v. Energy Conversion Devices, Inc.
Not Reported in F.Supp., 1996 WL 328594 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 179991 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Miteq, Inc. v. Comtech Telecommunications Corp.
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
MITEQ, INC., Plaintiff,
v.
COMTECH TELECOMMUNICATIONS CORP.,
Defendant.
**No. Civ.A. 02-1336-SLR.**

Jan. 23, 2003.

MEMORANDUM ORDER
ROBINSON, J.

## I. INTRODUCTION

*1 On July 29, 2002, plaintiff Miteq, Inc. filed this action against defendant Comtech Telecommunications, Corp. seeking a declaratory judgment that it does not infringe U.S. Patent No. 5,666,646 ("the '646 patent") owned by a subsidiary of defendant, or that the '646 patent is invalid. (D.I.1) Presently before the court is defendant's motion to dismiss, stay, or transfer this action. (D.I.6) This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. For the reasons that follow, the motion shall be granted.

## II. BACKGROUND

Plaintiff is a Delaware corporation with its principal place of business in Hauppauge, New York. (D.I. 14 at 5) Plaintiff designs and manufactures satellite communications equipment, including the accused infringing products. (*Id.* at 7) Defendant is a Delaware corporation with its principal place of business in Melville, New York. (D.I.8) Comtech EF Data ("EF Data") is a wholly owned subsidiary of defendant with its principal place of business in Tempe, Arizona. (*Id.*) EF Data is the assignee of the

'646 patent entitled "Radio Frequency (RF) Converter System with Distributed Protection Switching and Method Transfer." (*Id.*) Defendant and EF Data design and manufacture satellite communications equipment utilizing the technology of the '646 patent.

On April 10, 2002, defendant filed a complaint against plaintiff in the United States District Court for the District of Arizona alleging infringement of the '646 patent. (D.I. 7 at 3) However, defendant asserts that it did not serve plaintiff in the Arizona case until August 1, 2002, in order to "permit a dialogue between the parties." (*Id.*) Prior to being served in the Arizona case, plaintiff filed this action and served defendant on July 29, 2002, seeking declaratory judgment of non-infringement and invalidity of the '646 patent. (D.I.1) Defendant now seeks to either dismiss this action, stay this case until resolution of the Arizona litigation, or transfer this case to the District of Arizona. (D.I.7)

## III. DISCUSSION

More than fifty years ago, the Third Circuit Court of Appeals adopted the "first-filed rule" where "in all cases of federal concurrent jurisdiction the court which first had possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. M'Iver,* 22 U.S. (9 Wheat.) 532, 6 L.Ed. 152 (1824)). Consequently, the second filed action should be stayed or transferred to the court where the first filed action is pending. *Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 171 (E.D.Pa.1991); *Dippold-Harmon Enterprises, Inc. v. Lowe's Companies, Inc.,* 2001 U.S. Dist. LEXIS 18547, Civil Action No. 01-532-GMS, 2001 WL 1414868 (D.Del.2001). The rule "encourages sound judicial administration and promotes comity among federal courts of equal rank." *E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 971 (3d Cir.1988). The decision to transfer or stay the second action is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2003 WL 179991 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

within the discretion of the trial court. *Id.* at 972, 977. However, invocation of the rule will usually be the norm, not the exception. Courts must be presented with exceptional circumstances before exercising their discretion to depart from the first-filed rule. *Id.* at 979.

**\*2** In this case, it is undisputed that the first-filed case in Arizona and the present case involve the same patent and the same issues. Therefore, the burden is on plaintiff to present some exceptional circumstances why the court should depart from the first-filed rule. In support of its argument opposing transfer, plaintiff states that all of its relevant witnesses reside in New York, all the documents and records related to the accused product are in New York, and the "center of gravity" of the case is New York. (D.I. 14 at 6-7) None of these arguments show that there are any exceptional circumstances requiring the court to depart from the first-filed rule.

Furthermore, defendant makes the same arguments in favor of transferring the case to Arizona. It argues that all of its relevant witness, documents, and products are either in or near Arizona. Therefore, by not allowing a transfer, the court would simply be transferring the inconvenience of traveling from plaintiff to defendant. Mere inconvenience to one party does not rise to the level of exceptional circumstances that would require the court to depart from the well-established principles of the first-filed rule. Since the patent litigation action in Arizona was filed first, transfer of the subsequently filed Delaware action will promote judicial administration and consistency of results.

### IV. CONCLUSION

For the reasons stated, at Wilmington, this 23rd day of January, 2003, IT IS ORDERED that:

1. Defendant's motion to transfer (D.I.6) is granted.

2. Defendant's motions to dismiss and stay (D.I.6) are denied as moot.

3. The above-captioned action shall be transferred to the United States District Court for the District of

Arizona.

D.Del.,2003.
Miteq, Inc. v. Comtech Telecommunications Corp.
Not Reported in F.Supp.2d, 2003 WL 179991 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Westlaw.

Not Reported in F.Supp.                                                                           Page 1

Not Reported in F.Supp., 1997 WL 700496 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**C**
National Foam, Inc. v. Williams Fire P Hazard
Control, Inc.
E.D.Pa.,1997.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
NATIONAL FOAM, INC., Boots & Coots Limited
Partnership, and Kenneth Baker
v.
WILLIAMS FIRE & HAZARD CONTROL, INC.,
cause consequence Analysis. Inc. and Emergency
One, Inc.
**No. CIV. A. 97-3105.**

Oct. 29, 1997.

*MEMORANDUM AND ORDER*
HUTTON, J.
*1 Presently before the Court are the Defendants'
Motions to Dismiss, or, Alternatively, to Stay or
Transfer to the Southern District of Texas, and the
Plaintiffs' opposition thereto. For the following
reasons, the Defendants' Motions are GRANTED.

### I. BACKGROUND

Plaintiff, National Foam, Inc. ("National Foam"), is
a Pennsylvania corporation based in Exton,
Pennsylvania. Plaintiff, Boots & Coots Limited
Partnership ("Boots & Coots"), is a Colorado
limited partnership with its principal place of
business in Houston, Texas. Plaintiff, Kenneth
Baker ("Baker"), is an individual who resides in
Pottstown, Pennsylvania. The defendants in this
matter are Williams Fire & Hazard Control, Inc. ("
Williams") and Cause Consequence Analysis, Inc. ("
CCAI"), both Texas corporations with their
principal place of business in Vidor, Texas, and
Emergency One, Inc. ("Emergency One"), a Florida
corporation with its principal place of business in
Ocala, Florida. The parties to this suit are in the
business of inventing, manufacturing, selling,

delivering, using or installing fire suppression
systems.

National Foam is the owner of United States Patent
No. 4,436,487 (the "487 patent"), and CCAI is the
owner of United States Patent No. 4,460,461 (the "
461 patent"). The '487 patent, issued March 13,
1984, discloses a foam liquid concentrate supply
system. The system, powered by a concentrate
pump, supplies the foam liquid concentrate to one
or more water pump discharge outlets. The '461
patent, issued on February 3, 1987, is titled "
Foam-Applying Nozzle." The nozzle is used to
apply a foam-forming liquid from a hose.

Earlier this year, Williams determined that National
Foam was infringing the '461 patent through
National Foam's sale of its "Gladiator" nozzle.
Therefore, on March 3, 1997, Williams' attorney
sent a letter to National Foam's president,
demanding an "immediate confirmation ... that
National Foam will cease and desist from any such
making, offering to sell and selling of such a nozzle.
" On March 20, 1997, National Foam's attorney
responded with a letter asserting that National Foam
was not infringing the '461 patent. Williams'
counsel responded by letter on April 21, 1997,
rejecting National Foam's position and again
demanding that National Foam cease and desist.

Meanwhile, on April 3, 1997, National Foam
independently wrote its own cease and desist letter
to Emergency One, claiming infringement of the
'487 patent through Emergency One's use of one of
Williams' products. On April 24, 1997, Williams'
attorney responded in a letter denying infringement.
National Foam received this letter on April 28,
1997, and filed the instant action before this Court
the next day.

In its complaint, National Foam alleged that
Williams and Emergency One were infringing the
'487 patent in their use and sale of Williams' foam
proportioning systems. National Foam also sought

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 2

Not Reported in F.Supp., 1997 WL 700496 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

a declaratory judgment that, by its manufacture and sale of its "Gladiator" nozzle, it was not infringing the '461 patent. However, National Foam failed to name CCAI as a defendant, even though CCAI is the owner of the '461 patent.

**\*2** On May 9, 1997, CCAI and Williams filed an action against National Foam, Boots & Coots, and Baker in the Southern District of Texas (the "Texas case"). Boots & Coots is allegedly a National Foam distributor, and Baker is a former Williams employee who now works for National Foam. CCAI and Williams alleged that: 1) National Foam and Boots & Coots infringed CCAI's '461 patent; 2) National Foam was liable for false advertising, misappropriation of trade secrets, tortious interference, and unfair competition; and 3) Baker was liable for his violation of a duty not to disclose and for misappropriation of trade secrets. Moreover, defendant Williams sought a declaratory judgment against National Foam's patent infringement case before this Court.

On June 9, 1997, National Foam filed an amended complaint in the action before this Court. In its amended complaint, National Foam was joined by Boots & Coots and Baker. The plaintiffs sought a declaratory judgment stating their non-liability on all counts in the Texas case. Further, National Foam and Boots & Coots named CCAI as a defendant in their declaratory judgment request regarding the '461 patent. Finally, National Foam continued to allege that Williams and Emergency One infringed the '487 patent.

On July 14, 1997, CCAI filed its Motion to Dismiss, or Alternatively, to Stay or to Transfer, arguing that this Court lacks personal jurisdiction over CCAI, that this Court does not have subject matter jurisdiction over certain counts, and that the first-filed rule favors maintenance of this suit in Texas. Currently, the sole issue before this Court is whether this suit should be dismissed, stayed, or transferred to the Southern District of Texas./ [FN1]

> FN1. On September 23, 1997, this Court ordered that the Plaintiffs had until October 31, 1997 to respond to the

Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Subject Matter Jurisdiction, but required the Plaintiffs to respond by September 29, 1997 to the Defendants' Motion to Dismiss or, Alternatively, to Stay or to Transfer to the Southern District of Texas.

## II. *DISCUSSION*

In the present motion, the defendants ask the Court either to dismiss, stay it or transfer venue to the Southern District of Texas. Plaintiffs oppose the motion, claiming that these alternatives are all improper.

### A. *Counts 2, 3 and 4*

In Counts 3 and 4 of the plaintiffs' complaint, National Foam and Baker seek a declaratory judgment stating their non-liability on all counts in the Texas case. In Count 2, National Foam and Boots & Coots seek a declaratory judgment declaring their non-infringement of CCAI's '461 patent. Thus, this Court must discuss the applicability of the Declaratory Judgment Act to this matter.

### 1. *Jurisdiction Under the Declaratory Judgment Act*

The Declaratory Judgment Act, 28 U.S.C. § 2201 (1994), provides that:
In a case of *actual controversy* within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, *may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a) (emphasis added).

To demonstrate the presence of an actual controversy the declaratory plaintiff must show that (1) it has acted, or has made preparations to act, in a way that could constitute infringement, and (2) the patentee has created in the declaratory plaintiff a reasonable apprehension of suit for infringement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 700496 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

*Serco Servs. Co., L.P. v. Kelley Co., Inc.,* 51 F.3d 1037, 1038 (Fed.Cir.1995). In the present case, this Court assumes the presence of an actual controversy for purposes of this motion.

*3 However, the presence of an actual controversy, while providing authority, does not require the Court to accept jurisdiction over a declaratory judgment action. *See EMC Corp. v. Norand Corp.,* 89 F.3d 807, 813 (Fed.Cir.1996), *cert. denied,* 519 U.S. 1101, 117 S.Ct. 789, 136 L.Ed.2d 730 (1997). The Act's "may" language gives the Court "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137, 2143, 132 L.Ed.2d 214 (1995). It grants the Court leeway in which to make "a reasoned judgment whether the investment of time and resources will be worthwhile. " *Serco Servs.,* 51 F.3d at 1039. Both the Supreme Court and the Federal Circuit have emphasized recently that the Act is an *enabling act* that provides the courts with the power, rather than the obligation, to grant relief. *See Wilton,* 115 S.Ct. at 2144; *EMC Corp.,* 89 F.3d at 813. Accordingly, the district court's decision to accept or refuse jurisdiction is reviewed under an abuse of discretion standard. *EMC Corp.,* 89 F.3d at 813

### 2. Motion to Dismiss

In their motion, the defendants argue that Counts 2, 3 and 4 of this action should be dismissed in favor of the subsequently filed Texas litigation. First, the defendants state that these counts were added in their present form only after the Texas suit was filed. Thus, the defendants contend that the Southern District of Texas should hear Counts 2, 3, and 4 of the instant matter before this Court, because the Texas suit is the "first-filed" action. Second, the defendants claim that National Foam's inadequate investigation, as evidenced by its failure to join CCAI in its original complaint, was caused by National Foam's concern with winning the "race to the courthouse." This, they claim, is an abuse of the Declaratory Judgment Act, 28 U.S.C. § 2201 (1994), which was not meant to provide a potential defendant with a means of forum-shopping.

National Foam responds that this declaratory judgment action is appropriate under the circumstances, and that the matter before this Court is the "first-filed" action. Therefore, the plaintiffs argue that the Court should continue to entertain it under the principle that in all cases of concurrent federal jurisdiction the first-filed action should take precedence.

#### a. *The First-Filed Rule*

As between a mirror-image declaratory judgment action and an affirmative patent infringement action, the general rule favors the forum of the first-filed action, whether or not it is the declaratory action. *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 937-38 (Fed.Cir.1993), *cert. denied, Regents of Univ. of Cal. v. Genentech, Inc.,* 510 U.S. 1140, 114 S.Ct. 1126, 127 L.Ed.2d 434 (1994) (citing *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.,* 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200 (1952)). In the instant matter, however, the parties are in dispute over which suit constitutes the "first-filed."

#### (1) *Count 2*

*4 As explained above, when National Foam initially filed its complaint seeking declaratory relief regarding the '461 patent, it failed to name CCAI as a defendant. CCAI, as the patent owner, is a necessary and indispensable party to the patent infringement action concerning the '461 patent. *Suprex Corp. v. Lee Scientific, Inc.,* 660 F.Supp. 89, 93 (W.D.Pa.1987). After CCAI filed its patent infringement action against National Foam in Texas, National Foam amended its complaint to include CCAI as a defendant in its declaratory judgment request.

CCAI now argues that because it was a necessary and indispensable party, the Texas case should be considered the "first-filed" because it was the first to include CCAI as a party. Further, CCAI contends that when a party is added through an amended complaint, the date of the amendment, rather than the date of the initial complaint, controls for first to file priority. Thus, CCAI reasons that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 4

Not Reported in F.Supp., 1997 WL 700496 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

the Texas action, filed prior to the amended complaint before this Court, is the first filed suit. The plaintiffs disagree, arguing that the date the complaint was originally filed with this Court controls. Thus, the issue before this Court is whether National Foam's amended pleading relates back to its initial filing of April 29, 1997.

The "first-filed rule, as its name indicates, is premised upon a priority of filing the complaint." *Peregrine Corp. v. Peregrine Indus., Inc.,* 769 F.Supp. 169, 172 (E.D.Pa.1991). However, when an amendment to the complaint adds a party, the priority is unclear. Although "the date of the amendment *seems* to be controlling when the amendment adds a party," 8 Donald S. Chisum, *Chisum on Patents,* § 21.02[4][b] at 21-206 (emphasis added), this assumption "is open to question." *Ronson Art Metal Works, Inc. v. Brown & Bigelow, Inc.,* 105 F.Supp. 169, 173 n. 4 (S.D.N.Y.), *aff'd,* 199 F.2d 760 (2d Cir.1952)./ FN2

> FN2. "This rule was assumed in the *Kerotest* case." 8 Donald S. Chisum, *Chisum on Patents,* § 21.02[4][b] at 21-206 n. 12 (citing *Kerotest Mfg. Co.,* 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200).

Few courts have fully considered this issue in the context of a patent infringement case. The United States District Court for the Northern District of California discussed the applicability of Federal Rule of Civil Procedure 15(c)(2) to the first to file rule, but it recognized that:
The Federal Circuit has yet to discuss the applicability of the relation back doctrine to patent infringement claims.
....
[However, m]any of the cases dealing with relation back focus on whether fair notice was given to the opposing party. This interpretation agrees with the meaning underlying the intent of Rule 15.

*Applied Vision Inc. v. Optical Coating Lab., Inc.,* No. CIV.A.97-1233, 1997 WL 601425, at *3-4 (N.D.Cal. Sept.23, 1997) (finding Rule 15(c)(2) applicable to the first-to-file analysis).

In *Optima, Inc. v. Republic Indus., Inc.,* No. CIV.A.94-3919, 1995 WL 72430 (E.D.La. Feb.21, 1995), the United States District Court for the Eastern District of Louisiana confronted the issue of whether the relation back doctrine applied to the first to file rule, when a plaintiff amended its complaint in order to add a party. *Id.* at *1. In *Optima, Inc.,* the plaintiff repeatedly spoke with the president of and counsel to Republic Industries, Inc. ("Republic") concerning the plaintiff's belief that Republic was infringing the plaintiff's patent. *Id.* When the parties were unable to amicably settle their dispute, the plaintiff filed a complaint in the United States District Court for the Eastern District of Louisiana and served Republic's president. *Id.* However, the plaintiff mistakenly named " Dor-O-Matic," the trade name used by Republic, as the defendant. *Id.* By the time the plaintiff amended its complaint two weeks later, adding Republic as a defendant, Republic had filed a declaratory judgment action in the Northern District of Illinois. *Id.*

*\*5* The *Optima, Inc.* court held that the plaintiff " was the first to file because its amended complaint relates back to the date of the original complaint." *Id.* (citing Fed.R.Civ.P. 15(c)). The court reasoned that because the plaintiff had corresponded with Republic's president and counsel regarding the allegedly infringed patent before filing suit and served its original complaint on Republic's president, Republic "should have known that 'but for a mistake concerning the identity of the proper party, the initial complaint would have been brought against it.' " *Id.* (quoting Fed.R.Civ.P. 15(c)). Further, the court stated that the plaintiff's "prompt amendment of its complaint has prevented any prejudice to Republic, and [the plaintiff] served the amended complaint within the required time under Rule 15(c)." *Id.* Thus, even though the plaintiff " kept Dor-O-Matic in the amended complaint as a precaution, instead of suing only Republic ... [the plaintiff's] amendment conforms to Rule 15(c)(3). *Id.* at *2.

The facts in the instant case are similar to those in *Optima, Inc.* Before Williams and CCAI filed in the Southern District of Texas, it is highly probable if not certain that Williams, as CCAI's licensee, told

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 5

Not Reported in F.Supp., 1997 WL 700496 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

CCAI about the complaint before this Court. Thus, this Court finds that CCAI "should have known that 'but for a mistake concerning the identity of the proper party, the initial complaint would have been brought against it.' " *Id.* (quoting Fed.R.Civ.P. 15(c)). Further, the "prompt amendment of its complaint has prevented any prejudice to [CCAI], and [the plaintiff] served the amended complaint within the required time under Rule 15(c)." *Id.* The sole distinguishing feature is that the *Optima, Inc.* plaintiff "kept Dor-O-Matic in the amended complaint as a precaution, instead of suing only Republic." *Id.* at *2. Thus, this Court must now consider whether the addition of CCAI, as a defendant and an indispensable party, and Boots & Coots, as a plaintiff, destroys the applicability of Rule 15(c)(3).

In *Wine v. EMSA Ltd. Partnership,* 167 F.R.D. 34, 37-38 (E.D.Pa.1996), the Honorable Judge Eduardo C. Robreno discussed the elements a court must consider when adding new defendants under the relation back provisions of Rule 15(c)(3):

As here, Plaintiff seeks to add new defendants, not new claims....

....

In deciding whether an amendment to add a new defendant relates back under Rule 15(c)(3), the focus of the Court is on whether the proposed new defendant had actual, constructive or imputed notice of the action within 120 days after the filing of the complaint or longer for good cause shown. Fed.R.Civ.P. 15(c)(3)(A); *Dean* [*v. Harold Ives Trucking* ], 1995 WL 540519 at *2 [ (E.D.Pa. Sept. 7, 1995) ]; *but see Cruz* [*v. City of Camden* ] 898 F.Supp. 1100, 1115 (D.N.J.1995) ] (actual notice of existence of litigation required to add newly named defendants). Notice may be imputed to proposed new parties ... " 'when the original and added parties are so closely related in business or other activities that it is fair to presume the added parties learned of the institution of the action shortly after it was commenced.' " *Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc.,* 801 F.Supp. 1450, 1456 (E.D.Pa.1992) (quoting *Hernandez Jimenez v. Calero Toledo,* 604 F.2d 99, 101-02 (1st Cir.1979)).

*6 *Wine,* 167 F.R.D. at 37-38.

Moreover, a similar analysis must be conducted when new plaintiffs are added. "In order to preserve this protection, the relation-back rule requires plaintiffs to show that the already commenced action sufficiently embraces the amended claims so that defendants are not unfairly prejudiced by these late-coming plaintiffs and that plaintiffs have not slept on their rights." *Nelson v. County of Allegheny,* 60 F.3d 1010, 1014 (3d Cir.1995), *cert. denied,* 516 U.S. 1173, 116 S.Ct. 1266, 134 L.Ed.2d 213 (1996). Thus, "[w]hile a literal reading of Rule 15(c)(3) might suggest that the mistake element only applies to misnamed or misdescribed parties, 'the Rule is widely-understood to allow the addition of new parties that were never originally named or described.' " *Wine,* 167 F.R.D. at 38 n. 7 (citations omitted).

Thus, the sole distinguishable feature in *Optima, Inc.* is immaterial. Although the amended complaint added Boots & Coots and CCAI, both CCAI and Williams would not be prejudiced in " 'assembling evidence and constructing a defense.' " *Nelson,* 60 F.3d at 1015 (quoting *Curry v. Johns-Manville Corp.,* 93 F.R.D. 623, 626 (E.D.Pa.1982)). This finding is premised on the fact that CCAI and Williams filed suit against National Foam and Boots & Coots in Texas, and thus have already started to prepare for a suit including CCAI and Boots & Coots. Further, as explained above, this Court finds that CCAI and Williams knew or should have known that, but for National Foam's mistake, CCAI would have been originally included in National Foam's original complaint. Therefore, the amended complaint adding Boots & Coots and CCAI falls within Rule 15(c)(3)'s ambit.

### (2) Counts 3 and 4

Counts 3 and 4 before this Court were originally filed as Counts 3 through 7 in the Texas case. The defendants argue that the first to file rule therefore favors maintenance of this suit in Texas.

As stated above, the "Federal Circuit has yet to discuss the applicability of the relation back

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

doctrine to patent infringement claims." *Applied Vision, Inc.,* 1997 WL 601425, at *3. However, the few courts that have confronted this issue have found that the relation back doctrine should apply to amended complaints including additional issues. *See Mattel, Inc. v. Louis Marx & Co.,* 353 F.2d 421, 424 (2d Cir.1965), *cert. dismissed,* 384 U.S. 948, 86 S.Ct. 1475, 16 L.Ed.2d 546 (1966) (finding plaintiff's original complaint controlled for first to file priority, even though defendant's later complaint in another district first raised issues plaintiff later included in amended complaint); *Applied Vision, Inc.,* 1997 WL 601425, at *4 (applying relation back provision of Rule 15 to later amended complaint including additional issues); 8 Donald S. Chisum, *Chisum on Patents,* § 21.02[4][b] at 21-206 ("The priority rule relates to the date of the filing of the action between the parties, not the date when the issues were added by amendment of the pleadings or otherwise.").

*7 This Court adopts the reasoning of these courts and holds that National Foam's original complaint controls for first to file purposes. The additional claims filed by the defendants in Texas raised similar issues to those presented in the ongoing dispute before this Court. Thus, the suit before this Court "was the first suit which made possible the presentation of all issues and which, by amendment of the complaint did raise all the substantial issues between the parties." *Mattel, Inc.,* 353 F.2d at 424.

This Court finds that the plaintiffs' amended complaint filed on June 9, 1997 relates back to its initial filing of April 29, 1997. National Foam's original filing preceded the defendants' filing in Texas. Thus, the plaintiffs were the first to file this case.

### b. First-Filed Rule Exceptions

The general rule favors the forum of the first-filed action, whether or not it is the declaratory action. *Genentech, Inc.,* 998 F.2d at 937-38 (citing *Kerotest Mfg. Co.,* 342 U.S. 180, 72 S.Ct. 219, 96 L.Ed. 200). However, this presumption is not unrebuttable. *Novo Nordisk of North America, Inc. v. Genentech, Inc.,* 874 F.Supp. 630, 632

(S.D.N.Y.1995). Exceptions to the first-filed rule " are not rare, and are made when justice or expediency requires, as in any issue of choice of forum." *Genentech,* 998 F.2d at 937. Recognized exceptions include "when the choice of the forum of the first-filed case was the result of pure forum shopping, if the balance of convenience favors the second forum, or if the first filed action is against a customer of the alleged infringer and the second involves the infringer himself." *Novo Nordisk,* 874 F.Supp. at 632. The Court may also depart from the rule based on general considerations of "judicial and litigant economy" and "the just and effective disposition of disputes." *Serco Servs.,* 51 F.3d at 1039. "Thus, 'the trial court's discretion tempers the preference for the first-filed suit, when such preference should yield to the forum in which all interests are best served.' " *Id.* (quoting *Genentech,* 998 F.2d at 938).

### c. Forum-Shopping Exception Applies

The purpose of the Declaratory Judgment Act is "to enable a person caught in controversy to obtain resolution of the dispute, instead of being forced to await the initiative of the antagonist." *Genentech,* 998 F.2d at 937. *See Serco Servs.,* 51 F.3d at 1039 . In many cases, the declaratory defendant is prepared to, and does, file its own affirmative suit shortly afterwards. Therefore, a district court cannot dismiss a proper declaratory action merely because affirmative infringement litigation is subsequently brought elsewhere. *Genentech,* 998 F.2d at 938. It may, however, dismiss the action where it is shown that the declaratory action was filed in anticipation of the impending litigation and motivated solely by considerations of forum shopping. *See Serco Servs.,* 51 F.3d at 1040; *Novo Nordisk,* 874 F.Supp. at 633. Such a case falls outside the Act's purpose, in the patent context, of providing a remedy where a patentee delays suit in order to further damage the alleged infringer's business. *See* 10A Charles A. Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 2761 (1983).

*8 In *Serco Services,* the Federal Circuit upheld the Northern District of Texas' decision to dismiss a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 700496 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

similar declaratory judgment action as anticipatory. Both the declaratory plaintiff, Serco, and the declaratory defendant, Kelley, manufactured loading dock equipment used in the trucking industry. *Serco Servs.,* 51 F.3d at 1037. Kelley sent Serco a December 23, 1992, letter charging Serco with patent infringement, and giving Serco until February 1, 1993 to reply. *Id.* at 1038. Serco responded on January 29th with its conclusion that its product did not infringe. *Id.* Kelley took no action for over eight months. Finally, on September 8, 1993, Kelley sent Serco a letter that reiterated the charges and threatened suit if Serco did not comply by September 20th. *Id.* On the 20th, Serco notified Kelley that it continued to deny the charge of infringement, and that it had taken " the necessary action in Texas" to protect itself. *Id.* In fact, Serco had filed its declaratory judgment action in the Northern District of Texas on September 17th. *Id.* Therefore, on the 20th, Kelley filed its own patent infringement action in the Eastern District of Wisconsin. *Id.*

The Northern District of Texas dismissed Serco's declaratory judgment action in favor of Kelley's subsequent infringement action. *Id.* at 1039. The Court found that Serco's suit was filed in anticipation of Kelley's, and that the balance of convenience favored proceeding in the Wisconsin forum. The Federal Circuit affirmed, finding that the district court had not abused its discretion in relying on forum-shopping considerations, in combination with other factors, in its decision. *Id.* at 1039-40.

In the present case, the Court finds that National Foam, like Serco, filed its declaratory judgment action solely for forum-shopping purposes. As the plaintiffs' state in their Preliminary Opposition to the Motion to Dismiss, Stay, or Transfer, Williams initially demanded that National Foam cease and desist on March 3, 1997. In that letter, Williams' counsel informed National Foam that the "Williams HydroFoam Nozzle has long been available and marked with its patent number." Purvis Aff. Ex. A. National Foam's counsel responded on March 20, 1997, when it claimed that "the '461 patent is invalid, and not infringed by our client's product." Purvis Aff. Ex. B at 1.

After National Foam became aware of Williams' allegations and similar product, National Foam wrote a cease and desist letter to Emergency One, a Williams customer. In that letter, National Foam claimed that "Williams' HOT SHOT II Balanced Pressure Foam Proportioning System ... infringes [National's] '487 patent." Purvis Aff. Ex. D at 1. On April 21, 1997, Williams' counsel responded to National Foam's March 29th letter, rejecting National Foam's position and again demanding that National Foam cease-and-desist. On April 24, 1997, Williams' counsel responded to National Foam's cease and desist letter to Emergency One, claiming that Williams' product did not infringe the '487 patent. Purvis Aff. Ex. E at 1. National Foam received this letter on April 28, 1997. National Foam filed its complaint with this Court the next day, alleging that Williams and Emergency One infringed its '487 patent. In fact, National Foam acted so quickly that it failed to investigate the '461 patent to determine the owner. Thus, although National Foam sought declaratory relief concerning the '461 patent dispute, it failed to include CCAI as a defendant.

**\*9** As the communications between the parties indicate, National Foam threatened Emergency One only after Williams first sent National Foam a cease and desist letter. Thus, National Foam's strategy is clear. Instead of attempting to resolve its dispute with Williams, it chose to deny Williams' allegations while finding a Williams customer to threaten with a cease and desist letter of its own. While Williams' counsel sent three letters in an attempt to resolve this dispute, National Foam waited for a response from its own cease and desist letter to Emergency One. The day after Williams' counsel denied the allegations made against its customer by National Foam, National Foam filed the instant law suit. As stated previously, National Foam filed so quickly it failed to conduct research to determine the correct owner of the '461 patent, instead mistakenly naming Williams as the owner.

Permitting this case to go forward would discourage similar efforts at informal resolutions and promote " irresponsible litigation." *See Davox Corp. v. Digital Sys. Int'l, Inc.,* 846 F.Supp. 144, 148 (D.Mass.1993) (dismissing declaratory judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 8

Not Reported in F.Supp., 1997 WL 700496 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

action filed for forum-shopping purposes alone). National Foam employed a different type of subterfuge as the *Serco* plaintiff, but its actions constitute a similar attempt to preempt the "natural plaintiff" in its choice of forum.

In *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* the Federal Circuit explained the type of situation that the Declaratory Judgment Act was meant to prevent:
[A] patent owner engages in a *danse macabre,* brandishing a Damoclean threat with a sheathed sword.... Guerrilla-like, the patent owner attempts extra-judicial patent enforcement with scare-the-customer-and-run tactics that infect the competitive environment of the business community with uncertainty and insecurity.... Before the Act, competitors victimized by the tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue. After the Act, those competitors were no longer restricted to an *in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests.

*Arrowhead Indus. Water, Inc.,* 846 F.2d 731, 734-35 (Fed.Cir.1988). Obviously, Williams never placed National Foam in this type of position when National Foam filed the instant suit. Instead, National Foam brought this action as an offensive tactic, in an attempt to ensure this litigation took place in Pennsylvania. Therefore, the Court finds that National Foam filed its declaratory action solely for forum-shopping purposes.

### d. *Judicial and Litigant Economy Favors Dismissal*

Whether or not forum-shopping alone is a sufficient basis for dismissal, in this case considerations of judicial and litigant economy further counsel dismissal. *See Serco Servs.,* 51 F.3d at 1039. Considerations relevant to judicial and litigant economy include "the convenience and availability of witnesses," the possible "absence of jurisdiction over all necessary or desirable parties, ... the possibility of consolidation with related litigation,

[and] considerations relating to the real party in interest." *Genentech, Inc.,* 998 F.2d at 938 (citations omitted). Further, considerations such as "the importance of conservation of judicial resources and the comprehensive disposition of litigation" may mandate dismissal. *Id.*

**\*10** The location of the witnesses and documents, as well as the local interests, justifies dismissal of Counts 2, 3, and 4 in favor of the Texas suit. As the defendants argue, several witnesses relevant to Counts 2, 3, and 4 reside in Texas. The power of the Court to subpoena these witnesses may be necessary. Moreover, most of the documents and records relating to the '461 patent appear to be located in Texas. Although the plaintiffs may have witnesses from outside Texas, the operative facts relating to Counts 2, 3, and 4 appear to invoke a greater need for witnesses from Texas than Pennsylvania. The plaintiffs argue that the witnesses related to the '487 patent reside in Pennsylvania and Vermont, but the '487 patent is relevant only to the first count. Thus, the location of relevant documents and necessary witnesses favors maintenance of this suit in the Southern District of Texas.

Moreover, "the importance of conservation of judicial resources and the comprehensive disposition of litigation" would "make it unjust or inefficient to continue the first-filed action" in the present case. *Genentech, Inc.,* 998 F.2d at 938. First, this Court notes that CCAI has had very minimal contacts with Pennsylvania. Although this Court declines to rule on whether it has personal jurisdiction over defendant CCAI, it finds that litigation involving defendant CCAI would best be conducted in the Southern District of Texas. Second, on August 29, 1997, the United States District Court for the Southern District of Texas ordered that motions by these parties before the court would not be decided until this Court decided the instant motion./ [FN3] Thus, this case can be heard in Texas without interruption and without duplicative proceedings from this Court. Although duplicative proceedings could be avoided by enjoining the Texas action, doing so would unduly reward National Foam's forum-shopping conduct. Accordingly, this Court grants the defendants'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 700496 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

motion to dismiss Counts 2, 3, and 4.

FN3. The only valid argument the plaintiffs raise to dispute these findings is that the Southern District of Texas might dismiss Baker as a plaintiff for lack of personal jurisdiction. However, the plaintiffs deliberately procured these circumstances by Baker's own motion to dismiss. The Court will not allow the plaintiffs to raise Baker's possible absence in the Texas litigation as grounds for continuing this litigation.

### B. *Count 1*

The sole issue remaining is whether to retain jurisdiction over Count 1 of the plaintiffs' complaint. In light of this Court's decision to dismiss Counts 2, 3, and 4, the Court also grants the defendants' motion to transfer Count 1 to the Southern District of Texas, pursuant to 28 U.S.C. § 1404(a)./ FN4 The Southern District is now the only forum where "all of the related patent claims pending between the parties can be resolved." *Davox Corp.,* 846 F.Supp. at 149. The parties agree that the factual issues necessary to resolve the defendants' and plaintiffs' claims will substantially overlap. Defs.' Mot. to Dismiss or, Alternatively, Stay or Transfer at p. 22; Pls.' Prelim. Opp'n to Mot. to Dismiss, Stay, or Transfer at p. 51. "Since these cases, concerning similar technologies, will involve common discovery and witnesses, the cases should be heard in a single forum, to conserve judicial resources and to promote an efficient resolution of all the related matters pending between the parties." *Davox Corp.,* 846 F.Supp. at 149 (citations omitted). Therefore, this Court transfers Count 1 of plaintiffs' amended complaint to the Southern District of Texas.

FN4. Section 1404(a) states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a) (1993)

### C. *Motion to Stay*

**\*11** Given the Court's disposition on the Defendants' Motions to Dismiss and Transfer, it need not reach their alternative Motion to Stay. Likewise, Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and Subject Matter Jurisdiction is necessarily denied as moot.

An appropriate Order follows.

### ORDER

AND NOW, this 28th day of October, 1997, upon consideration of the Defendants' Motion to Dismiss, or, Alternatively, Stay or Transfer to the Southern District of Texas, and the Plaintiffs' opposition thereto, IT IS HEREBY ORDERED that:

1) the Defendants' Motion to Dismiss Counts 2, 3, and 4 of the Plaintiffs' Amended Complaint (Docket Nos. 20 and 27, Docket No. 21 is a copy of Docket No. 20) is GRANTED;

2) the Defendants' Motion to Transfer Count 1 of the Plaintiffs' Amended Complaint (Docket No. 20) is GRANTED; and

3) the Defendants' Motions to Dismiss for Lack of Personal Jurisdiction (Docket No. 17) and Subject Matter Jurisdiction (Docket No. 27) is DENIED AS MOOT.

E.D.Pa.,1997.
National Foam, Inc. v. Williams Fire & Hazard Control, Inc.
Not Reported in F.Supp., 1997 WL 700496 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7

Westlaw.

--- F.3d ----

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

C
Sandisk Corp. v. STMicroelectronics, Inc.
C.A.Fed. (Cal.),2007.

United States Court of Appeals,Federal Circuit.
SANDISK CORPORATION, Plaintiff-Appellant,
v.
STMICROELECTRONICS, INC.,
Defendant-Appellee,
andSTMicroelectronics NV, Defendant.
**No. 05-1300.**

March 26, 2007.

**Background:** Competitor brought action against
patent holder seeking declaratory judgment of
non-infringement and invalidity. The United States
District Court for the Northern District of
California, Jeremy Fogel, J., dismissed action.
Competitor appealed.

**Holdings:** The Court of Appeals, Linn, Circuit
Judge, held that:

(1) Article III case or controversy existed which
gave rise to declaratory judgment jurisdiction, and

(2) statement by patent holder, that it would not sue
competitor, did not eliminate justiciable controversy
created by actions of patent holder.

Vacated and remanded.

Bryson, Circuit Judge, filed opinion concurring in
the result.

**[1] Federal Courts 170B ⟲755**

170B Federal Courts

170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk754    Review    Dependent    on
Whether Questions Are of Law or of Fact
170Bk755 k. Particular Cases. Most
Cited Cases
For purposes of Article III, a Court of Appeals
reviews a dismissal of a patent claim for lack of an
actual controversy upon a particular set of facts as a
question of law subject to plenary appellate review.
U.S.C.A. Const. Art. 3, § 1 et seq.

**[2] Declaratory Judgment 118A ⟲235**

118A Declaratory Judgment
118AII Subjects of Declaratory Relief
118AII(L) Patents
118Ak231 Patents
118Ak235 k. Patent Licenses and
Assignments. Most Cited Cases

**Federal Courts 170B ⟲13**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk12    Case    or    Controversy
Requirement
170Bk13 k. Particular Cases or
Questions, Justiciable Controversy. Most Cited
Cases
Article III case or controversy existed which gave
rise to declaratory judgment jurisdiction, where
patent holder sought right to royalty under its
patents based on specific, identified activity by
competitor and competitor maintained that it could
proceed in its conduct without payment of royalties
to patent holder. U.S.C.A. Const. Art. 3, § 1 et seq.;
28 U.S.C.A. § 2201(a).

Article III case or controversy existed which gave
rise to declaratory judgment jurisdiction, where
patent holder sought right to royalty under its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----    Page 2

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

patents based on specific, identified activity by competitor and competitor maintained that it could proceed in its conduct without payment of royalties to patent holder. U.S.C.A. Const. Art. 3, § 1 et seq.; 28 U.S.C.A. § 2201(a).

**[3] Declaratory Judgment 118A ☜235**

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak235 k. Patent Licenses and Assignments. Most Cited Cases
In the context of conduct prior to the existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee; however, Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do. U.S.C.A. Const. Art. 3, § 1 et seq.; 28 U.S.C.A. § 2201(a).

**[4] Declaratory Judgment 118A ☜233**

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak233 k. Infringement of Patents. Most Cited Cases
Where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights. U.S.C.A. Const. Art. 3, § 1 et seq.; 28 U.S.C.A. § 2201(a).

**[5] Declaratory Judgment 118A ☜234**

118A Declaratory Judgment
  118AII Subjects of Declaratory Relief
    118AII(L) Patents
      118Ak231 Patents
        118Ak234 k. Claim of Infringement as Condition Precedent. Most Cited Cases
Statement by patent holder, that it would not sue competitor, did not eliminate justiciable controversy created by actions of patent holder, since patent holder engaged in course of conduct, of studying and considering infringement by competitor and communicating that determination to competitor, that showed preparedness and willingness to enforce its patent rights despite its statement. 28 U.S.C.A. § 2201(a).

**[6] Declaratory Judgment 118A ☜361.1**

118A Declaratory Judgment
  118AIII Proceedings
    118AIII(F) Hearing and Determination
      118Ak361 Dismissal Before Hearing
        118Ak361.1 k. In General. Most Cited Cases
Although a district court is given the discretion, in declaratory judgment actions, to dismiss the case, there are boundaries to that discretion; when there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal. 28 U.S.C.A. § 2201(a).

**[7] Declaratory Judgment 118A ☜361.1**

118A Declaratory Judgment
  118AIII Proceedings
    118AIII(F) Hearing and Determination
      118Ak361 Dismissal Before Hearing
        118Ak361.1 k. In General. Most Cited Cases
The exercise of discretion to dismiss a case seeking declaratory judgment must be supported by a sound basis for refusing to adjudicate an actual controversy. 28 U.S.C.A. § 2201(a).

Michael A. Ladra, Wilson Sonsini Goodrich & Rosati, of Palo Alto, California, argued for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                    Page 3

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

plaintiff-appellant. With him on the brief were James C. Yoon and Julie M. Holloway.
Edward V. Anderson, Sidley Austin Brown & Wood, LLP, of San Francisco, California, argued for defendant-appellee. With him on the brief were Russell L. Johnson, Georgia K. Van Zanten, Philip W. Woo, Matthew L. McCarthy, Peter Suen; and Kathi A. Cover, of Washington, DC.

Before BRYSON, LINN, and DYK, Circuit Judges.
LINN, Circuit Judge.
*1 SanDisk Corporation ("SanDisk") appeals from a decision of the U.S. District Court for the Northern District of California granting STMicroelectronics' ("ST's") motion to dismiss SanDisk's second through twenty-ninth claims relating to declaratory judgment of noninfringement and invalidity for failure to present an actual controversy. *See SanDisk Corp. v. STMicroelectronics, Inc.,* No. 04-CV-04379 (N.D.Cal. Jan. 20, 2005). Because the district court erred in dismissing the declaratory judgment claims for lack of subject matter jurisdiction, we vacate the judgment and remand the case to the district court.

I. BACKGROUND

SanDisk is in the flash memory storage market and owns several patents related to flash memory storage products. ST, traditionally in the market of semiconductor integrated circuits, more recently entered the flash memory market and has a sizeable portfolio of patents related to flash memory storage products. On April 16, 2004, ST's vice president of intellectual property and licensing, Lisa Jorgenson (" Jorgenson"), sent a letter to SanDisk's chief executive officer requesting a meeting to discuss a cross-license agreement. The letter listed eight patents owned by ST that Jorgenson believed "may be of interest" to SanDisk. *SanDisk,* slip op. at 2; Letter from Jorgenson to SanDisk (Apr. 16, 2004). On April 28, 2004, SanDisk responded that it would need time to review the listed patents and would be in touch in several weeks to discuss the possibility of meeting in June.

On July 12, 2004, having heard nothing further from SanDisk, Jorgenson sent a letter to SanDisk

reiterating her request to meet in July to discuss a cross-license agreement and listing four additional ST patents that "may also be of interest" to SanDisk. *SanDisk,* slip op. at 2; Letter from Jorgenson to SanDisk (July 12, 2004). On July 21, 2004, SanDisk's chief intellectual property counsel and senior director, E. Earle Thompson ("Thompson "), responded to ST's letter by informing Jorgenson of his "understanding that both sides wish to continue ... friendly discussions" such as those between the business representatives in May and June. *SanDisk,* slip op. at 2-3; Letter from Thompson to Jorgenson (July 21, 2004). The discussions of May and June that Thompson referred to were discussions among managers and vice presidents of SanDisk and ST at business meetings held on May 18, 2004, and June 9, 2004, to explore the possibility of ST's selling flash memory products to SanDisk. The business meetings were unrelated to any patents. Thompson also requested that Jorgenson join the next business meeting on August 5, 2005. On July 27, 2004, Jorgenson replied, again urging a meeting with Thompson, noting that it was "best to separate the business discussions from the patent license discussions." *SanDisk,* slip op. at 3; Letter from Jorgenson to Thompson (July 27, 2004).

On August 5, 2004, when the business representatives next met, SanDisk presented an analysis of three of its patents and orally offered ST a license. ST declined to present an analysis of any of its patents, stating instead that any patent and licensing issues should be discussed in a separate meeting with Jorgenson. Later that same day, Thompson wrote a letter to Jorgenson objecting to separating business and intellectual property issues and stating that "[i]t has been SanDisk's hope and desire to enter into a mutually beneficial discussion without the rattling of sabers." *SanDisk,* slip op. at 4; Letter from Thompson to Jorgenson (Aug. 5, 2004). On August 11, 2004, Jorgenson replied, stating that it was her understanding that the parties were going to have a licensing/intellectual property meeting later that month "to discuss the possibility for a patent cross-license." Letter from Jorgenson to Thompson (Aug. 11, 2004). She said that SanDisk should come to that meeting prepared to present an analysis of the three SanDisk patents it identified

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
(Cite as: --- F.3d ----)

Page 4

during the August 5th business meeting, as well as " any infringement analyses of an ST device or need for ST to have a license to these patents." *Id.* She also said that ST would be prepared at that meeting to discuss the twelve patents identified in her prior letters. In closing, Jorgenson said that ST was "look [ing] forward to open and frank discussions with SanDisk concerning fair and reasonable terms for a broad cross-license agreement." *Id.*

*2 On August 27, 2004, the licensing meeting was held. Jorgenson, two ST licensing attorneys, and three technical experts retained by ST to perform the infringement analyses of SanDisk's products, attended on behalf of ST. Thompson and an engineer attended on behalf of SanDisk. At the meeting, Jorgenson requested that the parties' discussions be treated as "settlement discussions" under Federal Rule of Evidence 408.[FN1] *SanDisk,* slip op. at 5. ST then presented a slide show which compared statistics regarding SanDisk's and ST's patent portfolios, revenue, and research and development expenses, and listed SanDisk's various "unlicensed activities." *Id.* This slide show was followed by a four- to five-hour presentation by ST's technical experts, during which they identified and discussed the specific claims of each patent and alleged that they were infringed by SanDisk. According to Thompson, the presentation by ST's technical experts included "mapp[ing] the elements of each of the allegedly infringed claims to the aspects of the accused SanDisk products alleged to practice the elements." *Id.* Thompson declares that " the experts liberally referred to SanDisk's (alleged) infringement of [ST's] products." *Id.,* slip op. at 5-6. SanDisk's engineer then made a presentation, describing several of SanDisk's patents and analyzing how a semiconductor chip product sold by ST infringes. *Id.,* slip op. at 6.

At the end of the meeting, Jorgenson handed Thompson a packet of materials containing, for each of ST's fourteen patents under discussion, a copy of the patent, reverse engineering reports for certain of SanDisk's products, and diagrams showing how elements of ST's patent claims cover SanDisk's products. According to SanDisk, Jorgenson indicated (in words to this effect):
I know that this is material that would allow

SanDisk to DJ [ST] on. We have had some internal discussions on whether I should be giving you a copy of these materials in light of that fact. But I have decided that I will go ahead and give you these materials.

*Id.* Jorgenson further told Thompson that "ST has absolutely no plan whatsoever to sue SanDisk." *Id.* Thompson responded to Jorgenson that "SanDisk is not going to sue you on Monday" and that another meeting might be appropriate. *Id.*

On September 1, 2004, Jorgenson wrote to Thompson, enclosing copies of ST's general slide presentation from the August meeting and also enclosing a hard copy booklet containing each of the engineering reports "for each claim on all products where ST demonstrated coverage by the 14 ST patents to-date [sic]." *Id.;* Letter from Jorgenson to Thompson (Sept. 1, 2004). Jorgenson requested that SanDisk provide ST with a copy of SanDisk's presentation and information about the three SanDisk patents presented. On September 8, 2004, Thompson replied by e-mail, confirming receipt of the package from ST, attaching a copy of SanDisk's presentation, indicating it was his " personal feeling ... that we have got to trust one another during these negotiations," and seeking a non-disclosure agreement. *SanDisk,* slip op. at 6-7; E-mail from Thompson to Jorgenson (Sept. 8, 2004). Thompson also wrote "I still owe you the rates quoted." *Id.*

*3 On September 15, 2004, Thompson again corresponded with Jorgenson, this time by letter, enclosing a confidential version of SanDisk's cross licensing offer, which noted that the offer would expire on September 27, 2004. *SanDisk,* slip op. at 7; Letter from Thompson to Jorgenson (Sept. 15, 2004). Jorgenson destroyed this confidential offer and did not retain a copy, and, on September 16, 2004, sent Thompson an e-mail requesting that a non-confidential version be sent for ST's consideration. *SanDisk,* slip op. at 7; E-mail from Jorgenson to Thompson (Sept. 16, 2004). SanDisk refused to send a non-confidential version. Instead, on September 27, 2004, Thompson offered to send another confidential version, or to communicate the offer orally. E-mail from Thompson to Jorgenson

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                          Page 5

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

(Sept. 27, 2004). Thompson also indicated that SanDisk did not need additional information regarding ST's patents because SanDisk was "quite comfortable with its position" and that it was "time to let our business people talk and see if a peaceful resolution is possible." *Id.* On September 28, 2004, Jorgenson repeated her request for a written non-confidential version of SanDisk's licensing offer. *SanDisk,* slip op. at 7-8; E-mail from Jorgenson to Thompson (Sept. 28, 2004). The following day, Thompson e-mailed Jorgenson another confidential version of SanDisk's offer. *SanDisk,* slip op. at 8.

On October 15, 2004, after several further e-mails and phone calls between the business representatives trying to establish another meeting, SanDisk filed the instant lawsuit. SanDisk alleged infringement of one of its patents and sought a declaratory judgment of noninfringement and invalidity of the fourteen ST patents that had been discussed during the cross licensing negotiations. On December 3, 2004, ST filed a motion to dismiss SanDisk's declaratory judgment claims for lack of subject matter jurisdiction, maintaining that there was no actual controversy at the time SanDisk filed its complaint.

The district court granted ST's motion to dismiss, holding that no actual controversy existed for purposes of the Declaratory Judgment Act because SanDisk did not have an objectively reasonable apprehension of suit, even though it may have subjectively believed that ST would bring an infringement suit. *See id.,* slip op. at 14. The district court reasoned that "SanDisk has presented no evidence that ST threatened it with litigation at any time during the parties' negotiations, nor has SanDisk shown other conduct by ST rising to a level sufficient to indicate an intent on the part of ST to initiate an infringement action." *Id.* The district court found that the studied and determined infringement analyses that ST presented to SanDisk did not constitute the requisite "express charges [of infringement] carrying with them the threat of enforcement." *Id.,* slip op. at 14-15. The district court also found that the totality of the circumstances did not evince an actual controversy because ST told SanDisk that it did not intend to

sue SanDisk for infringement. *Id.,* slip op. at 15-16. In a footnote, the court indicated that, as an alternative basis for its ruling, even if it did have jurisdiction, it would exercise its discretion and decline to hear the case. *Id.,* slip op. at 17 n. 30.

*4 SanDisk appealed the dismissal to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (2000).

## II. DISCUSSION

### A. Standard of Review

[1] For purposes of Article III, this court reviews a dismissal of a patent claim for lack of an actual controversy upon a particular set of facts as a question of law subject to plenary appellate review. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 735 (Fed.Cir.1988). This court reviews the underlying factual findings for clear error. *Gen-Probe Inc. v. Vysis, Inc.,* 359 F.3d 1376, 1379 (Fed.Cir.2004).

### B. Analysis

[2] SanDisk argues that the district court erred as a matter of law by requiring an express accusation of patent infringement coupled with an explicit threat of judicial enforcement to support declaratory judgment jurisdiction, and that, under the correct legal standard articulated by this court in *Arrowhead,* 846 F.2d at 736, the facts of this case illustrate that SanDisk's apprehension of an infringement suit was objectively reasonable. SanDisk asserts that the infringement analysis presented by ST and its experts at the August 27, 2004 licensing meeting constituted an allegation of infringement and that the totality of the circumstances shows that ST's conduct gave rise to an actual case or controversy. SanDisk further points out that negotiations regarding licensing had ceased by the time SanDisk filed its claims for declaratory judgment.

ST counters that the district court applied the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                           Page 6

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

correct legal standard and argues that SanDisk ignores the line of cases that have followed and interpreted *Arrowhead.* ST asserts that the cases following *Arrowhead* reveal that the bare mention of infringement, particularly during license negotiations, is not sufficient to meet the standard set forth in *Arrowhead.* ST asserts that its conduct at the August 27, 2004 licensing meeting was to strengthen its position during licensing negotiations and that, under the totality of the circumstances, SanDisk has not shown that ST's conduct gave rise to declaratory judgment jurisdiction. Moreover, ST argues that the district court did not abuse its discretion when it concluded, as an alternative basis for its ruling, that it would exercise discretion to decline to decide SanDisk's claims.

### 1. Case or Controversy

The first question we address is whether the facts alleged in this case show that there is a case or controversy within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

The Declaratory Judgment Act provides, in relevant part, that
[i]n a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). The "actual controversy" requirement of the Declaratory Judgment Act is rooted in Article III of the Constitution, which provides for federal jurisdiction over only "cases and controversies." Thus, our jurisdiction extends only to matters that are Article III cases or controversies.

**\*5** The Supreme Court, in the context of a patent license dispute, recently examined Article III's case or controversy requirement as it relates to the Declaratory Judgment Act. *See MedImmune, Inc. v. Genentech, Inc.,* ---U.S. ----, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). In *MedImmune,* the Supreme Court considered "whether Article III's limitation of

federal courts' jurisdiction to 'Cases' and 'Controversies,' reflected in the 'actual controversy' requirement of the Declaratory Judgment Act, 28 U.S.C. § 2201(a), requires a patent licensee to terminate or be in breach of its license agreement before it can seek a declaratory judgment that the underlying patent is invalid, unenforceable, or not infringed." *Id.* at 767.

The Supreme Court began its analysis
with the recognition that, where threatened action by government is concerned, [the Court] do[es] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat-for example, the constitutionality of a law threatened to be enforced. The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction.

*Id.* at 772. The Supreme Court quoted its earlier decision in *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), where the Court stated that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune,* 127 S.Ct. at 771. The Supreme Court emphasized that Article III requires that the dispute at issue be " 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " *Id.* (quoting *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240-41, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). The Supreme Court stated that, when faced with a genuine threat of enforcement that the government will penalize a certain private action, Article III " d[oes] not require, as a prerequisite to testing the validity of the law in a suit for injunction, that the plaintiff bet the farm, so to speak, by taking the violative action." *Id.* at 772 (citations omitted). As the Supreme Court noted, "the declaratory judgment procedure is an alternative to pursuit of the arguably

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

Page 7

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

illegal activity." *Id.* (quotation marks omitted). The Supreme Court clarified that, although a declaratory judgment plaintiff may eliminate an "imminent threat of harm by simply not doing what he claimed the right to do[,] ... [t]hat did not preclude subject-matter jurisdiction [where] the threat-eliminating behavior was effectively coerced. " *Id.* "The dilemma posed by that coercion-putting the challenger to the choice between abandoning his rights or risking prosecution-is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.* at 773 (internal quotation marks omitted).

**\*6** The Supreme Court then applied these principles to the facts of the case and remarked that "the requirements of [a] case or controversy are met where payment of a claim is demanded as of right and where payment is made, but where the involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." *Id.* (internal quotation marks omitted). The Supreme Court held that "[t]he rule that a plaintiff must destroy a large building, bet the farm, or (as here) risk treble damages and the loss of 80 percent of its business, before seeking a declaration of its actively contested legal rights finds no support in Article III." *Id.* at 775.

With regard to patent disputes, prior to *MedImmune,* this court articulated a two-part test that first considers whether conduct by the patentee creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit, and second examines whether conduct by the declaratory judgment plaintiff amounts to infringing activity or demonstrates concrete steps taken with the intent to conduct such activity. *See Arrowhead,* 846 F.2d at 736. The Supreme Court, in *MedImmune,* addressed the " reasonable apprehension of suit" aspect of this court's two-part test and concluded that it conflicts with *Aetna Life Insurance* and *Maryland Casualty,* and is in tension with *Cardinal Chemical Co. v. Morton International, Inc.,* 508 U.S. 83, 98, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993). *See MedImmune,* 127 S.Ct. at 774 n. 11.

In *Aetna Life Insurance,* an insurer sought a declaratory judgment that the insured was not relieved of his duty to continue to pay insurance premiums and that, since the insured had stopped making the payments, the insurance policy had lapsed. In that case, the Supreme Court upheld the constitutionality of the federal Declaratory Judgment Act. 300 U.S. at 240-41, 57 S.Ct. 461. The Supreme Court then held that, although the insured party gave no indication that he would file suit, *id.* at 239, 57 S.Ct. 461, the case nevertheless presented a controversy under Article III because the parties had taken adverse positions with regard to their obligations, each side presenting a concrete claim of a specific right-the insured claiming that he had become disabled and therefore was relieved of making insurance premium payments and the insurer claiming that the insured was not disabled and that the failure to make payments caused the policy to lapse, *id.* at 244, 57 S.Ct. 461. Similarly, in *Maryland Casualty,* the declaratory judgment plaintiff, an insurance company which had agreed to indemnify and defend the insured against actions brought by third parties against the insured, sought a declaration that it had no duty to defend or to indemnify the insured. 312 U.S. at 272, 61 S.Ct. 510. In that case, the insured could not have sued the declaratory judgment plaintiff without first obtaining a judgment against the third party and the underlying action against the third party " [a]pparently ... ha[d] not proceeded to judgment." *Id.* at 271, 61 S.Ct. 510. Nevertheless, the Supreme Court held that "[i]t is clear that there is an actual controversy between petitioner and the insured" since the insured was in the process of seeking a judgment and had a statutory right to proceed against the declaratory judgment plaintiff if such judgment were obtained and not satisfied. *Id.* at 274, 61 S.Ct. 510. Finally, in *Cardinal Chemical,* the Supreme Court held that this court's affirmance of a judgment of noninfringement does not necessarily moot a declaratory judgment counterclaim of patent invalidity. 508 U.S. at 98, 113 S.Ct. 1967. The Supreme Court's rationale for holding that the declaratory judgment action can proceed consistent with Article III was that a contrary result would create the potential for relitigation or uncertainty with regard to the validity of patents and would be contrary to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

*Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

*\*7 The Supreme Court's opinion in *MedImmune* represents a rejection of our reasonable apprehension of suit test.[FN2] The Court first noted that "the continuation of royalty payments makes what would otherwise be an imminent threat at least remote, if not nonexistent.... Petitioner's own acts, in other words, eliminate the imminent threat of harm." *MedImmune,* 127 S.Ct. at 772. The Court nonetheless concluded that declaratory judgment jurisdiction existed relying in particular on its earlier decision in *Altvater v. Freeman,* 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943). There, the patentee brought suit to enjoin patent infringement, and the accused infringer filed declaratory judgment counterclaims of invalidity. The district court found that there was no infringement and that the patent was invalid. *Id.* at 362, 63 S.Ct. 1115. The appellate court affirmed the finding of noninfringement but vacated the finding of invalidity as moot. *Id.* The Supreme Court held that the declaratory judgment counterclaims were not mooted by the finding of noninfringement. *Id.* at 365-66, 63 S.Ct. 1115. In finding declaratory judgment jurisdiction in *MedImmune,* the Court specifically addressed and rejected our reasonable apprehension test:

[e]ven if *Altvater* could be distinguished as an " injunction" case, it would still contradict the Federal Circuit's "reasonable apprehension of suit" test (or, in its evolved form, the "reasonable apprehension of imminent suit" test, *Teva Pharm. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1333 (2005)). A licensee who pays royalties under compulsion of an injunction has no more apprehension of imminent harm than a licensee who pays royalties for fear of treble damages and an injunction fatal to his business. The reasonable-apprehension-of-suit test also conflicts with our decisions in *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941), where jurisdiction obtained even though the collision-victim defendant could not have sued the declaratory-judgment plaintiff-insurer without first obtaining a judgment against the insured; and *Aetna Life Ins. Co. v.*

*Haworth,* 300 U.S. 227, 239, 57 S.Ct. 461, 81 L.Ed. 617 (1937), where jurisdiction obtained even though the very reason the insurer sought declaratory relief was that the insured had given no indication that he would file suit. It is also in tension with *Cardinal Chemical Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 98, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993), which held that appellate affirmance of a judgment of noninfringement, eliminating any apprehension of suit, does not moot a declaratory judgment counterclaim of patent invalidity.

*MedImmune,* 127 S.Ct. at 774 n. 11.

[3][4] The Supreme Court in MedImmune addressed declaratory judgment jurisdiction in the context of a signed license. In the context of conduct prior to the existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee. But Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do. We need not define the outer boundaries of declaratory judgment jurisdiction, which will depend on the application of the principles of declaratory judgment jurisdiction to the facts and circumstances of each case. We hold only that where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights. *See id.* Contra *Cygnus Therapeutics Sys. v. ALZA Corp.,* 92 F.3d 1153 (Fed.Cir.1996) (holding that declaratory judgment jurisdiction was not supported where the " patentee does nothing more than exercise its lawful commercial prerogatives and, in so doing, puts a competitor in the position of having to choose between abandoning a particular business venture or bringing matters to a head by engaging in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
(Cite as: --- F.3d ----)

arguably infringing activity").

*8 Our holding is consistent with decisions of other courts in various cases unrelated to patent licensing. *See, e.g., Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1085 (9th Cir.2000) (finding declaratory judgment jurisdiction based on trademark owner's cease and desist letter despite the fact that trademark owner offered to waive all trademark infringement and related claims); *GNB Battery Tech., Inc. v. Gould, Inc.*, 65 F.3d 615, 620 (7th Cir.1995) (finding declaratory judgment jurisdiction where declaratory judgment plaintiff filed action in anticipation of potential action by the defendant based on new legislation although the defendant had not indicated whether or when it may act); *Kunkel v. Cont'l Cas. Co.*, 866 F.2d 1269, 1274 (10th Cir.1989) (affirming exercise of declaratory judgment jurisdiction over suit seeking declaratory judgment for determination of value of insurance coverage even though existence of coverage remained dependent upon the outcome of a collateral action and noting that "[t]he contingent nature of the right or obligation in controversy will not bar a litigant from seeking declaratory relief when the circumstances reveal a need for present adjudication"); *see also IMS Health, Inc. v. Vality Tech. Inc.*, 59 F.Supp.2d 454 (E.D.Pa.1999) (holding that requirements for declaratory judgment jurisdiction were satisfied where copyright holder had not indicated it was going to file suit but had taken positions and made demands such that the declaratory judgment plaintiff justifiably believed that copyright holder might take such action in the future and noting that "[i]t is quite possible for two parties to simultaneously consider nonlitigious settlement of a dispute, while at the same time maintaining an awareness that either settlement is improbable or that litigation is equally likely"); *N. Shore Gas Co. v. Salomon, Inc.*, 896 F.Supp. 786, 789-90 (N.D.Ill.1995) (finding declaratory judgment jurisdiction where plaintiff, "rather than wait an indefinite time to be sued," filed suit after the settlement discussions came to an impasse); *J. Lyons & Co. Ltd. v. Republic of Tea, Inc.*, 892 F.Supp. 486 (S.D.N.Y.1995) (dismissing trademark holder's later-filed infringement action in favor of previously filed declaratory judgment actions where declaratory judgment plaintiffs had received cease and desist letters and no settlement appeared agreeable, despite the fact that trademark holder did not give actual notice of litigation); *Kmart Corp. v. Key Indus., Inc.*, 877 F.Supp. 1048, 1055 (E.D.Mich.1994) (holding that ongoing settlement negotiations did not require dismissal of declaratory judgment action where the evidence indicated that the trademark holder would accept no settlement short of total capitulation); *Agridyne Tech., Inc. v. W.R. Grace & Co.*, 863 F.Supp. 1522 (D.Utah 1994) (refusing to dismiss declaratory judgment action where plaintiff justifiably believed that further settlement negotiations would be fruitless).

*9 Under the facts alleged in this case, SanDisk has established an Article III case or controversy that gives rise to declaratory judgment jurisdiction. ST sought a right to a royalty under its patents based on specific, identified activity by SanDisk. For example, at the August 27, 2004 licensing meeting, ST presented, as part of the "license negotiations," a thorough infringement analysis presented by seasoned litigation experts, detailing that one or more claims of its patents read on one or more of SanDisk's identified products. At that meeting, ST presented SanDisk with a detailed presentation which identified, on an element-by-element basis, the manner in which ST believed each of SanDisk's products infringed the specific claims of each of ST's patents. During discussions, the experts liberally referred to SanDisk's present, ongoing infringement of ST's patents and the need for SanDisk to license those patents. ST also gave SanDisk a packet of materials, over 300 pages in length, containing, for each of ST's fourteen patents under discussion, a copy of the patent, reverse engineering reports for certain of SanDisk's products, and diagrams showing a detailed infringement analysis of SanDisk's products. ST communicated to SanDisk that it had made a studied and determined infringement determination and asserted the right to a royalty based on this determination. SanDisk, on the other hand, maintained that it could proceed in its conduct without the payment of royalties to ST. These facts evince that the conditions of creating "a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

were fulfilled. *Md. Cas.,* 312 U.S. at 273, 61 S.Ct. 510. SanDisk need not "bet the farm," so to speak, and risk a suit for infringement by cutting off licensing discussions [FN3] and continuing in the identified activity before seeking a declaration of its legal rights. *See MedImmune,* 127 S.Ct. at 774 n. 11. *Contra Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051 (Fed.Cir.1995) (" When there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down.").

### 2. Promise Not to Sue

[5] We next address whether Jorgenson's direct and unequivocal statement that "ST has absolutely no plan whatsoever to sue SanDisk" eliminates any actual controversy and renders SanDisk's declaratory judgment claims moot.

We decline to hold that Jorgenson's statement that ST would not sue SanDisk eliminates the justiciable controversy created by ST's actions, because ST has engaged in a course of conduct that shows a preparedness and willingness to enforce its patent rights despite Jorgenson's statement. Having approached SanDisk, having made a studied and considered determination of infringement by SanDisk, having communicated that determination to SanDisk, and then saying that it does not intend to sue, ST is engaging in the kinds of "extra-judicial patent enforcement with scare-the-customer-and-run tactics" that the Declaratory Judgment Act was intended to obviate. *Arrowhead,* 846 F.2d at 735. ST's statement that it does not intend to sue does not moot the actual controversy created by its acts. *See Md. Cas.,* 312 U.S. at 273, 61 S.Ct. 510 (jurisdiction obtained even though the defendant could not have sued the declaratory judgment plaintiff).

### 3. District Court's Discretion

**\*10** [6][7] Although the district court is given the discretion, in declaratory judgment actions, to dismiss the case, there are boundaries to that discretion. *See Wilton v. Seven Falls Co.,* 515 U.S.

277, 289, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). "When there is an actual controversy and a declaratory judgment would settle the legal relations in dispute and afford relief from uncertainty or insecurity, in the usual circumstance the declaratory judgment is not subject to dismissal." *Genentech v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed.Cir.1993). Furthermore, the exercise of discretion must be supported by a sound basis for refusing to adjudicate an actual controversy. *See Elecs. for Imaging, Inc. v. Coyle,* 394 F.3d 1341, 1345 (Fed.Cir.2005); *Capo, Inc. v. Dioptics Med. Prod., Inc.,* 387 F.3d 1352, 1357 (Fed.Cir.2004).

In this case, the district court noted, without explanation in a footnote, that "[a]s an alternative basis for its ruling, the Court concludes that even if it had subject matter jurisdiction over the instant claims, it would exercise its discretion and decline to decide them." *SanDisk,* slip op. at 17 n. 30. That decision, however, was made in the context of our " reasonable apprehension" precedent without the benefit of the Supreme Court's views in *MedImmune.* Given the change reflected in *MedImmune* and our holding in this case, we discern little basis for the district court's refusal to hear the case and expect that in the absence of additional facts, the case will be entertained on the merits on remand.

### CONCLUSION

For the above reasons, we conclude that the dismissal was improperly granted. The dismissal is vacated, and the case is remanded for further proceedings consistent with this opinion.

*VACATED and REMANDED*

### COSTS

Costs are awarded to SanDisk.

Opinion concurring in the result filed by Circuit Judge BRYSON.BRYSON, Circuit Judge, concurring in the result.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

Under our law, as things stood before the Supreme Court's decision in *MedImmune,* the district court's order in this case was correct. ST, the patentee, had offered a license to SanDisk, but had not threatened suit and had sought to continue licensing negotiations. Although ST had made a detailed showing as to why it believed SanDisk's products were within the scope of its patent rights, there is nothing exceptional in that. In the typical case, we would expect competent patent counsel who offers a license to another party to be prepared to demonstrate why such a license is required. By the time the suit was brought, ST had done nothing to give SanDisk cause to be in reasonable apprehension of suit, and in fact ST had expressly stated that it did not intend to sue SanDisk. In short, ST was simply availing itself of the safe haven our cases had created for patentees to offer licenses without opening themselves up to expensive litigation. *See, e.g., Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051, 1054 (Fed.Cir.1995); *Shell Oil Co. v. Amoco Corp.,* 970 F.2d 885, 888 (Fed.Cir.1992).

**\*11** The decision in *MedImmune* dealt with a narrow issue: whether a declaratory judgment action can be brought by a patent licensee without terminating the licensing agreement. Footnote 11 of the *MedImmune* opinion, however, went further and criticized this court's "reasonable apprehension of suit" test for declaratory judgment jurisdiction. I agree with the court that the footnote calls our case law into question and would appear to make declaratory judgments more readily available to parties who are approached by patentees seeking to license their patents. In particular, the reasoning of the *MedImmune* footnote seems to require us to hold that the district court in this case had jurisdiction to entertain SanDisk's declaratory judgment action. For that reason I concur in the judgment of the court in this case reversing the jurisdictional dismissal of the complaint.

I think it is important, however, to point out the implications of the footnote in *MedImmune* as applied here, because the implications are broader than one might suppose from reading the court's opinion in this case. While noting that it is not necessary to define the outer boundaries of

declaratory judgment jurisdiction, the court holds that "where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license," the party may bring a declaratory judgment action. Applying that principle, the court concludes that in this case, where "ST sought a right to a royalty under its patents based on specific, identified activity by SanDisk," an Article III case or controversy has arisen.

In practical application, the new test will not be confined to cases with facts similar to this one. If a patentee offers a license for a fee, the offer typically will be accompanied by a suggestion that the other party's conduct is within the scope of the patentee's patent rights, or it will be apparent that the patentee believes that to be the case. Offers to license a patent are not requests for gratuitous contributions to the patentee; the rationale underlying a license offer is the patentee's express or implied suggestion that the other party's current or planned conduct falls within the scope of the patent. Therefore, it would appear that under the court's standard virtually any invitation to take a paid license relating to the prospective licensee's activities would give rise to an Article III case or controversy if the prospective licensee elects to assert that its conduct does not fall within the scope of the patent. Indeed, as the court makes clear, even a representation by the patentee that it does not propose to file suit against the prospective licensee will not suffice to avoid the risk that the patentee will face a declaratory judgment action. And if there is any uncertainty on that score, all the prospective licensee has to do in order to dispel any doubt is to inquire of the patentee whether the patentee believes its activities are within the scope of the patent. If the patentee says "no," it will have made a damaging admission that will make it very hard ever to litigate the issue, and thus will effectively end its licensing efforts. If it says "yes" or equivocates, it will have satisfied the court's test and will have set itself up for a declaratory judgment lawsuit.

**\*12** For these reasons, I see nothing about the particular facts surrounding this licensing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

negotiation in this case that triggers SanDisk's right to bring a declaratory judgment action under the new standard. The court emphasizes that ST made a "detailed presentation [to SanDisk] which identified, on an element-by-element basis, the manner in which ST believed each of SanDisk's products infringed the specific claims of each of ST's patents." The court summarizes ST's presentation by stating that "ST communicated to SanDisk that it had made a studied and determined infringement determination and asserted a right to a royalty based on this determination" and that SanDisk "maintained that it could proceed in its conduct without the payment of royalties to ST." Those facts, the court concludes, evinced a sufficient controversy to entitle SanDisk to institute its declaratory judgment suit.

But what is the significance of those facts? The court's legal test does not suggest that the case would come out differently if ST had been less forthcoming about why it believed SanDisk should take a license, or even if ST had simply contacted SanDisk, provided copies of its patents, and suggested that SanDisk consider taking a license. I doubt the court would hold that there was no controversy in that setting, as long as SanDisk was prepared to assert that it believed its products were not within the scope of ST's valid patent rights. If SanDisk's lawyers had any question about whether this court would permit them to seek a declaratory judgment under those circumstances, they could readily resolve that question by sending a "put up or shut up" response to ST's licensing offer-asking ST to state expressly whether it regarded SanDisk's products to be within the scope of ST's patents and to identify with particularity how SanDisk's products read on particular claims of those patents. Any response by ST would either end its licensing efforts or expose it to a declaratory judgment action. FN1

In sum, the rule adopted by the court in this case will effect a sweeping change in our law regarding declaratory judgment jurisdiction. Despite the references in the court's opinion to the particular facts of this case, I see no practical stopping point short of allowing declaratory judgment actions in virtually any case in which the recipient of an invitation to take a patent license elects to dispute the need for a license and then to sue the patentee. Although I have reservations about the wisdom of embarking on such a course, I agree with the court that a fair reading of footnote 11 of the Supreme Court's opinion in *MedImmune* compels that result, and I therefore concur in the judgment reversing the district court's dismissal order in this case. FN2

FN1. To avoid the risk of a declaratory judgment action, ST could have sought SanDisk's agreement to the terms of a suitable confidentiality agreement. The record before us reflects that the parties did not enter into such an agreement. Rather, ST sought to condition its open licensing discussions and the infringement study on adherence to Federal Rule of Evidence 408. That rule expressly relates to evidence of efforts toward compromising or attempting to compromise a claim in litigation and does not prevent SanDisk from relying on the licensing discussions and infringement study to support its claims. *See* Fed.R.Evid. 408. Furthermore, ST's presentation was made outside the context of litigation, and there is nothing on the record to indicate that it could be properly considered an "offer" to settle a claim which was then in dispute. *See, e.g., Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1556-57 (Fed.Cir.1983).

FN2. In this case, we address only the first prong of this court's two-part test. There is no dispute that the second prong is met. We therefore leave to another day the effect of *MedImmune*, if any, on the second prong.

FN3. Although the district court found that licensing negotiations had not been terminated, we note that SanDisk in fact declined to participate in further negotiations, effectively bringing them to an end. Regardless, however, a party to licensing negotiations is of course within

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----

--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173
**(Cite as: --- F.3d ----)**

its rights to terminate negotiations when it appears that they will be unproductive.

FN1. The court suggests that ST could have avoided the risk of a declaratory judgment action by obtaining a suitable confidentiality agreement. The problem with that suggestion is that it would normally work only when it was not needed-only a party that was not interested in bringing a declaratory judgment action would enter into such an agreement. A party that contemplates bringing a declaratory judgment action or at least keeping that option open would have no incentive to enter into such an agreement.

FN2. Although I agree that the judgment must be reversed, I take issue with the scope of the remand insofar as it applies to the district court's exercise of its discretion to decline to entertain this action as a discretionary matter. I would allow the district court to reconsider that issue based on all the circumstances, not just " additional facts" not previously before the district court, as the terms of this court's remand seem to require. Thus, for example, the fact that the parties are engaged in a parallel infringement action in another district court is an important factor in the district court's decision on whether to allow SanDisk's declaratory suit to proceed at this time. *See Intermedics Infusaid, Inc. v. Regents of Univ. of Minn.,* 804 F.2d 129 (Fed.Cir.1986) (pending action in another jurisdiction is sufficient ground on which to stay declaratory suit). The district court should be free on remand to consider that factor in determining how to exercise its discretion, even though the pendency of that parallel action is not an " additional fact" that was not before the court at the time of its earlier decision.

C.A.Fed. (Cal.),2007.
Sandisk Corp. v. STMicroelectronics, Inc.
--- F.3d ----, 2007 WL 881008 (C.A.Fed. (Cal.)), 82 U.S.P.Q.2d 1173

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

Westlaw.

Slip Copy

Slip Copy, 2006 WL 1749399 (D.Del.)
(Cite as: Slip Copy)

Page 1

**c**

Thales Airborne Systems S.A. v. Universal
Avionics Systems Corp.
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
THALES AIRBORNE SYSTEMS S.A. and Thales
Avionics S.A., Plaintiffs,
v.
UNIVERSAL AVIONICS SYSTEMS
CORPORATION, Defendant.
**No. Civ. 05-853-SLR.**

June 21, 2006.

Steven J. Balick, Tiffany Geyer Lydon, Ashby &
Geddes, Wilmington, DE, for Plaintiffs.
Frederick L. Cottrell, III, Alyssa M. Schwartz,
Richards, Layton & Finger, Wilmington, DE, for
Defendant.
John G. Day, Ashby & Geddes, Wilmington, DE.

MEMORANDUM ORDER
ROBINSON, J.
*1 At Wilmington this 21st day of June, 2006,
having considered plaintiffs' motion to enjoin,
defendant's motion to transfer, and the papers
submitted in connection therewith;

IT IS ORDERED that defendant's motion to
transfer (D.I.9) is denied, for the reasons that follow:

1. Introduction. On December 12, 2005, at 8:34 am,
plaintiffs Thales Airborne Systems S.A. and Thales
Avionics S.A. filed a complaint for patent
infringement against defendant Universal Avionics
Systems Corporation. (D.I.1) That same day, at
9:46 am, defendant filed a declaratory judgment
action in the District of New Jersey against Thales
S.A. asserting noninfringement and invalidity of
four patents.[FN1] This action only involves U.S.
Patent No. 5,488,563 ("the '563 patent") and U.S.
Patent No. 5,638,282 ("the '282 patent"), whereas

the New Jersey action also involves U.S. Patent
Nos. 5,414,631 ("the '631 patent") and 6,088,654 ("
the '654 patent"). Plaintiffs filed a motion to enjoin
the New Jersey proceedings. (D.I.5, 6) Defendant
then filed an answer and this cross motion to
transfer to the District of New Jersey. (D.I.7, 9, 10)
Defendant filed its opposition to plaintiffs' motion
to enjoin, to which plaintiffs have replied. (D.I.10,
14) Plaintiffs also filed their opposition to the
motion to transfer (D.I.14), to which defendant has
replied. (D.I.19)

> FN1. The New Jersey action was later
> amended to include both Thales Airborne
> Systems S.A. and Thales Avionics S.A. as
> defendants.

2. Background. Plaintiff Thales Airborne Systems
S.A. is a French corporation and owns the rights to
the patents-in-suit. (D.I.6, Ex. A) Plaintiff Thales
Avionics S.A. is also a French corporation and has
been granted licenses and the right to enforce the
patents-in-suit. (*Id.*) Thales S.A. ("Thales"), a
French corporation, is the parent corporation of
both plaintiffs. (*Id.*) Thales Avionics, Inc., a
Delaware corporation with its principal place of
business in New Jersey, is a wholly-owned
subsidiary of Thales, but is not a party to either the
Delaware or New Jersey action.[FN2] (D.I. 14 at 10)

> FN2. The parties disagree about the
> significance of Thales Avionics, Inc. to
> both motions. *See infra* ¶¶ 10-12.

3. Defendant Universal Avionics Systems
Corporation is an Arizona corporation with its
principal place of business in Arizona. Defendant
and plaintiffs are competitors in the avionics
equipment market, including terrain awareness and
warning systems ("TAWS"). In May 2005, Thales
sent a letter to defendant alleging that its
manufacturing and sale of its TAWS products

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

infringed the patents-in-suit. (D.I. 6 at 2) Subsequently, both parties engaged in negotiations regarding the patents-in-suit and entered into a standstill agreement prohibiting either party from initiating litigation through December 9, 2005. (*Id.*)

5. Standard of Review. Under 28 U.S.C. § 1404(a), a district court may transfer any civil action to any other district where the action might have been brought for the convenience of parties and witnesses and in the interests of justice. Congress intended through § 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); *Affymetrix, Inc. v. Synteni, Inc.,* 28 F.Supp.2d 192, 208 (D.Del.1998).

*2 6. The burden of establishing the need to transfer rests with the movant "to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin,* 512 F.Supp. 972, 973 (D.Del.1981) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970). " Unless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail". *ADE Corp. v. KLA-Tencor Corp.,* 138 F.Supp.2d 565, 567 (D.Del.2001); *Shutte,* 431 F.2d at 25.

7. The deference afforded a plaintiff's choice of forum will apply as long as the plaintiff has selected the forum for some legitimate reason. *C.R. Bard, Inc. v. Guidant Corp.,* 997 F.Supp. 556, 562 (D.Del.1998); *Cypress Semiconductor Corp. v. Integrated Circuit Systems, Inc.,* 2001 WL 1617186 (D.Del. Nov.28, 2001); *Continental Cas. Co. v. American Home Assurance Co.,* 61 F.Supp.2d 128, 131 (D.Del.1999). Although transfer of an action is usually considered as less inconvenient to a plaintiff if the plaintiff has not chosen its " 'home turf' or a forum where the alleged wrongful activity occurred, the plaintiff's choice of forum is still of paramount consideration, and the burden remains at all times on the defendants to show that the balance of convenience and the interests of justice weigh strongly in favor of transfer." *In re M.L.-Lee Acquisition Fund II, L.P.,* 816 F.Supp. 973, 976

(D.Del.1993).

8. The Third Circuit Court of Appeals has indicated that the analysis for transfer is very broad. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995). Although emphasizing that "there is no definitive formula or list of factors to consider," *id.,* the Court has identified potential factors it characterized as either private or public interests. The private interests include: "(1) plaintiff's forum preference as manifested in the original choice; (2) defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Id.* (citations omitted).

9. The public interests include: "(1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases." *Id.* (citations omitted).

10. Discussion. Defendant asserts that its choice of forum should be given greater deference than plaintiffs' choice of forum because plaintiffs did not file suit on their "home turf." (D.I. 10 at 16) Defendant also points out that none of the parties are incorporated in Delaware, nor does any party have a physical presence in Delaware. (*Id.*) Defendant suggests that litigation in New Jersey would be more convenient and less expensive because of plaintiffs' "substantial ties" to New Jersey through the headquarters of Thales Avionics, Inc. (D.I. 19 at 3) Lastly, defendant contends that " the interest of justice" requires the case be transferred because "the Delaware action could not dispose of all remaining issues between the parties." FN3 (*Id.* at 4)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN3. The "remaining issues" being the '631 and '654 patents.

*3 11. Plaintiffs contend that, as French corporations, Delaware is their "home turf," so their choice of forum should be given full deference. (D.I. 14 at 19) Additionally, plaintiffs argue that Delaware has an interest in the litigation because defendant's allegedly infringing products are sold in the State. Plaintiffs repeatedly question the benefits of a New Jersey forum because none of the parties are incorporated or maintain a physical presence in New Jersey. (D.I. 14 at 21 n. 12) Lastly, there is a suggestion in the record that plaintiffs may challenge personal jurisdiction in New Jersey, which could affect the efficiency of litigation in New Jersey, as well as the enforceability of any judgment from a New Jersey court. (*Id.* at 20)

12. Weighing the parties' arguments against the *Jumara* balancing test, the court finds that the asserted advantages of moving the case to the District of New Jersey are insufficient to warrant a transfer. Much argument is made over the ties between plaintiffs and New Jersey-based Thales Avionics, Inc. Although plaintiffs share similar names with Thales Avionics, Inc. and all three corporations have the same corporate parent, neither Thales Avionics, Inc., nor Thales, are parties to this action. Defendant has not shown that Thales Avionics, Inc. has any connection to this patent infringement action, let alone a strong enough connection such that plaintiffs' choice of forum should be ignored.

13. Beyond the factors regarding the forum preferences of the parties, most of the *Jumara* factors do not favor either jurisdiction. For a patent infringement suit between an Arizona corporation and two French corporations, New Jersey and Delaware seem equally inconvenient for all parties. While defendant correctly points out that no party has a physical presence in Delaware, the same is true of New Jersey. Both parties argue that the other side's choice of forum makes little sense, but only plaintiffs maintain the ability to challenge jurisdiction in one of the forums in question. Transfer of this action is only appropriate to a jurisdiction where the action "might have been

brought," and long delays could result were plaintiffs to challenge personal jurisdiction in the New Jersey declaratory judgment action.

14. Defendant contends that "the interest of justice" requires the case be transferred because additional issues exist in the pending New Jersey action that are not addressed in this Delaware action. Defendant is free to raise the additional patents in the action at bar in order to resolve them in one proceeding.

15. Conclusion. For the reasons stated, defendant's motion to transfer (D.I.9) is denied.

IT IS FURTHER ORDERED that plaintiffs' motion to enjoin (D.I.5) is granted in part and denied in part, for the reasons that follow:

1. Standard of Review. It has long been settled that " a United States district court which first obtains jurisdiction of the parties and issues may ... enjoin proceedings involving the same issues and parties begun thereafter in another United States district court." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 927 (3d Cir.1941). While invocation of this " first-filed" rule is the norm, exceptions are not rare, and district courts are given discretion in retaining jurisdiction "when justice or expediency requires." *Genentech, Inc. v. Eli Lilly and Co.,* 998 F.2d 931, 937 (Fed.Cir.1993); *EEOC v. University of Pennsylvania,* 850 F.2d 969, 972 (3d Cir.1988).

*4 2. Although courts hearing patent cases must apply "the procedural law of the regional circuit in matters that are not unique to patent law, ... the regional circuit practice need not control when the question is important to national uniformity in patent practice." *Laboratory Corporation of America Holdings v. Chiron Corp.,* 384 F.3d 1326, 1330 (Fed.Cir.2004). The Federal Circuit has held that "injunctions arbitrating between co-pending patent declaratory judgment and infringement cases in different district courts are reviewed under the law of the Federal Circuit." *Id.* at 1331. In this context, co-pending patent infringement and declaratory judgment actions are those involving " the same patents and the same parties." *Id.* at 1328.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 1749399 (D.Del.)
**(Cite as: Slip Copy)**

3. Discussion. The parties spend much of their briefs arguing over whether the first-filed rule applies to actions filed within hours of one another, while comparatively little argument is made over whether the first-filed rule applies when the second action involves additional patents. In *APV North America, Inc. v. Sig Simonazzi North America, Inc.,* 295 F.Supp.2d 393, 398 (D.Del.2002), the court refused to use the first-filed rule to dismiss a case because the second case involved "different patents and different technologies." Although all four of the patents asserted in the New Jersey declaratory judgment action involve TAWS technology, the '631 and '654 patents arguably involve different aspects of this broad category of technology than do the '563 and '282 patents asserted at bar. (D.I. 19 at 7)

4. Plaintiffs cite several cases for the proposition that only the same general subject matter between the two actions is needed if additional claims are raised in a subsequently-filed action. (D.I. 14 at 15) None of the cases cited are Federal Circuit patent cases, however, and while the Federal Circuit has a strong preference for adhering to the first-filed rule, its application seems limited to actions "involving the same patents." *Laboratory Corporation,* 384 F.3d at 1328.

5. Conclusion. In light of the above discussion and the court's decision to deny defendant's motion to transfer this action to the District of New Jersey, plaintiffs' motion to enjoin the New Jersey declaratory judgment action is granted to the extent it involves the '563 and '282 patents at issue in the instant litigation.

D.Del.,2006.
Thales Airborne Systems S.A. v. Universal Avionics Systems Corp.
Slip Copy, 2006 WL 1749399 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 9

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2002 WL 31513432 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Whelan v. United Pacific Industries, Inc.
E.D.Pa.,2002.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
James A. WHELAN, et al.
v.
UNITED PACIFIC INDUSTRIES, INC.
**No. CIV.A. 02-2519.**

Nov. 1, 2002.

*MEMORANDUM*
THOMAS N. O'NEILL, JR., J.
*1 Defendant United Pacific Industries, Inc. ("UPI") commenced a declaratory judgment action in the United States District Court for the Central District of California on April 4, 2002, seeking a judgment that plaintiffs' patent, number 5,846,617 ("the '617 patent"), was invalid and not infringed. *See United Pacific Industries, Inc. v. Whelan Brothers, Inc,* No.02-2802 (C.D. Ca. filed Apr. 4, 2002). Plaintiffs, James and Robert Whelan and Whelan Brothers, Inc. subsequently sued defendant in this Court for patent infringement, common law unfair competition, and violation of Pennsylvania's Unfair Trade Practices Consumer Protection Law, 73 Pa. Stat. Ann. § 201, *et seq.* on April 26, 2002. Defendant now moves to dismiss the instant case because the central issue of patent validity and infringement is duplicative of the first-filed declaratory judgment action pending in California. Plaintiffs argue that special circumstances require that the this suit proceed or, in the alternative, that the proper relief for defendant is a stay until the California litigation is resolved. I will stay the present case and place it in the suspense docket pending the outcome of the California action.[FN1]

> FN1. Stay of the state law claims as well as the federal claim is appropriate because federal jurisdiction over the state law

claims in this case is dependant on plaintiffs maintaining a viable patent claim.

The individual plaintiffs are the owners of the corporate plaintiff, Whelan Brothers, Inc., and the inventors of the '617 patent, which consists of a vanity shift knob assembly and a method of replacement for truck transmissions. [FN2] The '617 patent was issued on December 8, 1998. Plaintiffs are headquartered in New Hope, Pennsylvania and conduct business nationally with various distributors. Plaintiffs recently appeared before me and recovered a default judgment for infringement of the '617 patent. *See Whelan v. A. Ward Enterprises, Inc.,* No. CIV.A. 01-2874, 2002 WL 1745614 (E.D.Pa. July 23, 2002).

> FN2. The '617 patent summarizes the invention as follows:
> Many truck transmissions have shift knob assemblies that contain a removable knob element with a specific bottom configuration and at least one manual switch that relies upon the specific bottom configuration of the knob element to function. The present invention replacement shift knob
> assembly includes a knob element made from an aesthetically pleasing material such as wood, stone, ceramic of [sic] the like. A base plate is attached to the bottom of the knob element. The base plate has a first side and an opposite second side, wherein the second side of the base plate is configured to generally physically mimic the specific bottom configuration of the original shift knob being replaced. The base plate is made from a material that differs from the replacement knob element in order to provide the base plate with greater material strength and wear resistance. As a result, a replacement shift knob assembly is provided that is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 2

Not Reported in F.Supp.2d, 2002 WL 31513432 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

aesthetically pleasing yet contains the same strength and functional elements as does the original knob element that is being replaced.

The present complaint alleges that defendant UPI has engaged in the importation and selling of replacement shifter knobs that infringe the '617 patent. On February 8, 2002, plaintiffs' counsel sent a cease and desist letter to UPI accusing the company of patent infringement. The letter provided in relevant part:
If your company does not immediately cease and desist from infringement and provide the needed assurances, your company and all of your distributors that sell the "Wood Eaton Fuller Gear Shift Knob" shifter knob may be subject to liability for patent infringement. The Whelan Brothers have already successfully sued other manufacturers and distributors of wooden Eaton Fuller gear shift knobs.

In response to this letter, defendant investigated the '617 patent, concluded that it was invalid, and filed the declaratory judgment action now pending in California.

Defendants contend that the present action should be dismissed because "the general rule favors the forum of the first-filed action, whether or not it is a declaratory action." *Genentech, Inc. v. Eli Lilly & Co.,* 998 F.2d 931, 937 (Fed.Cir.1993), *overruled on other grounds by Wilton v. Seven Falls Co.,* 515 U.S. 277, 281-82, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). The Court of Appeals for the Federal Circuit has determined, "When the declaratory action can resolve the various legal relations in dispute and afford relief from the controversy that gave rise to the proceeding, and absent sound reason for a change of forum, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action." *Id.* at 938. Similarly, the Supreme Court has recognized that first-filed declaratory actions may enjoin subsequently filed suits for infringement:
The manufacturer who is charged with infringing a patent cannot stretch the Federal Declaratory Judgments Act to give him a paramount right to choose the forum for trying out questions of infringement and validity. He is given an equal start

in the race to the courthouse, not a headstart. If he is forehanded, subsequent suits against him by the patentee can within the trial court's discretion be enjoined pending determination of the declaratory judgment suit, and a judgment in his favor bars suits against his customers. If he is anticipated, the court's discretion is broad enough to protect him from harassment of his customers. If the patentee's suit against a customer is brought in a district where the manufacturer cannot be joined as a defendant, the manufacturer may be permitted simultaneously to prosecute a declaratory action against the patentee elsewhere.

*2 *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 185-86, 72 S.Ct. 219, 96 L.Ed. 200 (1952).

Plaintiffs respond by noting that special circumstances exist in the instant situation, which militate for allowing the present case to proceed in Pennsylvania. *See Genentech,* 998 F.2d at 937 (" Exceptions, however, are not rare, and are made when justice or expediency requires, as in any issue of choice of forum."), *citing Kahn v. General Motors Corp.,* 889 F.2d 1078, 1081-83 (Fed.Cir.1989). Specifically, plaintiffs argue that 1) the defendants' declaratory judgment action is fatally flawed because the California complaint failed to name necessary parties; 2) a stay of the present case will deny plaintiffs immediate equitable relief, required to keep plaintiffs' company in business; and 3) the California action and the present case are not truly parallel suits.

The special circumstances which plaintiffs cite are not sufficient to depart from the general rule that duplicative issues should be resolved in the first-filed action. In *Genentech,* the Court of Appeals for the Federal Circuit determined that there must be a sound reason for not allowing the duplicative issues to be adjudicated in the original suit: "Such reason may be the convenience and availability of witnesses, or absence of jurisdiction over all necessary or desirable parties, or the possibility of consolidation with related litigation, or considerations relating to the real party in interest. " *Id.* at 938. Plaintiffs cite none of these reasons for allowing the present action to proceed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31513432 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Although plaintiffs argue that the California complaint failed to name the patent owners as parties to the declaratory judgment action,[FN3] such an easily correctable oversight does not prevent this Court from deferring to the first-filed suit. *See National Foam, Inc. v. Williams Fire & Hazard Control, Inc.,* No. CIV. A. 97-3105, 1997 WL 700496, at *5 (E.D.Pa. Oct.29, 1997) (Hutton, J.). In *National Foam,* the District Court had to determine priority between a first-filed declaratory judgment patent action that did not name a necessary defendant and an infringement suit subsequently filed in another district court by the defendants in the first suit. *Id.* at *2. The *National Foam* Court determined that amendment of the original declaratory judgment complaint gave the first-filed suit priority under Federal Rule of Civil Procedure 15(c).[FN4] *Id.* at *5. The *National Foam* Court focused on whether the failure to name all the appropriate defendants in the original complaint deprived the subsequently joined defendant of fair notice of the claims in the first-filed suit. *Id.* There, the court determined that the close association between the defendants originally named in the complaint and the subsequently named defendant was fatal to the claim of lack of notice. *See id.* (" Before Williams and CCAI filed in the Southern District of Texas, it is highly probable if not certain that Williams, as CCAI's licensee, told CCAI about the complaint before this Court. Thus, this Court finds that CCAI 'should have known that but for a mistake concerning the identity of the proper party, the initial complaint would have been brought against it.' ").

FN3. The California declaratory judgment complaint names Whelan Brothers, Inc. and Does 1 through 10 as defendants. Plaintiffs argue that because the complaint does not name the patent owners, James and Robert Whelan, as defendants, it is fatally flawed and the present action has priority over the California case.

FN4. Federal Rule of Civil Procedure 15(c) provides in part:
An amendment of a pleading relates back to the date of the original pleading when

(1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or
(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

The instant case presents a similar situation. The California complaint names Whelan Brothers, Inc. as the defendant. Although Whelan Brothers, Inc. is a licensee under the '617 patent, James and Robert Whelan, who own the closely-held corporation, are the patentees. Given this fact, I conclude that in the likely event that defendant amends its California complaint to name James and Robert Whelan as defendants, the declaratory judgment action will have priority over the present case.

*3 Next, plaintiffs contend that a stay of the present case will deny them necessary injunctive relief. Plaintiffs', however, do not suggest any reason why they could not assert a counter-claim for injunctive relief in the California declaratory judgment action under Federal Rule of Civil Procedure 13.

Plaintiffs also assert that the California suit for declaratory judgment and the present action are not parallel and should therefore proceed separately. "A suit is only duplicative if it involves the 'same claims, parties, and available relief.' " *Chrysler Credit Corp. v. Marino,* 63 F.3d 574, 578 (7th Cir.1995), *quoting Serlin v. Arthur Andersen & Co.,* 3 F.3d 221, 223 (7th Cir.1993). However, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31513432 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

parties in the present case are nearly identical to the California action. Moreover, except for the state law claims in the present case, the issues in both suits are the same: Is the '617 patent valid and is it infringed? The fact that the California suit seeks a declaratory judgment and the present action seeks damages and injunctive relief is immaterial.

### ORDER

AND NOW, this day __ of November, 2002, upon consideration of defendant's motion to dismiss and plaintiffs' response thereto and for the reasons set forth in the accompanying memorandum it is hereby ORDERED that defendant's motion to dismiss is DENIED, but that the present action is STAYED and placed in the suspense docket, pending a final decision by the District Court in *United Pacific Industries, Inc. v. Whelan Brothers, Inc,* No.02-2802 (C.D. Ca. filed Apr. 4, 2002).

E.D.Pa.,2002.
Whelan v. United Pacific Industries, Inc.
Not Reported in F.Supp.2d, 2002 WL 31513432 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.