# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FCI USA, INC. and                          )
FCI AMERICAS TECHNOLOGY, INC.,             )
                                           )
          Plaintiffs,                      )
                                           )
     v.                                    )          C.A. No. 07-49-JJF
                                           )
MOLEX INCORPORATED,                        )
                                           )
          Defendant.                       )
                                           )

## [PROPOSED] ORDER ON CLAIM CONSTRUCTION

WHEREAS the Court held a Claim Construction Hearing in this matter on December 14, 2007;

WHEREAS the parties dispute the construction of certain terms or phrases that appear in one or more claims of the patents-in-suit, including U.S. Patent Nos. 6,981,883 ("the '883 patent"), 7,182,643 ("the '643 patent"), 7,114,964 ("the '964 patent"), and 7,229,318 ("the '318 patent"); and

WHEREAS, the Court has considered the parties' respective positions as set forth in their briefs and supporting papers and during oral argument at the Claim Construction hearing;

NOW THEREFORE IT IS HEREBY ORDERED that for the purposes of the '883, '643, '964, and '318 patents, the disputed terms or phrases are construed as follows:

1. The phrase "air gap … between the respective portions of the electrical contacts that extend through the leadframe housings" shall mean "air between paired electrical contacts anywhere within the housings along the length of those contacts to control impedance;"

2.   The phrase "a gap width that provides … a uniform impedance profile along the respective portions of the contacts that extend through the leadframe housings" shall mean "the air gap has a particular distance that provides an impedance profile within an acceptable range;"

3.   The term "recess" shall mean "an indentation or small hollow;"

4.   The term "column" shall mean "vertical direction in which differential signal pairs are stacked;"

5.   The term "column centerline" shall mean "vertical line through the center of a column;"

6.   The term "row centerline" shall mean "horizontal line through the center of a row."


Dated: _____                    _____

                                         UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FCI USA, INC. and<br>FCI AMERICAS TECHNOLOGY, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 07-49-JJF |
| MOLEX INCORPORATED, | ) ) ) | **REDACTED<br>PUBLIC VERSION** |
| Defendant. | ) ) | |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Thomas C. Grimm (#1098)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
tgrimm@mnat.com
jparrett@mnat.com
*Attorneys for Plaintiffs*

OF COUNSEL:

George E. Badenoch
Sheila Mortazavi
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

Michael M. Shen
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
(202) 220-4200

Original Filing Date: October 22, 2007
Redacted Filing Date: October 22, 2007

# TABLE OF CONTENTS

Page No.

I.      BACKGROUND ................................................................................................ 1

        A.      Nature and Stage of the Proceedings ................................................. 1

        B.      FCI's Patents-In-Suit ........................................................................ 2

                1.      Field of Invention.................................................................... 2

                2.      Relationship Between the Patents-in-Suit................................. 6

II.     APPLICABLE LEGAL PRINCIPLES.............................................................. 7

III.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS IDENTIFIED BY FCI ......... 7

        A.      "Air gap . . . between the respective portions of the electrical
                contacts that extend through the leadframe housings" ......................... 7

        B.      "A gap width that provides . . .  a uniform impedance profile
                along the respective portions of the contacts that extend through
                the leadframe housings"................................................................... 11

        C.      "Recess".......................................................................................... 13

        D.      "Column"......................................................................................... 16

        E.      "Column Centerline" and "Row Centerline"..................................... 19

IV.     TERMS IDENTIFIED BY MOLEX THAT REQUIRE NO CONSTRUCTION............ 19

        A.      Contacts:  "Differential Signal Pair," "Signal Contact" and "
                Ground Contact" .............................................................................. 20

        B.      "Leadframe Housing" ....................................................................... 21

        C.      "Broadside-Coupled"........................................................................ 22

        D.      "Column"-Related Terms and Phrases:  "Column Spacing Distance" and
                "Column of Electrical Contacts" ....................................................... 23

        E.      "Row of Electrical Contacts"............................................................ 24

        F.      "Array of Electrical Contacts"........................................................... 24

        G.      "Tightly Electrically Coupled" .......................................................... 25

        H.      "Gap Distance" ................................................................................ 26

        I.      "Aspect Ratio" ................................................................................. 27

J.     "Rise Time" ........................................................................................... 27

K.     "Worst-Case, Multi-Active Cross Talk" ............................................. 28

V.    CONCLUSION .............................................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Abtox, Inc. v. Exitron Corp.*, 131 F.3d 1009 (Fed. Cir. 1997) ....................................... 17

*Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361 (Fed. Cir. 2007) .............................. 17

*Comark Comms., Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998) ................................ 14, 26

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111
    (Fed. Cir. 2004) .......................................................................................... 7

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968 (Fed. Cir. 1999) ....................... 14, 22

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995),
    *aff'd*, 517 U.S. 370 (1996) ...................................................................... 7

*Omega Engineering, Inc, v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ........................... 8, 17

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................ 7

*Smith v. Snow*, 294 U.S. 1, 11 (1935) ........................................................... 15

*SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985) ........................... 15

*Superguide Corp. v. DirecTV Enter., Inc.*, 358 F.3d 870 (Fed. Cir. 2004) ................................. 15

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997) ...................... 7, 19, 20, 21

*Varco, L.P. v. Pason Sys. USA Corp.*, 436 F.3d 1368 (Fed. Cir. 2006) ....................................... 26


**<u>Other References</u>**

Manual of Patent Examining Procedure (M.P.E.P.) §§ 201.07 and 201.08 (August 2006) ........... 6

The American Heritage College Dictionary, 1140 (3rd ed. 1997) ............................................... 14

Pursuant to the Court's Scheduling Order, dated May 1, 2007 (D.I. 25), Plaintiffs FCI USA, Inc. and FCI Americas Technology, Inc. (collectively "FCI") respectfully submit this claim construction brief setting forth their proposed constructions of the disputed terms and phrases in the asserted claims of FCI's U.S. Patent No. 6,981,883 ("the '883 patent"), U.S. Patent No. 7,182,643 ("the '643 patent"), U.S. Patent No. 7,114,964 ("the '964 patent") and U.S. Patent No. 7,229,318 ("the '318 patent") (collectively "the patents-in-suit") (attached as Exhibits A-D, respectively).[1]  FCI's proposed constructions of the disputed terms are also set forth in the proposed Order which is attached hereto as Exhibit 1.

## I.     BACKGROUND

### A.     Nature and Stage of the Proceedings

This is an action for patent infringement by FCI against Molex Incorporated ("Molex"). FCI owns the patents-in-suit, which are generally directed to high speed electrical connectors. FCI has alleged that Molex has infringed, is infringing, and/or will continue to willfully infringe one or more claims of each of the patents-in-suit through its activities with respect to certain shieldless, high speed electrical connectors.  Molex has not yet answered the complaint, and instead has filed a motion to dismiss, transfer or stay this action (D.I. 8).  The Court held a scheduling conference on April 20, 2007, and issued a Scheduling Order on May 1, 2007 (D.I. 25).

There is a parallel declaratory judgment action filed by Molex that is currently pending in the District Court of Nevada, captioned *Molex Incorporated v. FCI Americas Technology, Inc.*, Case No.: 3:07-cv-00039-BES-VPC.  FCI has filed a motion to dismiss or stay that action.

The parties have proceeded with discovery pending this Court's and the Nevada court's resolution of their respective motions to dismiss, and have agreed that any discovery would be useable in either forum.  The parties exchanged proposed claim terms and phrases for

---

[1]  The "Exhibit" or "Exh." cited in this Brief refer to the exhibits in the accompanying Appendix In Support of Plaintiffs' Opening Claim Construction Brief.

construction in mid-September 2007.  FCI identified five claim terms in the '883 patent, one

term in the '964 patent and three terms in the '643 patent that require construction by the Court.

(Exh. E)  Molex identified fourteen terms or phrases in the '883 patent, twelve in the '964 patent,

twelve in the '643 patent and fifteen in the '318 patent that it asserts require construction.  (Exhs.

F-G.)  Pursuant to the Scheduling Order (D.I. 25), the parties exchanged their proposed

constructions for the identified terms on October 1, 2007.  (Exhs. H-I.)  A *Markman* hearing has

been scheduled for December 14, 2007, or as soon thereafter as the Court's schedule permits.

    **B.**    **FCI's Patents-In-Suit**

        **1.**    **Field of Invention**

The patents-in-suit generally relate to high speed electrical connectors.  Electrical

connectors are devices that are used to provide signal connections between different electronic

devices by using signal contacts.  (Exh. A, col. 1, ll. 25-26.)  For example, electrical connectors

can be used to connect daughtercards to a motherboard in data and telecommunications network

equipment.

Electrical connectors can be formed as a single device, or, alternatively, they can be two

mating parts of an interconnection.  The two connectors in a mating interconnection are typically

referred to as a "plug" (or "header") and a "receptacle."

Figure 17 of the '964 patent (reproduced below) generally depicts one type of connector.

Figure 16A of the '964 patent (also reproduced below) shows the connector in Figure 17

(reference number 902) connected to an electrical device (reference number 912, which can be a

daughter card).   Figure 16A also shows another connector (reference number 1100) connected to

another electrical device (reference number 910, which can be a backplane).  As shown in Figure

16A, connecting the two mating connectors 902 and 1100 together provides a separable electrical

connection between the two electrical devices 910 and 912:



FIG. 17

FIG. 16A

(Exh. C, col. 14, ll. 15-29.)

Connectors are generally comprised of an insulative housing and electrical contacts disposed within and extending through that insulative housing. The type of connector depicted above in Figure 17 is sometimes referred to as a "right angle" connector, because the contact portions emerging from one end of the connector are perpendicular to the contact portions emerging from the opposite end of the connector. (*See, e.g.*, Exh. C, Fig. 17 (compare the direction of contact portions 942 to the direction of contact portions 932).)

Information can be electronically transmitted by a connector either by single-ended signaling or differential signaling. Single-ended signaling refers to a method of transmitting information where a signal contact carries a varying voltage that represents a signal, while another contact is connected to a reference voltage, usually ground. Differential signaling refers to a method of transmitting information by means of two complementary signals sent on two separate and paired contacts. The patents-in-suit refer to both types of signaling. (*See, e.g.*, Exh. C, col. 9, ll. 19-42 (differential signaling) and col. 9, l. 64 - col. 10, l. 4 (single ended signaling).)

-3-

One important consideration in electrical connector design is the "impedance," which generally refers to the opposition in an electrical circuit to the flow of an alternating current ("AC"). It is desirable to match the impedance of a connector to the impedance of the electrical device(s) of which it is a part (*i.e.*, the combination of the circuit boards and connectors), in order to minimize signal reflection or system resonance. (*See, e.g.*, Exh. A, col. 5, ll. 38-44.)

Another important consideration in connector design is the elimination or minimization of "cross talk." Cross talk generally refers to the undesirable situation where a signal or circuit unintentionally affects another signal or circuit. Cross talk is created when a current or voltage traveling through a contact (such as a signal contact or a pair of differential signal contacts) produces an electric field that overlaps with the electric field of an adjacent structure in the connector, thereby engaging or coupling the two together. While some contacts are designed to be paired together (such as, for example, the two contacts in a differential signal pair), any unintentional coupling of signal contacts in a connector may create cross talk.

Because of increasing demand for smaller, lower weight electronic and communications equipment, the signal contacts in connector devices have become increasingly more closely spaced. In order to deal with the resulting cross talk when either single ended or differential signal pair contacts are spaced more closely together, prior art connectors placed shields, such as metallic plates, between signal contacts or differential signal pairs of contacts. Placement of shields in connectors, however, had the disadvantage of reducing contact density. In other words, shields took up valuable space within a connector that could otherwise have been used to provide additional signal contacts. Shields also added to the weight of connectors, and increased the overall costs associated with manufacturing such connectors. (Exh. B, col. 1, ll. 30-48; col. 2, ll. 1-15.)

The patents-in-suit address these and other problems that existed in prior art high speed connectors. The patents-in-suit teach, for example, how to reduce cross talk between adjacent signal contacts without the use of metallic shield plates. They also teach how to control impedance based on the positioning of signal and ground contacts relative to each other.

For example, one aspect of the claimed invention(s) is the use of "edge" coupling and/or "broadside" coupling of contacts without the use of shields. As used in the patents-in-suit, edge coupling generally refers to an arrangement where the edge (or shorter side) of a contact is adjacent to the edge of an adjacent contact. (*See, e.g.*, Exh. C, Figs. 3A and 4A and col. 6, ll. 46-47.) Broadside coupling generally refers to an arrangement where the broad side (or longer side) of a contact is adjacent to the broad side of an adjacent contact. (*Id.* at Fig. 5 and col. 6, ll. 48-50.) Examples of edge-coupled and broadside-coupled contacts (taken from Figures 4A and 5 of the '964 patent, respectively) are shown below:



EDGE COUPLING                    BROADSIDE COUPLING

Another embodiment of the claimed invention teaches the use of air as the primary dielectric material between paired contacts. The patents-in-suit describe that exposing contacts primarily to air within the housings (rather than encasing them entirely in plastic) permits a reduction in the weight of the connectors and the size of the gaps between contacts. The patents-in-suit teach that using air in this manner results in better impedance and cross talk control, allowing relatively larger contacts and increased signal speed (i.e., less propagation delay).

The patents-in-suit teach various methods that can be used to improve connector design. They do not require that only air be used as the dielectric between paired contacts. Nor do they require that the resulting improved impedance uniformity be perfect and/or absolutely constant along the entire length of the contacts. Nor are they limited to differential signaling, edge coupling or broadside coupling. Molex seeks to support its non-infringement defenses by

reading limitations concerning specific types of signaling, specific types of coupling and detailed and unrealistic functional requirements into the claim terms it seeks to define. However, as explained in detail in Section III below, Molex's efforts to read these limitations into ordinary claim terms which do not require or relate to such limitations is legally improper.

**2.    Relationship Between the Patents-in-Suit**

The patents-in-suit are all related in that they have a common parent – Application Serial No. 10/294,966, filed on November 14, 2002 ("the '966 parent application"), which issued as U.S. Patent No. 6,976,886 (attached as Exh. J).

The '964 patent is a continuation of the '966 parent application, and the '883 patent is a continuation-in-part ("CIP") of the '966 parent application.[2] The '643 patent and the '318 patent are each a continuation of Application Serial No. 10/634,547, filed on August 5, 2003 ("the '547 parent application"), now U.S. Patent No. 6,994,569 (attached as Exh. L), which in turn is a CIP of the '966 parent application.

The '966 parent application is itself a CIP of both Application Serial No. 09/990,794 ("the '794 parent application"), now U.S. Patent No. 6,692,272  (attached as Exh. M) and Application Serial No. 10/155,786 ("the '786 parent application"), now U.S. Patent No. 6,652,318 (attached as Exh. N). The contents of the '966 parent application, and its parent applications (the '794 parent application and the '786 parent application) are all incorporated by reference in the specifications of each of the patents-in-suit.

For the Court's convenience, a patent family chart is attached as Exhibit O.

---

[2]  A "continuation" refers to a second application related to the invention claimed in an earlier application, where "[t]he disclosure presented in the continuation [is] the same as that of the original application; i.e., the continuation should not include anything which would constitute new matter if inserted in the original application." Manual of Patent Examining Procedure (M.P.E.P.) § 201.07 (August 2006) (attached as Exh. K).  A continuation-in-part refers to an application repeating "some substantial portion or all" of the earlier application and adding matter not disclosed in the earlier application.  M.P.E.P. § 201.08.  (Exh. K.)

## II.    APPLICABLE LEGAL PRINCIPLES

The purpose of claim construction is to determine "the meaning and scope of the patent claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) "[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Id.* at 979.  However, "[t]he *Markman* decisions do not hold that the trial judge must repeat or restate every claim term .... Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).

Claim terms are interpreted from the point of view of a person of ordinary skill in the art who "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  To determine what this person of ordinary skill would understand, the Court may consider "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (*citing Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

## III.    CONSTRUCTION OF THE DISPUTED CLAIM TERMS IDENTIFIED BY FCI

### A.    "Air gap . . . between the respective portions of the electrical contacts that extend through the leadframe housings"

| FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|
| air  between paired electrical contacts anywhere within the housings along the length of those contacts to control impedance | an uninterrupted air gap along the entire length of the electrical contacts within the leadframe housings |

The "air gap" limitation identified above is recited in claims 1, 17 and 28 of the '883 patent.[3]  As set forth in the chart above, the parties generally agree that this "air gap" limitation refers to the air present somewhere along the length of electrical contacts within the leadframe housings.  Defendants, however, wish to narrow the scope of the recited air gap to only those that are "uninterrupted" along the "entire length" of the electrical contacts within the housings.  From the point of view of one of ordinary skill in the art reading the claims and the specification in context, there is no basis for adopting the construction suggested by Molex.[4]

Claims 1 and 28 of the '883 patent recite, in relevant part, an "air gap . . . between the respective portions of the electrical contacts that extend through the leadframe housing."  Claim 17 similarly recites an "air gap . . . between respective portions of the second and fourth signal contacts that extend through the leadframe housing."  The recited air gap is described in the claims as "provid[ing] for a desired impedance profile between the electrical contacts."  (Exh. A, claims 1, 28.)  Nothing in these claims affirmatively states that the air gap must be "uninterrupted," as Molex claims, or that it must be formed "along the entire length of the contacts."  On the contrary, the claim language indicates that the air gap need only be along "portions" of the electrical contacts.

The specification too supports FCI's construction, and contradicts the construction proposed by Molex.  Consistent with FCI's construction, the specification states that the air gap is formed in order to control impedance between contacts:  "[t]he distance d of an air dielectric between the contacts that form a differential signal pair . . . can determine the impedance $Z_0$ between each of the contacts."  (Exh. A, col. 5, ll. 48-51.)  Although the specification (via

---

[3]  Dependent claims 2-16, 18-27 and 29-31 also include this limitation by virtue of the claims from which they depend.

[4]  Molex's proposed construction, which is flatly contradicted by the specification, stems from its untenable non-infringement position.

REDACTED

incorporation of the '966 parent application)[5] discusses "primarily" using air as the dielectric between contacts to reduce the weight and impedance of a connector (*see, e.g.,* Exh. J, col. 11, ll. 46-57), it never suggests that air is the only dielectric permitted along the "entire length" of the contacts within the housings.

Quite the contrary, the specification makes clear that the recited air gap between contacts need not be "uninterrupted." In the context of controlling impedance, the '966 parent application actually describes how the contacts may be exposed to two different materials having different dielectric properties within the housings. In particular, it states that "it is desirable to have materials having very low dielectric constants adjacent and in contact with as much as the conductors as possible" (Exh. J, col. 11, ll. 31-33) and that "air is the most desirable dielectric" (*id.* at col. 11, ll. 33-34). It then proceeds to explain that the signal contacts "are positioned both in air and . . . in a second material (e.g., a polymer) having a second dielectric property" (*id.* at col. 11, ll. 39-42), not just air.

Similarly, the '794 parent application (incorporated by reference into the '883 patent) expressly provides that the contacts may be exposed to both air and another material (such as a plastic or polymer) in the housings:

> While air is a desirable dielectric for reducing cross talk, frame 150 and frame 152 may comprise a polymer, a plastic, or the like to secure conductors 130 and 140 so that desired gap tolerances may be maintained. Therefore, conductors 130 and 140 are disposed both in air and in a second material (e.g., a polymer) having a second dielectric property.

(Exh. M, col. 6, ll. 16-23.) Thus, Molex's litigation-induced construction cannot be reconciled with the disclosure in the specification.

---

[5]  The specification of the '883 patent is shorter in length than that of the parent applications from which it claims priority. However, the contents of the parent applications are expressly incorporated by reference in the '883 patent. (Exh. A, col. 1, ll. 8-16.) Accordingly, the terms that are common to the '883 patent and it parent applications (as well as the other patents-in-suit, each of which also incorporate the parent applications) should be construed consistently. *Omega Engineering, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) (common terms in the same patent or related patents carry the same construed meaning).

The prosecution history too supports FCI's proposed construction of this phrase, and is inconsistent with that proposed by Molex.  In an Office Action dated June 20, 2005 (attached as Exh. P), the Examiner rejected the pending claims, which recited the air gap limitation, as anticipated by U.S. Patent No. 6,776,649 to Pape et al. ("the Pape patent," attached as Exh. Q). The Examiner found that the leadframe housings in Pape, pictured below, were such that "an air gap is formed between the respective portions of the electrical contacts that extend through the leadframe housings."  (Exh. P at 2.)



Figures 2 and 3 above show the two sides of a leadframe housing in the Pape patent. Figure 4 shows a cross section of that leadframe assembly taken along the line IV-IV in Figure 3. The Examiner asserted that Pape's leadframe housing (20) has an electrical contact (12) extending through it.  The Examiner further asserted that when two leadframe housings such as those depicted above are placed adjacent to each other, an "air gap" is formed between the respective portions of the contacts that extend through those housings.  The fact that certain

-10-

portions of the space between contacts would be interrupted by plastic (such as reinforcing web 32 or reinforcing edge 28) when two adjacent modules are placed next to each other did not, in the Examiner's view, change the fact that an air gap was formed.[6]

Rather than arguing that an air gap does not exist in Pape, the applicant noted that the prior art "does not teach or suggest an air gap that extends *into* the leadfame housings" (Exh. R), and stated its intention to pursue claims directed to that feature in a future application. With respect to the claims pending in the application that ultimately issued as the '883 patent, the applicant amended its claims to recite additional limitations that the Examiner agreed were not disclosed in Pape. (Exh. S.)

In view of the specification and the prosecution history, it is clear that both the Examiner and the patentee understood the term "air gap . . . between the respective portions of the electrical contacts that extend through the leadframe housing" to be broad enough to cover an embodiment where the dielectric along the length of the contacts within the housings is not necessarily "uninterrupted air." Accordingly, FCI respectfully requests that the Court adopt its proposed construction, which is consistent with and supported by the intrinsic evidence, and not Molex's litigation-induced construction, which would not comport with the understanding of the invention by one of ordinary skill in the art.

**B.    "A gap width that provides . . . a uniform impedance profile along the respective portions of the contacts that extend through the leadframe housings"**

| FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|
| the air gap has a particular distance that provides an impedance profile within an acceptable range | a distance between the portions of contacts within the leadframe housing that provides an impedance of a fixed single value along the entire length of |

---

[6] The Examiner did acknowledge that the Pape patent does not teach a connector where the impedance profile "is a uniform impedance profile along the respective portions of the contacts that extend through the leadframe housings." (Exh. P at 5-6.) The stated objective of the Pape patent is "to improve a contact assembly . . . such that a rather uniform and quick heating of all contacts is ensured" (Exh. Q, col. 1, ll. 42-44), and there is no teaching in the Pape patent of how to achieve a uniform impedance as described in the patents-in-suit.

|  | the contacts within the leadframe housings, such as achieved by precisely maintaining a uniform gap between the contact portions |
| --- | --- |

FCI's proposed construction for the term "a gap width that provides . . . a uniform impedance profile . . . ," which appears in claims 1, 17 and 28 of the '883 patent, is set forth in the chart above.[7]  As can be seen from the chart, Molex wishes to import a multitude of extraneous limitations into this phrase, arguing that it should be interpreted to require (i) that the air gap have "a distance  . . . that provides an impedance of *a fixed single value*," (ii) that the fixed value be "along the *entire length* of the contacts," and that (iii) the fixed value be achieved be a particular means, "such as by *precisely maintaining a uniform gap* between the contact portions."  Such a narrow reading is not supported by the claim language, the specification, or the prosecution history.

The claim language simply refers to a "uniform impedance profile along the respective portions of the contacts that extend through the leadframe housings."  The claim language does not suggest any particular fixed value for either the gap width or for the impedance along the entire length of the contacts.  Nor does it specify a particular means for achieving the "uniform impedance profile," beyond simply having an air gap with a certain "gap width."  To one of ordinary skill in the art, "uniform impedance profile along the respective portions of the contacts that extend through the leadframe housings" does not require an absolutely constant, fixed value impedance along the entire length.  It simply refers to an air gap having "a particular distance that provides an impedance profile within an acceptable range."[8]

---

[7]  Dependent claims 2-16, 18-27 and 29-31 also include this limitation by virtue of the claims from which they depend.

[8]  The fact that the phrase "uniform impedance profile" is readily understood by those skilled in the art is apparent from Molex's use of this term in its own patents and patent applications.  (*See, e.g.*, Exh. T, col. 4, ll. 66-67 (referring to "a constant or uniform impedance" without further defining the term).)  It does not appear that the use of the phrase "a constant or uniform impedance along its full length" in Molex's patent requires a fixed impedance value along the full length of the cable connector.

The specification supports the foregoing definition, confirming that neither the gap distance nor the impedance require perfection or a particular fixed value. As described in the specification, the gap distance d is meant to be controlled so as "[t]o maintain ***acceptable*** differential impedance $Z_0$ control for high bandwidth systems." (Exh. A, col. 6, ll. 3-5.) Indeed, impedance and gap variations are expressly permitted. Specifically, gap variations are permitted so long as the resulting variations in the impedance profile are acceptable. "[T]he acceptable variation is dependent on the speed desired, the error rate acceptable, and other design factors." (*Id.* at col. 6, ll. 8-9.)

In describing the acceptable tolerances for a uniform impedance profile, the '966 parent application (incorporated by reference into the '883 patent) further refutes Molex's requirement of a "single fixed value":

> [t]he desired differential impedance $Z_0$ depends on the system impedance (e.g., of first electrical device 810) . . . Typically, a tolerance of about 5 percent is desired; however, 10 percent may be acceptable for some applications. It is this range of 10% or less that is considered substantially constant differential impedance.

(Exh. J, col. 12, ll. 23-29.)

Accordingly, Molex's attempts to narrow the scope of the claims reciting a "uniform impedance profile" by reading extraneous limitations into these claims (and their respective dependent claims) should be rejected.

### C.    "Recess"

| FCI's Proposed Construction | Molex's Proposed Construction |
| --- | --- |
| an indentation or small hollow | an indentation in the lead frame housing which receives and precisely establishes both the position of the contact in the lead frame housing and the gap width between the contacts of adjacent lead frame housings |

The term "recess" appears in, *e.g.*, dependent claims 8-10, 14 and 29-31 of the '883 patent and refers to a physical feature that may be present in the leadframe housing. "Recess" is

a broad term and should be construed according to its plain meaning – an indentation or small hollow.[9] Molex's proposed definition implies that the recess is much more than a physical feature, but also must have a specific function – "which receives and precisely establishes both the position of the contact in the lead frame housing and the gap width between the contacts of adjacent lead frame housings." Molex's proposed construction is overly narrow and unsupported by the intrinsic evidence.

The claim language does not support Molex's proposed construction. One of the fundamental guiding principles when construing claims is the presumption that differently worded claims have a different scope. *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999); *Comark Comms., Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998). Here, claims 8, 10-11 and 29-30 merely require that the leadframe housing have a recess and that an electrical contact sit in that recess. These claims do not require that the recess "precisely establish[] both the position of the contact in the lead frame housing and the gap width between the contacts of adjacent lead frame housings." In contrast, claims 9 and 31 do include a specific functional limitation, namely, that the recesses have a certain depth and that the electrical contacts have a certain thickness wherein "the first and second depths and first and second thicknesses together define the gap width." For these dependent claims, the patentees ascribed a specific function to the recesses. Accordingly, claims 8, 10-11 and 29-30 are presumed to have a broader scope than claims 9 and 31. Molex's proposed construction does not account for this difference, and must be rejected for at least this reason.

There is nothing in the specification that suggests that the term "recess" should be construed as having anything other than its plain meaning. Nor is there any support in the prosecution history for Molex's proposed construction. Indeed, the Examiner construed the term "recess" to have its plain meaning as well.

Specifically, in rejecting the claims that issued as claims 8, 10-11 and 29-30 as

---

[9] The American Heritage College Dictionary, 1140 (3rd ed. 1997) (attached as Exh. U).

-14-

anticipated, the Examiner relied on the Pape patent and considered the area defined by raised

holding web 22 and raised edge 28 to be a recess in which an electrical contact sits.  (Exh. P at

3.)  The Examiner, however, did not reject the claims that issued as claims 9 and 31 as

anticipated by Pape.  Notably, the Examiner noted that the leadframes in Pape do not abut each

other, and thus, relied on a secondary reference to reject claims 9 and 31 as obvious.[10]  (*Id.* at 5.)

Thus, the Examiner too construed claims 9 and 31 to have a different scope than claims 8, 10-11

and 29-30.  The prosecution history does not support Molex's proposed construction, which

would eliminate any differentiation in the scope between claims 8, 10-11 and 29-30 and claims 9

and 31, respectively.

It appears that Molex may refer to details of the preferred embodiment to support its

overly narrow construction.  The specification describes a preferred embodiment in which

recesses can be "sized very precisely" so that "the gap distance d between each signal contact

can be maintained throughout a connector" (Exh. A, col. 6, l. 64 to col. 7, l. 3) and/or in which

there is "the ability to closely control the size of the recess" that "enables the impedance $Z_0$

between the contacts that form signal pairs … to be closely controlled" (Exh. A, col. 7, ll. 43-

48).  While it is true that the specification describes a particular function for the recess in the

leadframe housing, it would be improper to limit the scope of the term "recess" to that particular

function.  *See, e.g.*, *Superguide Corp. v. DirecTV Enter., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004)

("a particular embodiment appearing in the written description may not be read into a claim

when the claim language is broader than the embodiment"); *SRI Int'l v. Matsushita Elec. Corp.*,

775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) ("That a specification describes only one embodiment

does not require that each claim be limited to that one embodiment."); *see also Smith v. Snow*,

294 U.S. 1, 11 (1935) (a patentee is "not confined to [the] particular mode of use [described in

the specification], since the claims of the patent, not its specification, measure the invention.").

---

[10]  Indeed, the Examiner believed that the recess in Pape only partially defines the gap width.
(Exh. P at 3.)  This interpretation is supported by claims 9 and 31, which state that it is not only
the depth of the recess that controls the gap width but the thickness of the electrical contact that
*together* with the depth of the recess define the gap width.

-15-

There is no support for Molex's proposed construction in the claims, specification or the prosecution history, and thus, it should be rejected and the plain meaning of the term "recess" should be adopted.

**D.     "Column"**

| FCI's Proposed Construction | Molex's Proposed Construction |
| --- | --- |
| vertical direction in which differential signal pairs are stacked | the direction along which contacts in a single line arrangement of differential signal pairs are edge coupled |

The term "column" appears in the claims of the '964 patent and the '643 patent. From the vantage point of one of ordinary skill in the art, this phrase simply refers to the "vertical direction along which differential pairs are stacked." Molex argues that this term should be limited to "the direction along which contacts in a single line arrangement of differential signal pairs are edge coupled." In other words, Molex argues that a "column" cannot contain broadside-coupled differential signal pairs, with each pair being placed vertically above or below another broadside coupled differential pair in that same column. Molex is wrong.

First, Molex's proposed construction cannot be reconciled with the claim language. For example, claim 1 of the '964 patent recites a first, a second and a third "column" of electrical contacts, with each column comprising an "arrangement of differential signal pairs." (Exh. C.) Claim 1 does not specify whether the differential signal pairs are edge coupled or broadside coupled, and thus encompasses both. The fact that claim 1 is not limited to edge coupled contacts, as Molex suggests, is confirmed by dependent claim 13, which expressly recites the additional limitation that "the differential signal pairs are broadside coupled." Accordingly, Molex's proposed construction is contradicted by the claim language itself.

Similarly, independent claims 22 and 44 of the '964 patent also recite columns of electrical contacts, with each column comprising differential signal pairs. These claims have dependent claims that specify that the differential signal pairs can be broadside coupled (*see* Exh. C, claims 35 and 49), again conflicting with Molex's proposed construction.

-16-

Molex's proposed construction is also incorrect because it is inconsistent with the patentee's use of the term "column" in related patents, where the term has been used to refer to vertically stacked arrangements of broadside-coupled differential signal pairs.  It is well-settled that common terms in related patents generally must be construed consistently.  *Omega Engineering, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("the same claim term in the same patent or related patents carries the same construed meaning"); *see also Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1375 (Fed. Cir. 2007); *Abtox, Inc. v. Exitron Corp.*, 131 F.3d 1009, 1010 (Fed. Cir. 1997).[11]

For example, in the '883 patent, Figure 3 clearly shows columns of broadside coupled differential signal pairs, which are expressly referred to as "columns."  In connection with Figure 3 (pictured below), the specification states:



FIG. 3 depicts a conductor arrangement in which signal pairs and ground contacts are arranged in rows. . . . As shown in FIG. 3, each row 311-316 comprises a repeating sequence of two ground contacts and a differential signal pair. . . . In the embodiment shown in FIG. 3, it can be seen that the ***columns of contacts can be arranged as insert molded lead frame assemblies ("IMLAs"), such as IMLAs 1-3***.

FIG. 3

(Exh. A, col. 5, ll. 9-24) (emphasis added).  Thus, the definition of "column" clearly encompasses vertically stacked, broadside-coupled differential signal pairs.

Similarly, with respect to Figures 8A and 8B of the '883 patent (pictured below), the patentee again uses the term "column" to refer to each of the three IMLAs 1-3:

---

[11]  Molex itself has recognized this claim construction principle, stating that a number of the same terms that are used in the different patents-in-suit should have the same meaning.  (*See, e.g.*, Exh. I, at 5, 6 (proposing that "differential signal pair" in the '643 and '318 patents "means the same as in claim 2 of the '883 patent").)

Turning now to FIG. 8A, a conductor arrangement is depicted in which signal pairs are arranged in rows. As can be seen in FIG. 8A, each row 811-816 comprises a plurality of differential signal pairs. . . . In the embodiment shown in FIG. 8A and as was the case with FIG. 3, it can be seen that the *columns of contacts can be arranged as IMLAs, such as IMLAs 1-3*. In addition, *each IMLA has two lengthwise halves in a split configuration, A and B, that correspond to each column*. . . . [T]he conductor arrangement depicted in FIG. 8B shows that *adjacent columns of broadside-coupled pairs may be offset from each other*.



FIG. 8A                    FIG. 8B

(Exh. A, col. 8, l. 55- col. 9, l. 21) (emphasis added). Clearly, the term "column" cannot be construed in a manner that excludes the arrangements referred to as columns in the '883 patent.

Those of ordinary skill in the art, including Molex itself, have used the term "column" to refer to vertical arrangements of broadside-coupled differential signal pairs. (Exh. V, Molex product brochure (illustrating an 11-row, 6-column connector on page 1, entitled "I-Trac Standard Backplane Interconnect;" a 7-row, 10-column connector on page 3; an 11-row, 6-column connector on page 5; and a 15-row, 8-column connector on page 6).) Clearly, Molex's

proposed construction in this case is merely an attempt to avoid infringement, and is at odds with Molex's own ordinary use of the term.

FCI's proposed construction for "column" should be adopted because it is consistent with the claim language, the specification, the patentee's use of the same term in related patents and the understanding of others skilled in the art; Molex's construction should be rejected because it is not.

### E.    "Column Centerline" and "Row Centerline"

| Disputed Term | FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|---|
| column centerline | vertical line through the center of a column | centerline of a column of edge coupled differential signal pairs along the direction in which contacts are edge coupled |
| row centerline | horizontal line through the center of a row | the centerline of a row of electrical contacts |

The terms "column centerline" and "row centerline" appear in claims 1 and 7 of the '643 patent.  Based on the proposed definitions set forth above, there is no real dispute regarding the term "centerline," which simply refers to a line through the center.  In essence, the parties' disagreement on these terms boils down to their respective positions concerning the proper interpretation of the terms "column" and "row," described in Sections III.D and IV.B, which will not be repeated here.  FCI submits, however, that Molex's proposed definitions for "column centerline" and "row centerline" highlight the fact that Molex is proposing that a multitude of extraneous limitations be read into the definition of "column," none of which are warranted.

## IV.    TERMS IDENTIFIED BY MOLEX THAT REQUIRE NO CONSTRUCTION

Molex has identified a variety of claim terms and phrases that FCI does not believe require construction by the Court.  These terms should be given their plain and ordinary meaning, as understood by one skilled in the art, and need not be further defined.  *U.S. Surgical*, 103 F.3d at 1568 (a trial judge need not "repeat or restate every claim term").  Nevertheless, in

the event that the Court is willing to entertain Molex's arguments with respect to these terms or

phrases, FCI sets forth its proposed constructions below.

**A.    Contacts:  "Differential Signal Pair," "Signal Contact" and "Ground Contact"**

| Disputed Term | FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|---|
| differential signal pair | a pair of signal contacts that are arranged such that one can carry the first of a pair of differential signals and the other can carry the second of a pair of differential signals | a pair of adjacent contacts connected to a differential signal source with field coupling therebetween communicating time varying and opposing electrical potential along their respective paths |
| signal contact | the portion(s) of the leadframe assembly that can carry a signal | an electrical contact connected to an electrical signal source, such as a positive or negative electrical signal source |
| ground contact | portion(s) of the leadframe assembly that can be connected to ground | an electrical contact connected to a neutral or ground source |

The terms "differential signal pair," "signal contact" and "ground contact" are referenced

throughout the patents-in-suit, and one or more of these terms is recited in the claims of each

patent-in-suit.  Each term has an established meaning to those skilled in the art.  Molex's

proposed constructions are thus unnecessary, as well as circular in that they define the disputed

terms by repeating claim terms (*e.g.*, defining "ground contact" as "an electrical contact

connected to a neutral or ground source").  This is precisely the "exercise in redundancy" that the

Federal Circuit has held that a district court need not undertake.  *U.S. Surgical*, 103 F.3d at 1568.

The gist of Molex's proposed constructions for these three terms appears to be its

position that these terms must refer to contacts that are already "connected to" a signal source or

ground, rather than contacts that are capable of being so connected.  Molex's proposed

constructions are inconsistent with the claim language, which is simply directed to the structure

of the claimed connectors.  The claim language does not require that the connector actually be

physically connected to the devices that it is meant to connect.

Molex's proposed constructions are also inconsistent with the understanding of these terms by one of ordinary skill in the art, as demonstrated by the Examiner's definition of "differential signal pairs" during prosecution of the patents-in-suit.  Specifically, in an Office Action dated June 25, 2005 during prosecution of the '883 patent, the Examiner equated the term "differential signal pair" with contacts that are "capable of transmitting a differential signal." (Exh. P at 4.)  The examiner repeated substantially the same definition in an Office Action dated October 27, 2005 during prosecution of the '964 patent, using the phrase "a pair of contacts capable of transmitting a differential signal" when referring to a "differential signal pair."  (Exh. W at 3.)  Under this reasoning, and to the extent a definition is even necessary, "signal contact" and "ground contact" would similarly have to be defined as contacts that can be (or are capable of being) connected to a signal source or ground, respectively, not ones that are already so connected.

**B.    "Leadframe Housing"**

| FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|
| an insulative housing or frame through which a portion of an electrical contact extends | an insulative housing through which a contact extends and is supported |

The term "leadframe housing" appears in claims 1, 17 and 28 of the '883 patent.  This term is also readily understood by those skilled in the art and requires no construction by the Court.  The definitions proposed by the parties for this term are virtually identical, except for Molex's proposed addition that a contact extending through the housing "is supported" by the housing.  This addition is unnecessary and irrelevant, and does not appear to relate to any particular defenses articulated to date by Molex.  Accordingly, this term need not be construed by the Court.  *U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope . . . for use in the determination of infringement.").

### C.    "Broadside-Coupled"

| FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|
| electrical contacts that are arranged or positioned such that the longer sides of the longitudinal cross sections of paired contacts face each other | a differential signal pair of contacts with the elongated side of one contact adjacent the elongated side of the other contact of the pair |

The term "broadside-coupled" appears in dependent claims 3 and 20 of the '883 patent, dependent claim 35 of the '964 patent, independent claim 1 of the '643 patent and independent claims 1, 29 and 40 of the '318 patent. There is no dispute that the term refers to the longer (or elongated) sides of paired contacts facing each other. The real difference between the parties' proposed constructions is that Molex's definition ignores the doctrine of claim differentiation and limits the contacts being coupled to "differential signal pairs," while FCI's does not.

To the extent that the claims reciting the term "broadside-coupled" also recite contacts that are differential signal pairs (*e.g.*, claim 35 of the '964 patent, claim 1 of the '643 patent and claims 1, 29 and 40 of the '318 patent), Molex's construction is unnecessarily redundant. With respect to claims that recite the term "broadside-coupled," but do ***not*** require differential signal pairs (*e.g.*, claim 3 of the '883 patent), Molex's proposed construction is unduly limiting.

Specifically, claim 1 of the '883 patent is directed to "an electrical connector comprising . . . a first electrical contact . . . and . . . a second electrical contact." Claim 2, which depends from claim 1, adds the additional limitation that "the electrical contacts form a differential signal pair." Accordingly, under the doctrine of claim differentiation, the "electrical contacts" of claim 1 necessarily encompass more than the "differential signal pair" recited in dependent claim 2. *See Karlin Tech. Inc.*, 177 F.3d at 971-72 (holding that independent claims should not be construed to incorporate the limitations of dependent claims so as to render the dependent claims meaningless). Claim 3 depends from claim 1, and only adds the limitation that "the electrical contacts are broadside-coupled." Because the electrical contacts of claim 1 are not limited to "differential signal pairs," Molex's proposed construction requiring "broadside-coupled" contacts to be part of a "differential signal pair" must be rejected.

D.    **"Column"-Related Terms and Phrases:  "Column Spacing Distance" and "Column of Electrical Contacts"**

| Disputed Term | FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|---|
| column spacing distance | centerline distance between adjacent column | the pitch or distance between contacts in adjacent single line arrangements of edge coupled electrical contacts as measured from an elongated edge of a contact in a first single line arrangement of contacts to the corresponding elongated edge of a contact in the immediately adjacent single line arrangement of contacts |
| column of electrical contacts | an arrangement of contacts in the vertical direction in which differential signal pairs are stacked | a single line arrangement of electrical contacts that includes edge coupled differential signal pairs of contacts aligned in the direction along which the contacts of the differential pairs are edge coupled |

The term "column spacing distance" appears in claim 22 of the '964 patent and claim 1 of the '643 patent.  The term "column of electrical contacts" appears in claim 1 of the '318 patent. Neither of these terms requires construction by the Court.  The parties' disputes over these terms boil down primarily to their disagreement with respect to the definition of the term "column," described above in Section III.D, which Molex contends requires "edge coupled" contacts.  For reasons previously set forth above, Molex is wrong and its proposed construction should be rejected.

Molex's construction of both of these terms also should be rejected because it requires "a single line arrangement of electrical contacts."  This extraneous limitation is not supported by the specification.  As set forth above with respect to the construction of the term "column," the patentee did not limit this term to a single line arrangement.  On the contrary, the patentee expressly used the term "column" in a related patent to refer to vertically stacked broadside-coupled differential signal pairs.

Molex's construction of "column spacing distance" should be rejected for the additional reason that it requires the distance to be "measured from an elongated edge of a contact . . . to the

-23-

corresponding elongated edge of a contact in the immediately adjacent single line arrangement of contacts." There is no reason to limit the way in which the distance between adjacent columns is measured as suggested by Molex.

Accordingly, to the extent a construction for these terms is deemed necessary, FCI's proposed constructions should be adopted.

### E.     "Row of Electrical Contacts"

| FCI's Proposed Construction | Molex's Proposed Construction |
| --- | --- |
| an arrangement of contacts in a direction that is perpendicular to a column | a single line arrangement of differential signal pairs of contacts arranged in a direction perpendicular to the elongated direction of the contacts |

The term "row of electrical contacts" appears in claim 29 of the '318 patent. As with the "column"-related terms discussed above, Molex's proposed construction for this term again unnecessarily requires "a single line arrangement," which is not warranted. In addition, Molex's proposed construction attempts to limit this phrase to one that requires "differential signal pairs," even though the specification expressly discusses both single ended and differential signaling. (*See, e.g.*, Exh. D, col. 9, ll.13-36; col. 9, ll. 58-65.) For example, the specification includes figures, such as Figure 43, that depict "a contact arrangement for an adjacent pair of IMLAs wherein the contacts are defined to form a respective plurality of single-ended signal conductors in each IMLA." (*Id.* at col. 22, ll. 43-46.) Thus, there is no justification for limiting the scope of the simple phrase "row of electrical contacts" in the manner suggested by Molex. To the extent a construction is deemed necessary for this phrase, FCI's construction should be adopted.

### F.     "Array of Electrical Contacts"

| FCI's Proposed Construction | Molex's Proposed Construction |
| --- | --- |
| an organized, two-dimensional arrangement of contacts | a row of broadside coupled differential signal pairs of contacts |

The term "array of electrical contacts" appears in claim 40 of the '318 patent. This

-24-

phrase is readily understood to those skilled in the art and requires no construction.  Molex's outlandish proposed construction would require this Court to somehow read into the word "array" the additional limitations of (i) a row, (ii) broadside coupled contacts, and (iii) differential signal contacts.

The '318 patent refers to arrays (*see, e.g.*, Exh. D, col. 21, ll.31-42), and with respect to certain embodiments, refers to "linear contact arrays" (*id.* at col. 18, l.62 - col. 19, l. 9; col. 21, ll. 22-30; col. 22, ll. 43-53).  There is no basis for construing the broad term "array" to be limited to a "linear array," much less a "row."  Nor is there any basis for reading in the other limitations suggested by Molex that have nothing to do whatsoever with the definition of the term "array."  Molex's proposed construction should be rejected as being completely and utterly divorced from the claim language.

### G.     "Tightly Electrically Coupled"

| FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|
| a high field being produced by a differential signal in the gap between the contacts that form the differential signal pair and a low field near adjacent differential signal pairs | close edge coupling of a differential signal pair of contacts sufficient to minimize interference from an electrical field of adjacent differential signal pairs of contacts |

The phrase "tightly electrically coupled" appears in dependent claim 23 of the '964 patent, and requires no separate construction.  Although the actual term does not appear in the specification, the concept is described as follows:

> the signal contacts S and ground contacts G can be scaled and positioned relative to one another such that a differential signal in a first differential signal pair produces a high field H in the gap between the contacts that form the signal pair and a low . . .  field L ([i.e.,] close to ground potential) near an adjacent signal pair.

(Exh. C, col. 6, ll. 19-26.)  To the extent a construction is even necessary, FCI's proposed construction is consistent with this description in the specification.

Molex's construction, on the other hand, again attempts to limit the claimed invention to

only those embodiments where a differential signal pair is "edge coupled."  The claimed

invention and disclosure, however, are clearly not so limited, and describe embodiments where

the signal contacts can be either edge coupled or broadside coupled.  Indeed, Molex has asked

this Court to construe a number of the claims that specifically recite connectors that are

"broadside coupled."  Accordingly, Molex's proposed construction should be rejected because it

unnecessarily incorporates limitations from particular embodiments into the claims.  *Comark*

*Comms.*, 156 F.3d at 1187 ("Although the specification may aid the court in interpreting the

meaning of disputed claim language, particular embodiments and examples appearing in the

specification will not generally be read into the claims."); *Varco, L.P. v. Pason Sys. USA Corp.*,

436 F.3d 1368, 1373 (Fed. Cir. 2006) ("In examining the specification for proper context,

however, this court will not at any time import limitations from the specification into the

claims.")

     Molex's proposed construction should also be rejected because it violates the doctrine of

claim differentiation.  Claim 35, which depends from claim 22, adds the additional limitation that

"the differential signal pairs are broadside coupled."  Accordingly, claim 22 necessarily

encompasses differential pairs that are either edge coupled or broadside coupled.  Given that

construction, claim 23, which depends from claim 22 and only adds the limitation that the

contacts in "the first differential signal pair are tightly coupled to each other," must also be

construed to apply to both edge coupled and broadside coupled differential pairs.

    **H.**    **"Gap Distance"**

| FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|
| the distance between the facing surfaces of the electrical contacts that form a differential signal pair | the distance between the opposed faces of the contacts of a differential pair |

    The term "gap distance" appears in claim 22 of the '964 patent, and does not require

construction by the Court.  To the extent a construction is deemed necessary, the parties appear

to be essentially in agreement with respect to the meaning of this term; FCI submits, however,

that its proposed construction using the phrase "facing surfaces" is more clear and precise than Molex's "opposed faces" definition.  Accordingly, FCI's proposed construction is the one that should be adopted if a construction for this term is deemed necessary.

**I.    "Aspect Ratio"**

| FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|
| the ratio of the column-spacing distance to the gap distance | the ratio of the pitch between columns of edge coupled differential signal pairs of contacts to the gap between the contacts of the differential signal pair in a given column |

The term "aspect ratio" appears in claim 1 of the '643 patent and is defined by the claim language itself as well as in the specification, requiring no separate construction by the Court. There is no genuine dispute that this term simply refers to the ratio of the "column spacing distance" to the "gap distance," each of which has been previously addressed above.  (*See, e.g.*, Exh. B, claim 1 ("an aspect ratio of the fixed column-spacing distance to the fixed gap distance . . ."); col. 10, ll. 9-10 ("the aspect ratio of column pitch to gap width . . .".)  Molex's proposed construction merely attempts to read into this term the same extraneous limitations identified above with respect to "column-spacing distance," and should be rejected for the same reasons.

**J.    "Rise Time"**

| FCI's Proposed Construction | Molex's Proposed Construction |
|---|---|
| the time required for a signal to change from a specified low value to a specified high value | the duration of time required for a voltage step to transition from one level to a second level within the voltage step |

The term "rise time" appears in claim 22 of the '964 patent and claim 7 of the '643 patent.  This is a term of art that is readily understood by one of ordinary skill.  Generally speaking, with respect to high speed electronics, it is a measure of the ability of a circuit to respond to fast input signals.  The parties have proposed similar definitions for this term. However, as the construction of this term appears unlikely to resolve the infringement issues in

this case, there is no need for the Court to have to choose between the proposed constructions.

**K.     "Worst-Case, Multi-Active Cross Talk"**

| FCI's Proposed Construction | Molex's Proposed Construction |
| --- | --- |
| interference caused by electrical fields, as measured by the sum of the absolute values of such interference (or cross talk) from each of multiple differential signal pairs closest to the victim pair | the combined cross-talk on a given differential signal pair from the six nearest neighboring differential signal pairs determined by summing the absolute values of the peak crosstalk from each of the six neighboring differential signal pairs, assuming that each pair is at its highest level of cross-talk at the same time |

The term "worst-case, multi-active cross talk" appears in claim 22 of the '964 patent and claim 7 of the '643 patent. Once again, FCI submits that this is a term of art readily understood by one of ordinary skill in the art that does not require construction by the Court. Indeed, as can be seen from the constructions set forth above, there is no real dispute that this phrase refers to the sum of the absolute values of cross talk from differential signal pairs closest to a particular victim pair. The only real difference between the parties' proposed constructions is that Molex is attempting to read into this phrase the requirement that crosstalk from a specific number (6) of differential signal pairs be measured when this phrase is used, whereas FCI's proposed definition simply refers to "multiple differential signal pairs closest to the victim pair."

The claim language does not support Molex's proposed construction. For example, in claim 22, "the six differential signal pairs . . . that are closest to the [victim] signal pair" are to "produce no more than 6% worst-case, multi-active cross talk" on the victim pair. Molex's proposed definition would render meaningless the portions of this claim specifying that six differential pairs are to be used in measuring the worst-case, multi-active cross talk. Similarly, claim 7 of the '643 patent would not need to specifically refer to "six differential signal pairs . . . that are closest to the victim pair," if this was already incorporated into the definition of the "worst-case, multi-active cross talk" phrase recited in the claim. Accordingly, to the extent a

construction is deemed necessary, FCI's proposed construction should be adopted.

## V.    CONCLUSION

For all of the reasons set forth above, FCI respectfully requests that the Court adopt its

proposed constructions for the disputed claim terms/phrases.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm (#1098)*
Thomas C. Grimm (#1098)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
OF COUNSEL:                         P.O. Box 1347
                                    Wilmington, DE 19899-1347
George E. Badenoch                  (302) 658-9200
Sheila Mortazavi                    tgrimm@mnat.com
KENYON & KENYON LLP                 jparrett@mnat.com
One Broadway                        *Attorneys for Plaintiffs*
New York, NY 10004
(212) 425-7200

Michael M. Shen
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
(202) 220-4200

October 22, 2007


1290937

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send notification of such filing to all registered participants.

Additionally, I hereby certify that true and correct copies of the foregoing were caused to be served on October 22, 2007 upon the following individuals in the manner indicated:

### BY HAND & E-MAIL

Josy W. Ingersoll
Adam W. Poff
YOUNG, CONAWAY, STARGATT
  & TAYLOR LLP
The Brandywine Building,
1000 West Street, 17th Floor
Wilmington, DE 19899-0391

### BY E-MAIL

John W. Kozak
Dennis R. Schlemmer
Caryn C. Borg Breen
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
180 N. Stetson Avenue
Chicago, IL  60601-6780

*/s/ Thomas C. Grimm (#1098)*
Thomas C. Grimm (#1098)
tgrimm@mnat.com