IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FCI USA INC., and
FCI AMERICAS TECHNOLOGY INC.,

Plaintiffs,

v.

MOLEX INCORPORATED

Defendant.

Case No. 1:07-cv-00049 (JJF)

**MOLEX INCORPORATED'S OPENING *MARKMAN* BRIEF**

Josy W. Ingersoll (#1088)
Adam W. Poff (#3990)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
apoff@ycst.com

Counsel for Defendant Molex Incorporated

OF COUNSEL:
John W. Kozak
Caryn C. Borg-Breen
Leydig, Voit & Mayer Ltd.
Two Prudential Plaza, Suite 4900
Chicago, IL 60601-6780
(312) 616-5600

Dated: October 22, 2007

TABLE OF CONTENTS


I. INTRODUCTION ..... 1

A. FACTUAL BACKGROUND ..... 2

B. The Asserted Claims and the Terms at Issue ..... 3

II. SUMMARY OF THE LAW ..... 4

A. Claim Construction ..... 4

B. Intrinsic Evidence ..... 4

1. The Claims ..... 4
2. The Specification ..... 5
3. The Prosecution History ..... 5

C. Extrinsic Evidence ..... 6

III. MOLEX'S PROPOSED CLAIM CONSTRUCTIONS ..... 6

A. Introduction ..... 6

B. Background of the Technology ..... 7

C. Patent No. 6,981,883 ..... 8

1. Disclosure of the '883 patent ..... 8
2. Prosecution History of the '883 Patent ..... 12
3. Construction of the '883 Patent Terms ..... 13

D. U.S. Patent 7,114,964 ..... 21

1. Disclosure of the '964 Patent ..... 21
2. Prosecution History of the '964 Patent ..... 23
3. Construction of the '964 Patent Terms ..... 24

E. U.S. Patent 7,182,643 ..... 32

1. Disclosure and Prosecution of the '643 Patent ..... 32

F. U.S. Patent 7,229,318 ..... 37

IV. CONCLUSION ..... 39

TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
334 F.3d 1343 (Fed. Cir. 2003) ........ 4
*Abtox, Inc. v. Exitron Corp.*,
122 F.3d 1019 (Fed. Cir. 1997) ........ 6
*AFG Indus., Inc. v. Cardinal IG Co.*,
239 F.3d 1239 (Fed. Cir. 2001) ........ 2
*Amazon.com Inc. v. Barnesnoble.com, Inc.*
239 F.3d 1343 (Fed. Cir. 2001) ........ 2, 4
*Bell Atlantic Network Servs., Inc. v. Covad Comms. Group, Inc.*,
262 F.3d 1258 (Fed.Cir. 2001) ........ 24
*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002) ........ 25, 26
*Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005) ........ 18, 21
*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
64 F.3d 1553 (Fed. Cir. 1995) ........ 2
*Fin Control Sys. Pty. Ltd. v. OAM, Inc.*,
265 F.3d 1311 (Fed. Cir. 2001) ........ 5
*Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*,
450 F.3d 1350 (Fed. Cir. 2006) ........ 25
*Jonsson v. Stanley Works*,
903 F.2d 812 (Fed. Cir. 1990) ........ 6
*Kraft Foods, Inc. v. Int'l Trading Co.*,
203 F.3d 1362 (Fed.Cir. 2000) ........ 28
*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
424 F.3d 1336 (Fed Cir. 2005) ........ 15
*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1966) ........ passim
*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
133 F.3d 1473 (Fed. Cir. 1998) ........ 28
*NTP, Inc. v. Research in Motion,Ltd.*,
418 F.3d 1282 (Fed Cir. 2005) ........ 6
*Omega Engineering*,
334 F.3d 1314 (Fed. Cir. 2003) ........ 6
*On Demand Machine Corp. v. Ingram Indus., Inc.*,
442 F.3d 1331 (Fed. Cir. Mar. 31, 2006) ........ 5, 24
*Ormco Corp. v. Align Tech., Inc.*,
Nos. 2006-1240, 2006-1274, 2007 WL 2404723 (Fed. Cir., Aug. 24, 2007) ........ 5

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........ passim

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999) ........ 6

*Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ........ 20

*Seachange Intern., Inc. v. C-COR Inc.*,
413 F.3d 1361(Fed. Cir. 2005) ........ 28

*Wang Labs., Inc. v. Am. Online Inc.*,
197 F.3d 1377 (Fed. Cir. 1999) ........ 6

*Warrior Lacrosse*,
2006 WL 763190 ........ 2

## I. INTRODUCTION

Pursuant to the extant Scheduling Order, Molex Incorporated ("Molex") submits this brief in support of its proposed construction of claim terms and phrases. A listing of Molex's proposed construction of claim terms in dispute is attached hereto as Exh. A.[1] Except in those few instances where the patentee acted as its own lexicographer and gave special meaning to a term, Molex proposes that the claim terms be given the meaning it would have to a person of ordinary skill in the art at the time of invention, in accord with the Federal Circuit's en banc decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). In most instances, such constructions are based entirely upon the intrinsic evidence, i.e., the claim language, the specification and, where applicable, the prosecution history.

The parties have collectively identified more than a twenty terms and phrases that require construction. FCI USA Inc. and FCI Americas Technologies, Inc. ("FCI") asserts that only nine claim terms or phrases need construction. FCI advocates leaving most of the claim language without a construction. To the extent FCI takes a position on claim construction, its proposals are unsupported by the intrinsic evidence, contrary to express definitions of the terms in the patent specifications, and/or contrary to well-settled law.

FCI's position is not surprising. To argue that the accused products infringe, FCI needs to assert a claim scope that is much broader than the intrinsic evidence warrants. However, a broad construction risks rendering the claims invalid based on the prior art and/or indefiniteness for lack of supporting disclosure in the applications as filed.

Leaving the disputed claim terms and phrases without construction would be improper. The Federal Circuit has consistently stated that in the post-*Markman* era, "the trial judge alone

[1] The exhibits referenced herein are provided in Appendix V submitted herewith. Also submitted herewith as Appendices I-IV are copies of each of the four asserted patents along with their complete file histories.

has the duty and responsibility to interpret the claims at issue." *Warrior Lacrosse, Inc. v. Brine, Inc.*, No. 04-71649, 2006 WL 763190 at *6 (E.D. Mich. 2006) (quoting *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1556 (Fed. Cir. 1995)). "It is critical for trial courts to set forth an express construction of the material claim terms in dispute, in part because the claim construction becomes the basis for jury instructions, should the case go to trial.... It is also the necessary foundation of meaningful appellate review." *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) (internal citations omitted). If the claims are not construed, the meaning and scope of the claims will ultimately need to be resolved by the jury. Such a result would be contrary to the holding in *Markman v. Westview Instruments, Inc.*, which provides that claim construction is an issue of law for the court to decide. 52 F.3d 967, 978 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1966); *Warrior Lacrosse*, 2006 WL 763190 at *6 ("An unwillingness to discern the meaning of claim limitations would undermine one of the principle rationales underlying the *Markman* decision, the consistent application of established rules of interpretation to patent claims, leading to increased certainty and fairness for patentees and accused infringers alike."). It would also permit FCI to advocate differing claim scope depending on the issue, e.g., infringement or validity, contrary to the principle that the claim terms must be given the same meaning for both purposes. *Amazon.com Inc. v. Barnesnoble.com, Inc.* 239 F.3d 1343, 1351 (Fed. Cir. 2001).

**A. FACTUAL BACKGROUND**

Molex filed a declaratory judgment action in the U.S. District Court for the District of Nevada, Civil Action No. 3:07-cv-00039 ("the Nevada Action"), on January 28, 2007 seeking a declaration that U.S. Patent Nos. 6,981,883 ("the '883 patent") and 7,114,964 ("the '964 patent") were non-infringed and/or invalid. The complaint similarly addressed two pending applications which subsequently issued as U.S. Patent 7,182,643 ("the '643 patent") and U.S. Patent

7,229,318 ("the '318 patent"). Thereafter, on January 29, 2007, FCI filed a complaint in the U.S. District Court for the District of Delaware ("the Delaware action") against Molex for infringement of the '883 and '964 patents. On February 27, 2007, FCI filed an Amended Complaint in the Delaware action further asserting infringement of the '643 patent, the same day it was issued by the U.S. Patent and Trademark Office. On March 22, 2007, Molex moved to dismiss, transfer, or stay the Delaware action in favor of the Nevada Action and FCI moved the Nevada court to dismiss or stay the Nevada action in favor of the Delaware action. Molex's motion was argued before the Delaware court on April 20, 2007. FCI's motion is scheduled to be argued before the Nevada court on December 19, 2007. On August 31, 2007, FCI filed a motion for leave to file a Second Amended Complaint in the Delaware action further asserting infringement of the '318 patent. That motion was not opposed. Because the respective motions to dismiss, transfer or stay are still pending, neither party has yet filed an Answer in the respective actions asserting its defenses and counterclaims.

**B. The Asserted Claims and the Terms at Issue**

The asserted patents are part of a protracted family of closely related patents stemming from two applications originally filed in 2001 and 2002, respectively. Presently, the family includes ten issued U.S. patents (*see* attached Exh. B; patent family genealogy) and six pending continuation applications.

FCI asserts that Molex infringes 43 claims: claims 1-5, 7-10, 14, 17, 18, 20, 21, and 28-31 of the '883 patent; claims 22, 23 and 35 of the '964 patent; claims 1, 6, and 7 of the '643 patent; and claims 1-4, 13, 19, 21, 22, 26-32, 40, and 43-45 of the '318 patent. Those asserted claims which contain the words and phrases at issue are reproduced as Exh. C with the words and phrases at issue in bold typeface.

## II. SUMMARY OF THE LAW

### A. Claim Construction

Claim construction is a matter of law that is reserved exclusively for the court to decide. *Markman*, 52 F.3d at 978. It is the first step in any infringement or validity analysis and the claims must be construed to have the same meaning for both purposes. *Amazon.com*, 239 F.3d at 1351 ("A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement.") (citations omitted).

The words of a claim are generally given their "ordinary and customary meaning" which is "the meaning that term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313. In determining such meaning, the court considers the intrinsic evidence including the "words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314.

### B. Intrinsic Evidence

#### 1. The Claims

A court first looks to the claim language because "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312. They "provide substantial guidance as to the meaning of particular terms." *Id.* at 1314. For example, the claim terms must be construed in the context of the language of the claim as a whole. *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1351 (Fed. Cir. 2003). Other claims can also be relevant in determining the meaning of a claim term. *Phillips*, 415 F.3d at 1314. For example, "the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different

meanings at different portions of the claims." *Fin Control Sys. Pty. Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001); *see also Phillips*, 415 F.3d at 1314.

**2. The Specification**

The patent specification also plays a critical role in determining the meaning of a claim term because "the person of ordinary skill in the art is deemed to have read the claim term not only in the context of the particular claim ... but in the context of the entire patent." *Phillips*, 415 F.3d at 1313. In fact, "the court in *Phillips*, resolving conflict, stressed the dominance of the specification in understanding the scope and defining the limits of the terms used in the claim." *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1337-38 (Fed. Cir. 2006). A claim cannot, for example, "be of broader scope than the invention that is set forth in the specification." *Id.* at 1340. In addition, the specification may set forth limits on the meaning of a particular term through explicit or implicit definition, or may include a disclaimer or disavowal of the claim scope by the inventor. *Phillips*, 415 F.3d at 1316.

**3. The Prosecution History**

A court "should also consider the patent's prosecution history" including the prior art cited therein. *Phillips,* 415 F.3d at 1317 (citing *Markman*, 52 F.3d at 980). Like the specification, it shows how the inventor understood the invention and whether the inventor limited the invention during the course of prosecution. *Id.*

The prosecution history of related patents is also intrinsic evidence that is properly considered in resolving claim construction. *See, e.g.*, *Ormco Corp. v. Align Tech., Inc.*, Nos. 2006-1240, 2006-1274, 2007 WL 2404723 at *5, (Fed. Cir., Aug. 24, 2007) (majority holding that district court properly considered the prosecution history of familial patents relating to the same subject matter when construing claims of patents-in-suit); *NTP, Inc. v. Research in Motion,*

*Ltd.*, 418 F.3d 1282, 1293 (Fed Cir. 2005); *Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1024 (Fed. Cir. 1997); *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990).

This is true whether the related patent is a parent application, a sibling application, or a related continuation-in-part application arising from the same parent. *See Omega Engineering*, 334 F.3d 1314, 1333 (Fed. Cir. 2003) (citing *Wang Labs., Inc. v. Am. Online Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999)); *Jonsson*, 903 F.2d at 818.

### C. Extrinsic Evidence

A court can also consider, in appropriate circumstances, extrinsic evidence. Such evidence includes, for example, expert testimony, dictionaries, and learned treatise. *Phillips*, 415 F.3d at 1317; see *also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999). However, extrinsic evidence is generally viewed as less reliable than intrinsic evidence in determining the meaning of claim language and should be disregarded if clearly at odds with the intrinsic evidence. *Phillips*, 415 F.3d at 1318-19.

## III. MOLEX'S PROPOSED CLAIM CONSTRUCTIONS

### A. Introduction

For each of the '883, '964, '643, and '318 patents ("the asserted patents"), the claim terms at issue will be set forth below, along with both Molex's and FCI's proposed constructions. In a number of instances, the same terms are used in multiple claims and/or patents. Since there appears to be no dispute that these terms should be afforded the same meaning in the different claims and/or patents and the only dispute centers around what construction each term should be afforded, the claim construction analysis need not be repeated for each subsequent appearance in another claim or patent. (See Exh. A.)

**B. Background of the Technology**

Each of the asserted patents are directed to electrical connectors which have a plurality of electrical contacts and which are matable for connecting a plurality of signal traces on a circuit board to the signal traces on another circuit board or electrical component.

As electrical connectors become miniaturized, the signal contacts become very closely spaced together such that the electrical field of one signal contact can interfere with the electrical field of an adjacent signal contact. This undesirable intermingling of electrical fields, referred to as "cross talk," compromises signal integrity.

One known way to minimize the effects of cross talk is to transmit electrical information over differential signal pairs of contacts, whereby a pair of adjacent contacts is connected to a differential signal source for transmitting signals having opposing electrical potential along their respective paths.

The electrical contacts of the connectors commonly have a flat metal (copper) plate construction. Differential signal pairs of contacts are said to be "edge coupled" when the narrow edge (viewed in cross section) of one contact of a differential signal pair is adjacent the narrow edge of the other contact of the pair, as depicted below, so that the differential coupling is between opposed narrow edges of the contacts. The signal pairs are "broadside coupled" when the broad side (again, viewed in cross section) of one contact of the differential signal pair is adjacent the broad side of the other contact of the pair, as also depicted below, so that the differential coupling is between opposed broadsides of the contacts. Contacts adjacent the differential signal pairs may be connected to ground or neutral to further minimize the effect of electrical noise or cross talk on differential signal pairs, and in some instances, conductive shields are used.




**Edge Coupled**

**Modified FIG. 4A of '964 Patent**

**Broadside Coupled**

**Modified FIG. 5 of '964 Patent**

FCI did not invent differential signal pair connectors or differential signal pair transmission. Instead, the asserted patents are directed to shieldless connectors having a particular relationship between the contacts of differential signal pairs and specific column and row arrangements of differential signal pairs of contacts and ground contacts.

**C. Patent No. 6,981,883**

**1. Disclosure of the '883 patent**

The '883 patent (copy attached at Exh. D) is directed to an electrical connector in which a precisely maintained air gap exists between the contacts of differential signal pairs for improved impedance control. The illustrated connectors comprise a plurality of lead frame assemblies or modules, such as those shown in FIGS. 5A and 5C appearing below at page 11, wherein each has an overmolded plastic lead frame housing 511, 521 and a series of metal contacts 530. The contacts 530 each have a portion supported within the lead frame housing 511, 521 and connecting terminals at opposite ends projecting from the lead frame housing.

The invention of the '883 patent must be interpreted in the light of the disclosures of its parent applications, including U.S. Patents 6,692,272 ("the parent '272 patent") and 6,976,886 ("the parent '886 patent"), upon which priority was claimed and the disclosures of which were

incorporated by reference. Copies of these patents are attached at Exh. E. The parent '272 and '886 patents, for example, similarly disclosed contact-supporting modules, as depicted below:




**FIG. 11 of '272 Patent** **FIG 7 of '272 Patent**

Contacts within the lead frame housing were partly exposed to air and partly covered by over molded plastic support strips, as depicted above in FIG. 11 of the parent '272 patent ('272 pat., Col. 6, l. 14-21). Since air and the plastic material of the housing have different dielectric properties, in order to obtain a substantially constant impedance profile, defined by the parent '272 patent as being within a variation of 10% or less ('272 pat., Col. 6, l. 48-51) along the lengths of contacts in adjacent leadframe housings, the distance between the contacts was increased (jog) as the contacts passed through the plastic over molded material that secures the contacts in place, as depicted above in FIG. 7. ('272 pat., Col. 6, ll. 14-25, 38-39.)

The '883 patent acknowledges the desirability of maintaining a substantially constant differential impedance profile, as disclosed in the parent '272 and '886 patents (Col. 5, ll. 38-40, 44-48). However, the '883 patent describes that by carefully maintaining a precise air gap distance "d" (Col. 5, ll. 48-51) between the contacts along the length of the portions within adjacent leadframe housings, impedance and cross talk can be controlled to the point of

eliminating the need for ground contacts positioned between the signal pairs (Col. 2, ll. 44-45; Col. 5, l. 58 - Col. 6, l.2; Col. 6, ll. 25-27). This is depicted below:




FIG. 5A of '883 Patent FIG. 5C of '883 Patent

In the '883 patent, contacts are recessed in the lead frame housing such that an uninterrupted air gap distance "d" is maintained between the signal contacts of adjacent modules along the entire length or respective portions within the lead frame housings. (See Figs. 5A-5C and 6A-6C; Col. 2, ll. 50-54; Col. 5, ll. 55-56; Col. 6, l. 62 - Col. 7, l. 3.) The '883 patent reiterates for each disclosed embodiment that for differential impedance control in accordance with the invention, the air gap distance "d" must be "precisely" established and maintained, i.e., within a few thousandths of an inch.[2]

---

[2] … careful control of the distance between the broadside-coupled contacts may be used to maintain an appropriate differential impedance $Z_0$ so as to reduce cross talk between signal pairs. (Col. 4, ll. 66-67 to Col. 5, ll. 1-2)

******

… if a proper geometry of broadside-coupled differential signal pairs is attained by precisely maintaining the distance between the contacts of the signal pair, the cross talk between multiple differential signal pairs can be reduced to the point that ground contacts are unnecessary. … the signal quality that results from precisely maintaining an appropriate distance between broadside-coupled signal pairs is high enough to render any additional improvement in signal quality that may be gained by the presence of ground contacts … irrelevant for the connector's intended application…

To maintain acceptable differential impedance $Z_0$ control for high bandwidth systems, it is desirable to control the gap distance *d* between contacts to within a few thousandths of an inch. (Col. 5, ll. 58-67 to Col. 6, ll. 1-7)

******

... placing of one contact of a signal pair in a recess of each portion of the lead frame assembly ... enables greater precision in maintaining the gap distance *d* between contacts. (Col. 6, ll. 21-24)

******

... maintaining careful control of the distance between broadside-coupled contacts that form signal pairs can reduce cross talk between signal pairs. ... such distance control is maintained by using each "split" half of an IMLA ... to maintain precise spacing between contacts of a differential signal pair throughout a connector. (Col. 6, ll. 50-56)

******

... fabrication techniques permit the recesses in each portion of the IMLA 510,520 to be sized very precisely. As a result, the gap distance *d* between each signal contact can be maintained throughout a connector. (Col. 6, ll. 65-67 to Col. 7, l. 1)

******

... the distance *d* is able to be maintained at a high level of precision because of the low tolerances possible with overmolded housing fabrication, as well as contact fabrication. Because the distance *d* only depends on these two, highly-precise components, the distance *d* can be maintained with the very low acceptable variations that are needed to maintain an appropriate differential impedance $Z_0$. (Col. 7, ll. 32-38)

******

... the ability to closely control the size of the recess within each overmolded housing 511, 521, enables the impedance $Z_0$ between the contacts that form signal pairs (and, consequently, cross-talk between signal pairs) to be closely controlled.

Because ... differential impedance $Z_0$ (and therefore cross talk between signal pairs) is controlled by maintaining a precise distance *d*, ... a header IMLA that is to be coupled to a receptacle IMLA should also carefully maintain a precise distance *d* between signal pairs. (Col. 7, ll. 43-54)

******

... ability to closely control the size of the recess within each housing 611, 521, as well as the contact size, enables differential impedance $Z_0$ and cross-talk to be closely controlled. (Col. 8, ll. 30-34)

******

... the precise maintenance of the distance *d* between contacts within both the receptacle IMLA and the header IMLA enables the differential impedance $Z_0$ to be carefully controlled through the connector. (Col. 8, ll. 49-52)

******

**2. Prosecution History of the '883 Patent**

The application for the '883 patent as originally filed contained claims which broadly called for lead frame housings to be disposed adjacent one another such that "an air gap is formed between the respective portions of the electrical contacts that extend through the lead frames … having a gap width that provides for a desired impedance profile between the electrical contacts." (*See* claim 30 of Original Claims, attached at Exh. F.) The desired impedance is described in the '883 patent specification as "substantially constant impedance" (Col. 5, ll. 44-46), which in turn is specifically defined in the incorporated by reference parent '272 application as being within a tolerance range of 10%:

> Typically, a tolerance of about 5 percent is desired; however, 10 percent may be acceptable for some applications. It is this range of 10% or less that is considered substantially constant differential impedance. (parent '272 patent, Col. 6, ll. 47-51) *(emphasis added)*

These originally filed claims were rejected as being unpatentable over Pape et al. (i.e., U.S. Patent 6,776,649) (hereinafter "Pape", copy attached at Exh. G), which disclosed modules in which contacts in the lead frame housing had portions exposed to air and portions covered by overmolded plastic support strips 34,34, as depicted below:

---

… each contact in a given signal pair is separated by a precisely-maintained distance *d*, which enables the differential impedance $Z_0$ to be carefully controlled through the connector. (Col. 9, ll. 27-30)




**FIG. 2 of Pape**

To overcome that rejection, FCI amended the claims to include the limitation of dependent claim 7, which the USPTO had indicated was allowable over the prior art and which required that the air gap width provide "a uniform impedance profile" along the respective contact portions.[3]

### 3. Construction of the '883 Patent Terms

#### (i) "leadframe housing"

| Molex's Proposed Construction | FCI's Proposed Construction |
| --- | --- |
| an insulative housing through which a portion of an electrical contact extends and is supported | an insulative housing or frame through which a portion of an electrical contact extends |

As understood by a person skilled in the art, and consistent with the '883 patent disclosure, a leadframe housing is an insulative housing through which a portion of a contact extends and is supported. In each embodiment, in accordance with the invention, a portion of each contact is maintained within a recess of the housing (Col. 6, ll. 20-24; Col. 7, ll. 6-8, 26-27, 32-38) with terminal portions protruding from the housing ends. Molex does not object to FCI's

3 A copy of the Office Action dated June 20, 2005, and Reply thereto, dated July 22, 2005, are attached at Exh. H and Exh. I, respectively.

proposed construction but believes it should be modified, consistent with the intrinsic evidence, to call for an insulative housing through which a portion of an electrical contact extends "and is supported."

**(ii) "a portion of a ... electrical contact extending therethrough"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| the portion of the electrical contact within the leadframe housing | FCI does not separately construe this phrase. |

When read in the light of the patent disclosure and the further recitation in claim 1 which calls for an air gap formed between "the respective portions of the electrical contacts that extend through the lead frame housings," Molex proposes that the phrase "a portion of a ... electrical contact extending therethrough" means "the portion of the electrical contact within the lead frame housing." It does not include the terminal portions of the contact that extend from the lead frame housing. Molex's proposed construction again is supported by the intrinsic evidence. (Fig. 5A; Col. 2, ll. 50-54; Col. 7, ll. 7-8, 26-27; Col. 6, ll. 55-56; Col. 6, l. 68 - Col. 7, l. 7.)

**(iii) "air gap ... between the respective portions of the electrical contacts that extend through the lead frame housings"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| an uninterrupted air gap along the entire length of the electrical contacts within the leadframe housings | air between paired electrical contacts anywhere within the housings along the length of those contacts to control impedance |

Molex proposes that the phrase "air gap ... between the respective portions of the electrical contacts that extend through the lead frame housings" means "an uninterrupted air gap along the entire length of the electrical contacts within the lead frame housings". Such a construction contrasts with the disclosures of the parent '272 and '886 patents and the cited prior art Pape patent discussed above in which the air gap width between the contacts of adjacent lead frame housings was interrupted by overmolded retention ribs or strips. Because air and the overmolded plastic material of the housing have different dielectric properties, the impedance

profile between parallel contacts of adjacent lead frame housing changes over the length of the contacts within the lead frame housing when the air gap is interrupted ('272 pat, Col. 6, ll. 14-21).

The '883 patent describes that the contacts are recessed within the lead frame housing such that a precise air gap "d" distance is formed and maintained along the length of the portions of the contacts within the lead frame housings. (Figs. 5A-5C; Col. 2, ll. 50-54; Col. 5, ll. 48-51; Col. 6, ll. 55-56; Col. 6, l. 68 - Col. 7, l. 7; Col. 9, ll. 27-30.) This configuration permitted sufficient impedance control and crosstalk prevention to eliminate the necessity for ground contacts, such as the ground contacts described in the '272 and '886 patents. (Col. 2, ll. 44-45; Col. 5, l. 58 - Col. 6, l. 12; Col. 6, ll. 25-27.)

FCI's proposed construction of the phrase to mean an air gap "anywhere" along the length of the contacts within the leadframe housing would read on the prior art Pape patent, which FCI distinguished during prosecution in order to secure allowance of the claims. (See Reply, Exh. I.) Moreover, such a broad construction would be inconsistent with the purpose of the invention as ultimately covered by the allowed '883 patent claims. *See, e.g., LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1343-44 (Fed Cir. 2005) ("it would be peculiar for the claims to cover prior art that suffers from precisely the same problems that the specification focuses on solving.")

Molex's proposed construction is supported by the claim language, the specification, and the prosecution history, and hence, should be adopted.

(iv) **"gap width that provides ... a uniform impedance profile along the respective portions of the contacts that extend through the leadframe housings"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| a distance between the portions of contacts within the leadframe housing that provides an impedance of a fixed single value along the entire length of the contacts within the leadframe housings, such as achieved by precisely maintaining a uniform gap between the contact portions | the air gap has a particular distance that provides an impedance profile within an acceptable range |

"Gap width" of course is the "air gap width." During prosecution of the application for the '883 patent, the USPTO rejected claims which called for an "air gap width" that provides "a desired impendance profile" as being unpatentable over Pape, which like the parent '272 and '886 patents, disclosed leadframe housings with overmolded strips covering the portions of the contacts, such that the air gap width did not extend along the entire length of the contacts within the lead framing housing. (See Office Action attached at Exh. H.) To overcome that rejection, FCI amended the claims to recite an air gap width that provides "a uniform impendance profile." (See Reply, Exh. I.) The prosecution history confirms that the meaning of the term "uniform impedance profile" must be different from "desired impedance profile," which was defined in the '883 patent and in the incorporated by reference parent applications as a "substantially constant impedance profile" "within a range of 10%." (See '883 pat, Col. 5, ll. 38-40, 40-48; '272 pat, Col. 6, ll. 48-51) Indeed, the term "substantially constant" denotes a range of variation. On the other hand, "uniform" denotes a single value.

While the term "uniform" is not defined in the '883 patent disclosure, it may be given its ordinary meaning in light of the intrinsic evidence, namely non-varying or fixed value. (See attached dictionary definitions, Exh. J.) The '883 patent describes with excruciating repetition that the differential impedance profile according to the invention is obtained by "precisely"

establishing and maintaining an air gap distance "d" between the portions of the contacts that extend through the lead frame housings (see footnote 2, p. 10-11).

Molex proposes that the phrase "a gap width that provides a uniform impedance profile" means "a distance between the portions of contacts within the leadframe housing that provides an impedance of a fixed single value along the entire length of the contacts within adjacent leadframe housings, such as achieved by precisely maintaining a uniform gap between the contact portions." This is consistent with its ordinary meaning in the light of the patent specification, prosecution history, and prior art.

FCI proposes that the phrase more generally means "an air gap has a particular distance that provides an impedance profile within an acceptable range." This construction, however, gives the claim the same scope as the originally filed claims, which called for an air gap width that provides "a desired impedance profile" that the USPTO rejected as unpatentable over Pape. Indeed, the Examiner found that the gap width in Pape provided a desired/acceptable impedance between contacts. (*See* Office Action dated June 20, 2005, p. 3, ll. 2-5, attached at Exh. H.) The prosecution history of the '883 patent precludes FCI from construing the claim to now cover that which it gave up during prosecution in order to obtain its allowance. When FCI amended the claims to call for the air gap width to provide a "uniform impedance profile," it disavowed any broader construction of the term. (*See* Reply, Exh. I.)

Molex's proposed construction of an "air gap width" that provides a "uniform impedance profile" is supported by the compelling intrinsic evidence and should be adopted.[4]

---

[4] Molex's proposed construction also is consistent with its construction of "air gap width." In order for the "air gap width" to provide a uniform impedance profile it must extend uninterrupted along the entire length of the contacts within the lead frame housings.

(v) **"differential signal pair"**

| Molex's Proposed Construction | FCI's Proposed Construction |
| --- | --- |
| a pair of adjacent contacts connected to a differential signal source with an electrical field coupling therebetween communicating time varying and opposing electrical potential along their respective paths | pair of signal contacts that are arranged such that one can carry the first of a pair of differential signals and the other can carry the second of a pair of differential signals |

The term "differential signal pair," consistent with Molex's proposed construction, is well-known in the art to mean "a pair of adjacent contacts connected to a differential signal source with electrical field coupling therebetween communicating time varying and opposing electrical potential along their respective paths." (See Col. 4, ll. 31-34, 46-50; FIG. 2B; and technical dictionary definitions attached as Exhibit K.)

The FCI proposed construction is improper for two reasons. First, it merely calls for contacts that "can" carry, or in other words, are "capable" of carrying differential signals. As the specification of the '643 patent, another of the asserted patents, acknowledges, the contacts of such electrical connectors typically are identical in structure and functional capability, until they are connected to designated signal or ground sources, which usually is done by a system manufacturer or end user. ('643 pat, Col. 19, ll. 43-61.) Calling for contacts that are "capable" of carrying differential signal signals provides no structural limitation to the claim. *See, e.g., Cross Medical Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005) ("[T]he claim does not require that the interface be merely 'capable' of contacting the bone; the claim has a structural limitation that the anchor seat be in contact with the bone."). Furthermore, FCI's proposed construction specifies no relationship between the contacts of a differential signal pair, or that they even are connectable to a common differential signal source. Under FCI's broad construction, the contacts of a differential signal pair could be connected to different differential signal sources.

Molex's proposed construction, which is both definite and consistent with the meaning that would be given to the term differential signal pair by a person skilled in the art should be adopted.

**(vi) "electrical contacts are broadside-coupled"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| a differential signal pair of contacts with the elongated side of one contact adjacent the elongated side of the other contact of the pair | electrical contacts that are arranged or positioned such that the longer sides of the longitudinal cross sections of paired contacts face each other |

The '883 patent specifically defines broadside-coupled differential signal pairs of contacts as differential signal pairs "where the broadside of one contact is adjacent the broadside of an adjacent contact" (Col. 1, ll. 60-65), consistent with the well-understood meaning to a person skilled in the art and usage, without exception, throughout the specification. The term "broadside-coupled" is used exclusively in the specification to describe contacts that form differential signal pairs. (See Col. 4, ll. 65-67; Col. 5, ll. 58-59; Col. 5, ll. 50-52; Col. 9, ll. 20-21; Col. 6, ll. 50-51.)

FCI's proposed construction again is overly broad and ignores the important limitation "coupled." FCI's construction is so broad it would encompass any elongated electrical contacts that face each other (1) whether or not electrical field coupled, (2) whether one contact is a signal contact and the other contact is a ground contact (such as contacts G, F1+ in FIG. 6 of the parent '272 patent), (3) whether the contacts are signal contacts of different signal pairs (such contacts F1+ F2+ in FIG. 5 of the parent '272 patent), (4) whether the contacts each are one of a respective edge-coupled differential signal pair of contacts, (such as contacts S1+ and S2+ in FIG. 5 of the '272 patent), or (5) whether the contacts are single-ended signal contacts that do

not carry differential signals. Thus FCI's construction would render the term "coupled" superfluous and contravene the public notice function provided by the patent claims.

The specification, including the express definition in the patent, confirms Molex's proposed construction that "electrical contacts are broadside coupled" means "a differential signal pair of contacts with the elongated side of one contact adjacent the elongated side of the other contact of the pair." Accordingly, Molex's proposed construction should be adopted.

**(vii) "recess"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| an indentation in the lead frame housing which receives and precisely establishes both the position of the contact in the lead frame housing and the gap width between the contacts of adjacent lead frame housings | an indentation or small hollow |

In contrast to the simple "indentation or small hollow" construction proposed by FCI, the '883 patent describes, as a feature of the invention, recesses precisely formed in the leadframe housing for receiving the contacts and establishing the precise air gap distance between contacts. (*See* Col. 6, ll. 57-58; Col. 6, l. 62 - Col. 7, 13; and footnote 2) The characterization of such feature as a part of the invention is strong evidence such feature is, in fact, part of the claim structure. *See, e.g.*, *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("Characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure."). Molex's proposed construction, again, is fully supported by the intrinsic evidence.

**(viii) "signal contact"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| an electrical contact connected to an electrical signal source, such as a positive or negative electrical signal source | portion(s) of the leadframe assembly that can carry a signal |

The term "signal contact," consistent with Molex's proposed construction, is well known in the art to mean "an electrical contact connected to an electrical signal source, such as a positive or negative electrical signal source." Indeed, the asserted patents illustrate numerous arrangements of signal contacts, designated by the positive signal source (+) or negative (-) signal source to which they are connected. (See Figs. 3, 8A, 8B.)

FCI's broad construction of "signal contact" to mean "any portion" of the leadframe assembly that can carry a signal is improper for two reasons. First, it is indefinite and not supported by the intrinsic evidence, which only discloses electrical contacts as "signal contacts." Second, similar to FCI's construction of "differential signal pair," it only calls for contacts that "can" carry, or in other words, are "capable" of carrying a signal. Since contacts of electrical connectors typically are identical in structure and functional capability, until they are connected to a signal source ('643 pat, Col. 19, ll. 43-61), calling for contacts that are "capable" of carrying a signal provides no structural limitation to the claim. *See Cross Medical*, 424 F.3d at 1311.

Molex's proposed construction, which again is definite, supported by the intrinsic evidence, and consistent with the meaning understood by persons skilled in the art, should be adopted.

**D. U.S. Patent 7,114,964**

**1. Disclosure of the '964 Patent**

The '964 patent (copy attached at Exh. L) describes numerous embodiments of connectors according to the invention in which "edge coupled" differential signal pairs of contacts are arranged in single line "columns." For example, FIG. 4A, reproduced below, depicts a connector 100 in which edge coupled differential signal pairs are arranged in six, single line columns 401-406, respectively (Col. 8, ll. 16-19).




FIG. 4A

FIG. 5

The specification of the '964 patent specifically defines the meaning of the terms "column" and "row" in relation to edge coupled signal pairs:

> As used herein, a "column" refers to the direction along which the contacts are edge coupled. A "row" is perpendicular to a column. (Col. 8, ll. "19-21")

The term "edge coupled" differential signal pair also is defined in the specification as a differential signal pair of contacts "where the edge of one contact is adjacent to the edge of an adjacent contact." (Col. 6, ll. 45-46.) The term "broadside coupled" differential signal pair is defined as a differential signal pair of contacts "where the broadside of one contact is adjacent to the broadside of an adjacent contact." (Col. 6, ll. 47-50.) It was well understood to a person skilled in the art that "coupled" means electrical field coupling, such as field coupling between the edge coupled contacts shown in FIG. 2B below, not just physical positioning of the edges of contacts adjacent each other.[5]

[5] While understood to a person skilled in the art, the specification further distinguishes between positioning and coupling, stating, for example, that the contacts may be "positioned edge to edge, and may be edge coupled to one another." Col. 2, ll. 42-43.; *See also* Col. 6, ll. 43-46.




**FIG. 2B of '964 Patent**

FIG. 5 of the '964 patent (reproduced above) discloses an alternative embodiment in which broadside coupled differential signal pairs of contacts are arranged in "rows" (Col. 8, ll. 60-61). The distinction between the FIG. 4A and 5 embodiments is solely a function of the manner in which contacts were connected to differential signal and ground sources. The contacts otherwise are structurally identical. The '964 patent describes that the column arrangement of differential signal pairs has significant advantages over the row arrangement in terms of contact density (Col. 9, ll. 5-9), crosstalk reduction (Col. 6, ll. 45-46), smaller gap widths, and impedance control. (Col. 6, ll. 56-67)

**2. Prosecution History of the '964 Patent**

From the outset, the claims for the application that resulted in the '964 patent were directed to the preferred column based arrangement of edge-coupled differential signal pairs. None of the claims ever called for rows of broadside coupled differential signal pairs. Only after protracted prosecution were the '964 patent claims allowed. All of the allowed claims required "columns" of differential signal pairs of contacts, except for one claim specifically drawn to the contact shape.

**3. Construction of the '964 Patent Terms**

**(i) "column of electrical contacts"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| a single line arrangement of electrical contacts that includes edge coupled differential signal pairs of contacts aligned in the direction along which the contacts of the differential pairs are edge coupled | vertical direction in which differential signal pairs are stacked |

The term "column" is specifically defined in the '964 patent as the direction along which contacts are edge-coupled, (Col. 8, ll. 19-21.) and is consistently used, without exception, in the specification and prosecution of the '964 patent, to describe a single line arrangement of edge-coupled differential pairs of contacts. For example, in FIG. 4A, each column 401-406 comprises a single line of edge-coupled differential signal pairs of contacts with interspersed ground contacts. With respect to each of numerous other embodiments, disclosed in the patent, including FIG. 1A, 1B, 3A, 3C, 6, 7 20, 21, and 26-29, the term "column" similarly is used to describe single line arrangements of edge-coupled differential signal pairs of contacts. The term is used in the same manner throughout the prosecution, including specific application of the term "column" to an exemplary connector in the Reply to an Office Action dated 3/26/06, pp. 20-22.

Repeated and consistent use of the term "column" throughout the specification and prosecution in only one way (i.e., a single line arrangement of edge coupled differential signal pairs) serves to further define the term. *Bell Atlantic Network Servs., Inc. v. Covad Comms. Group, Inc.*, 262 F.3d 1258, 1271 (Fed.Cir. 2001) ("when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning" that term is defined by implication); *see also On Demand*, 441 F.3d at 1339-40 (term "customer" properly limited "retail customer" where "specification repeatedly reinforces the usage of term 'customer' as the retail customer."); *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d

1350, 1353 (Fed. Cir. 2006) (term "host interface" construed to mean "direct parallel bus interface" consistent with the only embodiment disclosed).

Molex's proposed construction of "column of electrical contacts" to mean "a single line arrangement of electrical contacts that include edge coupled differential signal pairs of contacts aligned in the direction along which the contacts of the differential pairs are edge coupled" is consistent with the express definition of the term "column" in the specification and the patentee's repeated and consistent usage of the term.[6]

FCI's proposed construction is improper for a number of reasons, including:

1. It ignores the express definition and consistent usage of the term "column" in the specification and prosecution. *See Phillips*, 415 F.3d at 1316 ("[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[A] claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history."); *Markman*, 52 F.3d at 979 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.").

2. The patentee never used the term "vertical" in the explicit definitions set forth in the specification, nor in the description of the connectors according to the invention.

3. The term "vertical" is meaningless in the context of the claim. The term "vertical" is equivalent of saying "from top to bottom," specific words, as well as words of similar

[6] Molex's construction does not preclude the existence of ground contacts within the column between differential signal pairs, consistent with the '964 patent disclosure.

import, the specification states do not limit the invention (Col. 4, l. 64 - Col. 5, l. 6). Indeed, since connectors can be mounted with the arrays of contacts in any desired orientation, the term "vertical" would not provide the public with a definite or meaningful recitation of the metes and bounds of the claim scope. The term also is inconsistent with the prosecution where both the Examiner and applicant referred to horizontally arranged edge coupled contacts in prior art Kemmick et al. Patent 6,540,559 (copy attached at Exh. M) as being in "columns," consistent with the defined meaning of the term in the '964 specification. (*See* Office Action dated May 30, 2006, pp. 3-4, attached at Exh. N; Amendment dated June 27, 2006, p. 26, attached at Exh. O.)

4. The term "stacked" is undefined and indefinite. The specification does not describe stacking of contacts, but rather mounting arrays of contacts in lead frame housings.

5. FCI's proposed construction is again overly broad and attempts to ignore the express definition that it gave to the term column in order to read the claim on arrangements of broadside-coupled differential signal pairs, as illustrated below in FIG. 5 of the '964 patent. Indeed, under FCI's impermissibly broad construction, modified FIG. 5 could be argued to include three columns of differential signal pairs arranged in the vertical direction as indicated by the added dashed lines. That construction, however, clearly defies the intrinsic evidence, including the express definition and use of the term "column" in the specification and the description of the FIG. 5 embodiment in the '964 patent. *See Phillips*, 415 F.3d at 1316; *CCS Fitness*, 288 F.3d at 1365; *Markman*, 52 F.3d at 979.

**FIG. 5 (Modified) - Effect of FCI Construction of Column**




FIG. 5

Hence, FCI's proposed construction is overly broad, indefinite, and inconsistent with defined and consistent usage of terms in the specification and prosecution.

Molex, in presenting the proposed construction of "column of electrical contacts," appreciates that dependent claim 35 calls for differential signal pairs to be "broadside coupled." FCI can be expected to take the position that the doctrine of claim differentiation would dictate construing independent claim 22, from which claim 35 depends, sufficiently generic to encompass broadside coupled differential signal pairs. The doctrine simply is inapplicable in this case. The terms "columns" and "rows" of differential signal pair were used consistently throughout the specification and prosecution, and it is clear from the outset that the claims presented during the prosecution were directed to the preferred embodiments having columns of edge coupled differential signal pairs. Dependent claim 35 was added to the application as a new dependent claim 88 in a final amendment following protracted prosecution. (See Amendment attached at Exh. O.) There is nothing in the prosecution history to suggest that the Examiner focused on dependent claim 35 or the facial inconsistency that it presented. In any event, there is

no written description in the '964 patent to support claim 35 and its recitation of "columns" of contacts which are "broadside" coupled. The claim is invalid for indefiniteness and cannot be meaningfully construed.

Under these circumstances, the doctrine of claim differentiation has no applicability. *See, e.g.*, *Seachange Intern., Inc. v. C-COR Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005) ("the doctrine 'only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction.'")(quoting *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed.Cir. 2000)). "[T]he doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence...." *Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998)).

Molex's proposed construction of the term "column of electrical contacts" is fully supported by the intrinsic evidence, including the express definition of the term in the specification and applicant's extensive and consistent usage of the term in the specification and prosecution. Accordingly, Molex's proposed construction should be adopted.

**(ii) "first column of electrical contacts comprising a first differential signal pair ..."**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| a single line arrangement of electrical contacts that includes first, second and third edge coupled differential pairs of electrical contacts aligned in the direction along which the contacts are edge coupled | the first column comprises three differential signal pairs |

For the reasons expressed above, it follows that the phrase "first column of electrical contacts comprising a first differential signal pair ... a second differential signal pair ...and a third differential signal pair" means "a single line arrangement of electrical contacts that includes

first, second and third edge coupled differential pairs of electrical contacts aligned in the direction along which the contacts are edge coupled." The "second column" and "third column" of electrical contacts as recited in claim 1 should be construed similarly.

Again, FCI's proposed construction, which could be argued to cover any arrangement of differential signal pairs whether they are single line arrangements of edge-coupled pairs as disclosed in the patent or double lined arrangements of broadside-coupled pairs, is overly broad and contravenes the intrinsic evidence.

**(iii) "column spacing distance"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| the pitch or distance between the contacts in adjacent single line arrangements of edge coupled electrical contacts as measured from an elongated edge of a contact in a first single line arrangement of contacts to the corresponding elongated edge of a contact in the immediately adjacent single line arrangement of contacts | the centerline distance between adjacent columns |

When read literally, "column spacing distance" could be construed as the distance between the face of one contact and the opposing face of a contact in an adjacent column. However, "column spacing distance" is specifically defined in the patent as the pitch or distance between contacts in adjacent single line arrangements of edge-coupled electrical contacts as measured from an elongated edge of a contact in a first single line arrangement of contacts to the corresponding elongated edge of a contact in the immediately adjacent single line arrangement of contacts (FIG. 6). This is illustrated, for example, in FIG. 6 of the '964 patent below:




**FIG. 6 of '964 Patent**

Based upon FCI's construction of "column," the phrase "column spacing distance" could be improperly argued to be twice or more the pitch defined in the '964 patent, as indicated in modified FIG. 5 shown above. Molex's proposed construction is supported by the intrinsic evidence, including the express definition described in the '964 patent, and should be adopted.

**(iv) "gap distance"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| the distance between the opposed faces of the contacts of a differential pair | the distance between the facing surfaces of the electrical contacts that form a differential signal pair |

Molex's proposed construction more clearly defines the "opposed" faces of the contacts of the differential signal pair that are field coupled, consistent with the intrinsic evidence (FIGS. 2B and 6).

**(v) "rise time"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| the duration of time required for a voltage step to transition from one level to a second level within the voltage step | the time required for a signal to change from a specified low value to a specified high value |

While the term "rise time" is not defined in the specification, Molex's proposed construction is supported by extrinsic evidence (see, e.g., the dictionary definition attached at Exh. P) and should be adopted.

**(vi) worst case, multi-active crosstalk"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| the combined cross-talk on a given differential signal pair from the six nearest neighboring differential signal pairs determined by summing the absolute values of the peak crosstalk from each of the six neighboring differential signal pairs, assuming that each pair is at its highest level of cross-talk at the same time | interference caused by electrical fields, as measured by the sum of the absolute values of such interference (or cross talk) from each of multiple differential signal pairs closest to the victim pair |

Molex's proposed construction is based upon the definition explicitly set out in the specification (Col. 8, ll. 6-11) and should control. FCI's proposed construction is incomplete, including only a part of that definition.

**(vii) "tightly electrically coupled"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| close edge coupling of a differential signal pair of contacts sufficient to produce strong electrical field coupling between the contacts of the signal pair | a high field being produced by a differential signal in the gap between the contacts that form the differential signal pair and a low field near adjacent differential signal pairs |

The '964 patent teaches that less cross talk occurs when differential signal pairs of contacts are edge-coupled then when they are broadside-coupled (Col. 6, ll. 45-50), and that tight edge-coupling will increase the electrical field coupling between the coupled signal pair and reduce crosstalk. (Fig. 2B; Col. 6, ll. 51-54.) Molex's proposed construction is supported by the intrinsic evidence.

FCI's proposed construction is overly broad and encompasses broadside-coupled pairs which, according to the intrinsic evidence, are not tightly coupled. (Col. 6, ll. 56-65.)

**(viii) "ground contact"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| an electrical contact connected to a neutral or ground source | portions(s) of the leadframe assembly that can be connected to ground |

For the same reasons stated above with respect to the term "signal contact" in the '883 patent claims (*supra*, p. 20), FCI's proposed construction of "ground contact" is indefinite and provides no structural limitation. Molex's proposed construction that the term "ground contact" means "an electrical contact connected to a neutral or ground source" is definite, supported by the intrinsic evidence (*see*, for example, FIGS. 2B, 4A-C, and ), and consistent with the well understood meaning in the art.

**(ix) "broadside coupled"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| Indefinite and not susceptible to meaningful construction | electrical contacts that are arranged or positioned such that the longer sides of the longitudinal cross sections of paired contacts face each other |

The term "broadside coupled" as used in claim 35 is indefinite since the claim depends upon claim 1, which when properly construed calls for columns of edge-coupled differential signal pairs which could not also be broadside-coupled, as called for in claim 35. In any event, FCI's proposed construction is improper for the reasons stated with respect to the similar term in the '883 patent (*supra*, p. 19), since it recites only a structural relationship of contacts and not electrical field coupling of differential pairs of contacts.

**E. U.S. Patent 7,182,643**

**1. Disclosure and Prosecution of the '643 Patent**

The '643 patent (copy attached at Exh. Q) has a disclosure similar to that of the '946 patent, but including additional FIGS. 34A-46F and description beginning at Col. 18, l. 4. The added disclosure again primarily concerns connectors with column-based arrangements of edge-coupled differential signal pairs of contacts.

During the prosecution of the application for the '643 patent, FCI presented various claim amendments, which Molex believes were motivated by a desire to draft claims that could

arguably be read to cover the accused Molex I-Trac connector, without regard to whether such claims were consistent with and supported by the patent disclosure. During the course of this litigation, Molex will show that these claims are indefinite and not supported by the written disclosure of the patent. To the extent terms of the claims can be reconciled with the intrinsic record of the specification and file history, the following constructions should apply:

**(i) "row of electrical contacts"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| a single line arrangement of broadside coupled differential signal pairs of contacts arranged in a direction perpendicular to the elongated direction of the contacts | a direction that is perpendicular to a column |

Claim 1 of the '643 patent calls for a "row of electrical contacts" which include broadside-coupled differential signal contacts. The term "row" is used in the specification and related parent applications to describe single line arrangements of broadside-coupled differential signal pairs of contacts, such as the single rows 511-516, respectively, shown in FIG. 5. (See also, for example, Col. 1, ll. 60-65.)

FCI's construction of the term "row" in the abstract and apart from its usage in the claim in connection with broadside-coupled contacts is improper. While the '643 patent defines the term "row" as a direction perpendicular to a column of edge-coupled contacts (Col. 8, ll 11-12), when the '643 patent uses the term "row" to describe broadside-coupled differential signal pairs of contacts, it refers, without exception, to single line arrangements of differential signal pairs of contacts arranged in a direction perpendicular to the elongated direction of the contacts. This is consistent with Molex's proposed construction.

**(ii) "row centerline"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| the centerline of a row of electrical contacts | horizontal line through the center of a row |

While the term "row centerline" is not defined or used in the '643 patent, Molex proposes that it should be given its ordinary meaning, consistent with the patent disclosure, namely, "the centerline of a row of electrical contacts."

FCI's proposed construction that the term means "a horizontal line through the center of a row" is improper for the same reasons expressed with respect to use of the term "vertical" its proposed construction of "column" (*supra*, p 24). The term "horizontal" is meaningless in the context of the claims. Words of such import have been expressly disclaimed in the specification as limitations of the invention, and the term is an indefinite structural recitation incapable of providing the public with notice of the scope of the invention since such connectors are usable with arrays of contacts in any desired orientation.

**(iii) "column centerline"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| the centerline of a column of edge-coupled differential signal pairs along the direction in which contacts are edge-coupled | vertical line through the center of a column |

The term "column" is again specifically defined in the '643 patent specification as "the direction along which the contacts are edge coupled" (Col. 8, ll. 11-13), and the specification further describes that when differential signal pairs of contacts are arranged into columns, they may be positioned along a centerline of their support frames (Col. 11, ll. 56-57; Col. 13, ll. 39-41). Giving the term "centerline" its ordinary meaning in the light of the intrinsic evidence, Molex proposes that the term "column centerline" means "the centerline of a column of edge-coupled differential signal pairs along the direction in which the contacts are edge-coupled".

FCI's proposed construction that column centerline means "a vertical line through the center of a column" again is indefinite and improper, since words of such import have been expressly disclaimed as limitations of the invention (Col. 4, ll. 58-67) and because it is a meaningless limitation since connectors are usable with the arrays of contacts in any desired orientation (*supra* p. 26).

Molex's proposed construction is consistent with the intrinsic evidence, including the express definition of the term "column" and the disclosure of the specification, and accordingly, should be adopted.

**(iv) "column-spacing distance"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| same as similar phrase in the '964 patent, alternatively measured from the centerline of one single line arrangement of edge coupled differential signal pairs of contacts to the corresponding column centerline of an immediately adjacent single line arrangement of edge coupled differential signal contacts | the centerline distance between adjacent columns |

For the reasons discussed with respect to the similar phrase in the '964 patent (*supra*, p. 30), Molex's proposed construction is fully supported by the intrinsic evidence, including the express definition of pitch "P" in the patent and the language of the claim. FCI's construction again is based upon an overly broad and improper construction of the term column, contrary to the intrinsic evidence.

Molex proposes that the term "column spacing distance" means the same as the similar phrase in claim 1 of the '964 patent, "alternatively measured from the centerline of one single line column arrangement of edge-coupled differential signal pairs of contacts to the centerline of an immediately adjacent single line arrangement of edge-coupled electrical contacts." The

proper meaning is critical in this case since, as indicated below, it is used in the determination of "aspect ratio" also called for by the claim.

**(v) "aspect ratio"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| the ratio of the pitch between columns of edge-coupled differential signal pairs of contacts to the gap between the contacts of the differential signal pair in a given column | the ratio of the column-spacing distance to the gap distance |

The term "aspect ratio" is specifically defined in the specification with respect to "columns" of edge-coupled differential signal pairs as "the ratio of column pitch (i.e., the distance between adjacent columns) to the gap between adjacent contacts in a given column" (Col. 6, ll. 61-63; Col. 10, ll. 9-15). This is explicitly described as P/X, with reference to FIG. 5, shown above (supra, p. 27) (Col. 10, ll. 9-15).

The specification provides no disclosure of aspect ratios for broadside-coupled differential signal pairs, or even how an aspect ratio would be defined for a connector with rows of broadside-coupled differential signal pairs. More significantly, even if "aspect ratio" were equated to broadside coupled signal contacts, it would not be as defined as in claim 1, but rather would be the ratio of "row spacing" to "gap distance" between the contacts of differential signal pairs as depicted in the comparison on the following page of FIG. 4A (edge coupled differential signal pairs) and modified FIG. 5 (broadside coupled differential signal pairs). Indeed, during prosecution of the application for the '643 patent, claims initially directed to the broadside coupled contacts defined "aspect ratio" in that manner.[7]

---

[7] In the amendment filed November 21, 2006 in which an independent claim was first presented directed to rows of "broadside" differential signal pairs, the claim called for "an aspect ratio of row spacing distance to gap distance."




FIG. 4A (Modified) FIG. 5 (Modified)

Molex's proposed construction of "aspect ratio" to mean "the ratio of the pitch between columns of edge-coupled differential signal pairs of contacts to the gap between the contacts of the differential pair" is supported by the intrinsic evidence, including the express definition of the term in the specification and depicted in the patent drawings.

FCI's construction, premised on an overly broad construction of the term "column spacing distance" again contravenes the intrinsic evidence.

**F. U.S. Patent 7,229,318**

The disclosure of the '318 patent (copy attached at Exh. R) is substantially similar to that of the '643 patent. While FCI made various amendments to the claims of the application of the '643 patent - which Molex again believes were motivated by a desire to draft claims which arguably would cover the accused Molex product without regard to whether such claims are properly supported by the specification - the USPTO allowed the claims without rejection or prosecution.

During the course of this litigation, Molex will show that the asserted claims of the '318 patent are indefinite and not supported by the written disclosure of the patent. To the extent

terms can be reconciled with the intrinsic record of the specification, they mean the same as the similar terms already discussed, as set forth in Molex's accompanying proposed construction of claim terms/phrases (*See* attached Exh. A). Only one additional term of the '318 patent requires construction.

**(i) "array of electrical contacts"**

| Molex's Proposed Construction | FCI's Proposed Construction |
|---|---|
| a row of broadside coupled differential signal pairs of contacts | two-dimensional arrangement of contacts |

Claim 40 the '318 patent calls for a first "array of electrical contacts" arranged in a first pattern of broadside coupled differential signal pairs and ground contacts and a second "array of electrical contacts" arranged in a second different pattern. The term array is repeatedly used in the '318 patent to describe single line arrangements of electrical contacts. Indeed each time an array is specifically identified it relates to a single line arrangement of contacts. (See Col. 18, ll. 12-14; Col. 19, ll. 22-26, 60; Col. 21, ll. 25-26; Col. 22, l. 48.)

Since claim 40 calls for the "array of electrical contacts" to be arranged in a pattern of "broadside coupled differential signal pairs and ground contacts," Molex proposes that the phrase "array of electrical contacts" means "a row of broadside-coupled differential signal pairs of contacts," consistent with applicant's consistent use, without exception, of the term "row" to describe single line arrangements of broadside-coupled differential signal pairs of contacts. (See FIG. 5; Col. 8, ll. 54-65.)

FCI's proposed construction again is overly broad and indefinite, encompassing multiple rows or columns of contacts, inconsistent with the intrinsic evidence.

## IV. CONCLUSION

For the reasons set forth above, Molex respectfully requests that the Court construe the disputed terms in accordance with its proposed constructions.

Dated: October 22, 2007

*/s/ Adam W. Poff*

Josy W. Ingersoll (#1088)
Adam W. Poff (#3990)
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
apoff@ycst.com

John W. Kozak
Caryn C. Borg-Breen
LEYDIG, VOIT & MAYER LTD.
Two Prudential Plaza, Suite 4900
180 N. Stetson Avenue
Chicago, IL 60601
(312) 616-5600

*Attorneys for Molex Incorporated*

**CERTIFICATE OF SERVICE**

I, Adam Poff, Esquire, hereby certify that on October 22, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Thomas C. Grimm, Esquire
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 N. Market Street
Wilmington, DE 19801
*tgrimm@mnat.com*

I further certify that I caused a copy of the foregoing document to be served by hand delivery and e-mail on the above-listed counsel of record and on the following counsel in the manner indicated below:

***By E-Mail***

Albert J. Breneisen, Esquire
KENYON & KENYON LLP
One Broadway
New York, NY 10004
*abreneisen@kenyon.com*

John W. Bateman, Esquire
Michael M. Shen, Esquire
Yariv Waks, Esquire
KENYON & KENYON LLP
1500 K STREET, NW
Washington, DC 20005
*jbateman@kenyon.com*
*mshen@kenyon.com*
*ywaks@kenyon.com*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

______________________________
Josy W. Ingersoll (No. 1088) *[jingersoll@ycst.com]*
Adam W. Poff (No. 3990) *[apoff@ycst.com]*
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
*Attorneys for Defendant*